ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARRY E. WILLIAMS, JR., | : | CIVIL CASE |
| Plaintiff, | : | |
| v. | : | NO. 1:CV 01-0877 |
| PENNSYLVANIA TURNPIKE COMMISSION | : | (Judge Rambo) |
| Defendant. | : | |

FILED
HARRISBURG, PA
AUG 3 0 2002
MARY E. D'ANDREA, CLERK
Per_____ Deputy Clerk

**DEFENDANT PENNSYLVANIA TURNPIKE COMMISSION'S
STATEMENT OF MATERIAL FACTS**

Pursuant to the provisions of Rule 56.1 of the Local Rules of the United States District Court for the Middle District of Pennsylvania, Defendant, the Pennsylvania Turnpike Commission (the "Commission") submits the following uncontroverted material facts for purposes of its Motion for Summary Judgment:

I. **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

*Plaintiff's Employment With the Commission*

1. Plaintiff was hired by the Commission on February 2, 1981, to be a "Radio Operator I" in the Communications Center. (See Deposition of Plaintiff ("Pl.'s Dep.") at p. 9, relevant portions of which are attached hereto as Exhibit "A").

2. As a Radio Operator I, Plaintiff's duties included changing audiotapes for recording telephone calls, ascertaining weather reports, learning how to answer the phone, and placing emergency phone calls. (Pl.'s Dep. at p. 9).

3. Plaintiff bid for and received (as a result of his seniority per the applicable collective bargaining agreement) the position of "Radio Operator II" in April 1996. (Pl.'s Dep. at p. 10).

4. As a Radio Operator II, Plaintiff basically performed the same job duties as he did as a Radio Operator I. (Pl.'s Dep. at p. 10).

5. Both the Radio Operator I and Radio Operator II positions were Union positions. (Pl.'s Dep. at p. 15).

6. Plaintiff remained employed as a Radio Operator II until December 15, 2000 when he bid for and accepted a "Customer Assistance Center Representative" vacancy in the Customer Assistance Center. (Pl.'s Dep. at p. 17).

2

7. The Customer Assistance Center Representative position resulted in approximately a $2.00 per hour raise for Plaintiff. (Pl.'s Dep. at pp. 17-18).

8. Although those holding the Radio Operator II position had some supervisory responsibility, it is not a "management" position; rather Radio Operator II's are Union employees and act basically as "shift leaders." (See December 19, 2001 Deposition of Harry Williams ("Pl.'s Dep. II") at p. 8, relevant portions of which are attached hereto as Exhibit "B").[1]

9. The Radio Operator II's have no authority to impose discipline on Commission employees, nor do they have any authority to hire or fire employees. (Pl.'s Dep. II at p. 8).

10. All Radio Operators report to a Duty Officer – which is a supervisory (non-union) position. (Pl.'s Dep. at pp. 15-16).

11. The Duty Officer position was created around 1997 as a "management" position within the Communications Center. (Pl.'s Dep. at pp. 14-16). One of the major differences between a Radio Operator and a Duty Officer is that the Duty Officer must possess supervisory and management skills that the Radio Operator (a bargaining unit position) does not necessarily have. (See

---

[1] Plaintiff's deposition testimony was taken in the matter of Terri Lynn Edwards v. Pennsylvania Turnpike Commission, Civil Action No. 1:CV 01-0357 (M.D. Pa.), and is referred to herein as Pl.'s Dep. II.

3

Deposition Testimony of William Capone ("Capone Dep.") at p. 26, relevant portions of which are attached hereto as Exhibit "C").

12. With respect to the hiring of Duty Officers (which is a management position, as opposed to a union position), no consideration is given to an applicant's seniority with the Commission. (See Deposition Testimony of Joanne Gitto Davis ("Gitto Davis Dep.") at pp. 37-38, relevant portions of which are attached hereto as Exhibit "D."

13. At the time the Duty Officer position was instituted by the Commission, Ronald Frank was employed by the Commission as the Communications Center Manager. (See Deposition Testimony of Ronald Frank "Frank Dep." at p. 5, relevant portions of which are attached hereto as Exhibit "E").

14. As the Communications Center Manager, Mr. Frank reported to the Director of Safety and Operations, who, at that time, was Joseph McCool. (Frank Dep. at p. 6).

15. Mr. McCool was hired as the Director of Safety and Operations on September 19, 1998. (See Deposition Testimony of Gregory Rausch ("Rausch Dep.") at pp. 24-26, attached hereto as Exhibit "F").[2]

---

[2] The deposition of Gregory Rausch was taken on December 20, 2001 in the matter of Terri Lynn Edwards v. Pennsylvania Turnpike Commission, Civil Action No. 1:CV 01-0357 (M.D. Pa.).

4

16. Initially, four (4) Duty Officers were selected, including, Gregory Rausch, Angela Rudy, David Dombrowski and Joseph Sullivan.

17. Thereafter, in March 1999, Mr. Frank was demoted and accepted a Duty Officer position.

18. At the time Mr. Frank was demoted to the Duty Officer position, Joseph Sullivan took over as the Communications Center Manager (Frank Dep. at p. 8).

19. At the time Rausch, Rudy, Dombrowski and Sullivan were initially hired as Duty Officers, John Martino was the Commission's Legislative Liaison and Acting Deputy Executive Director of Customer Service. (See Deposition Testimony of John Martino ("Martino's Dep.") at pp. 9-11, relevant portions of which are attached hereto as Exhibit "G").

20. Mr. Martino remained the Acting Deputy Executive Director of Customer Service until September 1999, when Gregory R. Richards was hired to be the Deputy Executive Director of Customer Service. (See Deposition Testimony of Gregory Richards ("Richards Dep.") at p. 5, relevant portions of which are attached hereto as Exhibit "H").

## *The Commission's Policy and Procedure for Promoting Employees*

21. Pursuant to the Commission's Policy and Procedure for Promoting Employees ("Policy No. 65"), after vacancy notices are posted, interested candidates must present a written application to the Human Resources Department no later than the last day listed on the posting. (See Policy No. 65, attached hereto as Exhibit "I").

22. Per Policy No. 65, the Human Resources Department will acknowledge receipt of all applications. Importantly, an applicant who does not receive a written acknowledgement is under an obligation to immediately contact the Human Resources Department to determine why the application was not acknowledged. (See Policy No. 65 at ¶ E(3)).

23. After all applications are received, the Human Resources Department determines which applicants meet the minimum educational, experience and training requirements for the position. (Id. at ¶ E(4); see also Gitto Davis Dep. at p. 33).

24. The Human Resources Department then forwards to the Deputy Executive Director of the department where the vacancy exists all applications which it has determined meet the minimum qualifications for the position. (Policy No. 65 at ¶ E(5)).

6

25. The department manager and the Deputy Executive Director then follow Commission procedures when conducting the interviews. (Id. at ¶ E(7)).

26. Interviews are conducted using the same job-related questions for all applicants. (Id. at ¶ E(7)).

27. All interviewers are required to first complete a course on interviewing before being considered for any interview panel. (See Gitto Davis Dep. at p. 102).

28. The Deputy Executive Director or the department head typically chooses who will sit on the interview panel. Usually, those chosen to conduct interviews are department heads or other managerial employees. (Gitto Davis Dep. at pp. 41-42).

29. After the interviews, the department manager, subject to the review and approval of the Deputy Executive Director presents promotion/hiring recommendations to the Salary Administration Committee. (See Policy No. 65, at ¶ E(9)).

### *The April 1999 Duty Officer Position*

30. The Commission posted a "Vacancy" for three (3) open Duty Officer positions on April 23, 1999. Initially, the vacancy listed only two (2) open Duty

7

Officer positions, but the Commission amended the posting to add an additional Duty Officer position. (See April 23, 1999 Vacancy Notice, attached hereto as Exhibit "J").

31. Plaintiff submitted an application to the Human Resources Department for the posted Duty Officer position on April 23, 1999. (Pl.'s Dep. at pp. 27-28; see also April 23, 1999 letter from Plaintiff to Joanne Gitto Davis (Director of Human Resources), attached hereto as Exhibit "K").

32. Consistent with Policy No. 65, Plaintiff received a notice from the Human Resources Department dated May 21, 1999 acknowledging receipt of his application for the Duty Officer position. (Pl.'s Dep. at p. 30; see also May 21, 1999 Memorandum from Joanne Gitto Davis to Plaintiff, attached hereto as Exhibit "L").

33. The Human Resources Department determined that Plaintiff met the minimum education and training requirements for the job. (Gitto Davis Dep. at pp. 33-37; see also Promotion Application Log dated April 23, 1999, attached hereto as Exhibit "M").

34. Notably, the Duty Officer position required a Bachelor's Degree or an equivalent combination of experience and training. (See Job Description, attached hereto as Exhibit "N").

35. Even though Plaintiff did not have a Bachelor's Degree, the Commission still found him to be qualified based upon a combination of his experience and training. (Gitto Davis Dep. at pp. 36-37).

36. The Human Resources Department received twenty (20) applications for the vacant Duty Officer positions, of which eight (8) candidates were considered to have met the minimum qualifications by the Human Relations Department. (Gitto Davis Dep. at p. 86; Promotion Application Log, Exhibit "M").

37. The Promotion Application Log, along with the applications of the eligible candidates, was sent to John Martino, Acting Deputy Executive Director of Customer Service, on May 12, 1999. (May 12, 1999 Memorandum from J. Gitto Davis to J. Martino, Exhibit "O")

38. Of the eight (8) applicants determined by the Human Resources Department to meet the minimum qualifications for the position, two declined an invitation for an interview and a third was not responsive to telephone messages attempting to schedule an interview. Therefore, only five (5) interviews were conducted. (See June 4, 1999 Recommended Personnel Actions, attached hereto as Exhibit "P").

39. The interview panel assembled for the Duty Officer positions included: (1) Joseph Sullivan (Communications Center Manager[3]); (2) Joseph Rispoli (Safety Manager[4]); and (3) William Capone (Director of Marketing[5]). (See Pl.'s Dep. at p. 33).

40. A list of standard questions was compiled and asked of each qualified applicant. (Gitto Davis Dep. at pp. 43-44).

41. Consistent with Commission policy, all interviews were structured in the same manner, and the same written questions were asked of each candidate. (See Deposition Testimony of Joseph Rispoli ("Rispoli Dep.") at p. 22, relevant portions of which are attached hereto as Exhibit "Q").

42. Moreover, Mr. Capone testified that the interview process for the Duty Officer positions was conducted in the same manner as every other interview he had conducted at the Commission. (See Capone Dep. at p. 10).

43. After each candidate was interviewed, the panel would discuss the candidate's qualifications. After all candidates were interviewed, the panel the deliberated over who was the most qualified. (See Rispoli Dep. at pp. 25-27).

---

[3] Mr. Sullivan retired from the Commission in October of 1999, and has since passed away.
[4] Mr. Rispoli is now employed as the Manager of Customer Safety.
[5] Mr. Capone is now employed as the Director of Public Affairs.

44.  After the interview process was concluded, the panel recommended Fred Jumper and Dale G. Wickard, II. (See June 4, 1999 Recommended Personnel Actions, attached hereto as Exhibit "P").

45.  With respect to Jumper and Wickard, the interview panel noted that each was highly regarded by co-workers and superiors, had management skills, administrative experience and good computer training and experience. (Id.).

46.  Plaintiff was not recommended for promotion to the Duty Officer position because he lacked management and decision-making skills, did not have strong leadership abilities and did not have adequate computer experience. (See Capone Dep. at pp. 24 and 33).

47.  Mr. Capone testified that based on his accumulated experiences with Mr. Williams, it was his understanding that Mr. Williams did not possess the necessary skills (i.e., leadership and management/decision-making abilities) to successfully perform the responsibilities of a Duty Officer. (Capone Dep. at p. 29).

48.  Accordingly, Capone testified that Fred Jumper and Dale Wickard, II were both better qualified candidates for the Duty Officer position than was Plaintiff. (Capone Dep. at pp. 24-29).

49.  Mr. Capone and Mr. Rispoli testified that another reason Plaintiff was not considered sufficiently qualified for the Duty Office position was his lack of

11

necessary computer experience. (See Rispoli Dep. at pp. 36-37; Capone Dep. at p. 33).

50. Joseph Sullivan advised Plaintiff that he did not get the position because he did not have sufficient computer experience. (See Pl.'s Dep. at p. 47).

51. Plaintiff received a notice on June 18, 1999 that he was not selected for the Duty Officer position. (See June 18, 1999 Memorandum from J. Gitto Davis to Plaintiff, attached hereto as Exhibit "R").

52. Plaintiff believes (and allegedly was told by his friend Ronald Frank) that he did not get the Duty Officer position because he had helped one of his co-employees Terri Edwards with respect to some issues she had with the Commission. Plaintiff testified that Ronald Frank made this statement before the decision on who was selected to fill the Duty Officer positions was even made. (See Pl.'s Dep. at pp. 50-51; Frank Dep. at pp. 17, 31-33).

53. Specifically, Ronald Frank testified that Joseph McCool instructed Frank to tell Plaintiff that his promotion would be affected if he continued to support Edwards. (See Frank Dep. at pp. 31-32).

54. Plaintiff testified that Frank first made this statement prior to the time that McCool became employed by the Commission -- and therefore, long before Plaintiff ever applied for a Duty Officer position. (Pl.'s Dep. at p. 54).

55.    Neither McCool nor Frank were involved in the selection process for the Duty Officer positions. (Frank Dep. at p. 32).

56.    And there is no evidence that either Frank or McCool ever had any discussion with respect to Mr. Williams' candidacy for the Duty Officer position with any of the people on the interview panel – i.e., those responsible for recommending candidates for hire/promotion. (See Rispoli Dep. at p. 22; Frank Dep. at p 32).

### *The July 1999 Duty Officer Position*

57.    The Commission posted a "Vacancy" for an open Duty Officer position on July 28, 1999. (See July 28, 1999 Vacancy Notice, attached hereto as Exhibit "S").

58.    While Plaintiff alleges that he turned in an application to the Human Resources Department, he admits that he never received an acknowledgment from Human Resources that his application had been received. (See Pl.'s Dep. at pp. 62-63).

59.    Despite the fact that Policy No. 65 requires applicants to advise the Human Resources Department immediately if they do not receive an acknowledgement of their application, Plaintiff did not make any inquiry to the

Human Resources Department as to why he did not receive an acknowledgment. (Id.).

60. At the close of the posting period, the Human Resources Department reviewed all applications and forwarded a Promotion Application Log to John Martino, Acting Deputy Executive Director of Customer Service on August 24, 1999. (See August 24, 1999 Memorandum from Joanne Gitto Davis to John Martino, attached hereto as Exhibit "T").

61. The Promotion Application Log for the July 1999 posting establishes that five (5) individuals had actually applied for the Duty Officer position, but that Plaintiff had not applied. (See Promotion Application Log, attached hereto as Exhibit "U").

62. The Promotion Application Log contained the names of all individuals who sent an application to the Human Resources Department for consideration. The only reason Plaintiff's name (or any other name for that matter) would not be on the Promotion Application Log is if he actually did not make an application for the position. Conversely, if Plaintiff had made an application to the Human Resources Department, his name would have been on the Promotion Application Log. (See Gitto Davis Dep. at p. 53).

63. There is no other reason why a name would not be on the log. (Id.).

64. Ms. Gitto Davis never had any conversations with anyone about excluding Mr. Williams from the list. (Gitto Davis Dep. at pp. 65-66).

65. The Commission never received an application from Plaintiff for the July 1999 Duty Officer posting, and, therefore, he was never even considered for the position. (See Gitto Davis Dep. at p. 53).

66. Ultimately, a woman by the name of Diane Jordan was selected to fill this Duty Officer position. (Pl.'s Dep. at p. 60).

67. At this time, Ms. Jordan was just the second female hired to the Duty Officer position – compared to a total of five (5) men selected for the Duty Officer position. (See ¶¶ 16-18 and 44, above).

### *The November 2000 Duty Officer Position*

68. The Commission posted a "Vacancy" for an open Duty Officer position on November 28, 2000. (See November 28, 2000 Vacancy Notice, attached hereto as Exhibit "V").

69. Plaintiff submitted an application to the Human Resources Department for the posted Duty Officer position on December 11, 2000. (See Pl.'s Dep. at pp. 83-84).

70. Consistent with Policy No. 65, Plaintiff received a notice from the Human Resources Department dated January 5, 2001 acknowledging receipt of his application for the Duty Officer position. (See Pl.'s Dep. at p. 84; see also January 5, 2001 Memorandum from Joanne Gitto Davis to Plaintiff, attached hereto as Exhibit "W").

71. As with the April 1999 Duty Officer position, Plaintiff was initially considered qualified in that it appeared that he met the minimum qualifications for the job. (See Promotion Application Log dated November 28, 2000, attached hereto as Exhibit "X").

72. In September 1999 (prior to this posting, yet subsequent to the earlier Duty Officer positions Plaintiff applied for) Greg Richards had been hired by the Commission as the new Deputy Executive Director for Customer Service. (Richards Dep. at pp. 5-6).

73. In addition, Mr. McCool had resigned from the Commission in or about May 2000 and was not employed by the Commission at the time of the November 2000 Duty Officer posting. (Richards Dep. at p. 42).

74. Greg Richards, consequently, was not only the Deputy Executive Director, but also was the acting Operations Center Manager. (Richards Dep. at pp. 41-42).

75. Richards started to "raise the bar" for the Duty Officer position, requiring that all candidates have the ability to interface with the computer and to meet the minimum testing requirements set forth on the Duty Officer job description for the purpose of getting the reports out accurately and quickly. (Richards Dep. at pp. 45-47; see also Duty Officer job description, attached hereto as Exhibit "N").

76. Since the job description for the Duty Officer position required that each qualified individual be able to type 35 words per minute, all otherwise qualified applicants were required to take a typing test before being considered initially qualified for the position. (See Deposition Testimony of Daniel Bretzman ("Bretzman Dep."), relevant portions of which are attached hereto as Exhibit "Y" at pp. 26-29; Richards Dep. at p. 45).

77. Five (5) individuals applied for the November Duty Officer position, three (3) of whom (including Plaintiff) were listed as "qualified" on the Promotion Application Log prepared by the Human Resources Department. (See Promotion Application Log, Exhibit "X").

78. All three (3) otherwise qualified applicants were then required to take a typing test to establish that they could type 35 words per minute – per the job description. (See Richards Dep. at p. 45; Bretzman Dep. at pp. 19-29; see also Typing Tests for Plaintiff, Richard Fleck and Todd Leiss, attached hereto

collectively as Exhibit "Z"). Bretzman agreed that effective November 2000, "there is no way you get the [Duty Officer] job unless you take a typing test." (Bretzman Dep. at p. 28).

79. While Mr. Fleck and Mr. Leiss both passed their typing tests with scores of 35.2 and 37 words per minute, respectively, Mr. Williams failed the typing test with a score of just 29.1 words per minute. (See Typing Tests at Exhibit "Z;" see also Pl.'s Dep. at p. 85).

80. Since Plaintiff failed the typing test, he was not considered qualified for the Duty Officer position, and, therefore, was not given an interview for the Duty Officer position. (See Richards Dep. at p. 45).

81. Ultimately, Todd Leiss was recommended for the Duty Officer position. (See January 17, 2001 Recommended Personnel Actions, attached hereto as Exhibit "AA").

82. Plaintiff received a notice on February 6, 2001 that he was not selected for the Duty Officer position. (See February 6, 2001 Memorandum, attached hereto as Exhibit "BB").

83. Plaintiff fails to offer any evidence to suggest that the Commission's reasons for not promoting him to the Duty Officer position were in any way retaliatory for his support of Ms. Edwards.

Respectfully submitted,

MARVIN L. WEINBERG, ESQUIRE
JOHN C. ROMEO, ESQUIRE
FOX, ROTHSCHILD, O'BRIEN
 & FRANKEL, LLP
2000 Market Street, Tenth Floor
Philadelphia, PA 19103-3291
(215) 299-2000
Attorneys for Defendant,
Pennsylvania Turnpike Commission

Dated: 8/30/02