

ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARRY E. WILLIAMS JR.,       : CIVIL NO.: 1:CV-01-0877
        **Plaintiff** :

     **v.** :

PENNSYLVANIA TURNPIKE COMMISSION, :
        **Defendants** :

FILED
HARRISBURG, PA

SEP 24 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S STATEMENT OF MATERIAL FACTS

Local Rule 56.1 requires that a motion for summary judgment must be accompanied by a separate *short* and *concise* statement of the material facts as to which the parties contend there is no genuine issue to be tried. Shortness and conciseness are ostensibly required to readily permit a simple admission and/or denial without unnecessary qualification and prolixity in response. Plaintiff therefore objects to Defendants' Statement of Undisputed Material Facts to the extent that they are neither short nor concise and/or are not material for purposes of Defendants' Motion.

To facilitate disposition of Defendants' Motion, the matters admitted by Plaintiff are to be taken as true for summary judgment purposes only, and Plaintiff reserves the right to test all Defendants' evidence at the time of trial.

1

1-3.    Admitted.

4.    Admitted with the clarification that the Radio Operator Two was a Shift Leader with supervisory responsibilities over the Radio Operator One.  Appendix, pp. 42 (Deposition of Ron Frank, pp. 18).

5.    Admitted.

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Admitted with the clarification that Radio Operators Twos have the customary authority to participate in the disciplinary process.

10.    Admitted.

11.    Admitted.

12.    Denied.  While the cited testimony is consisted with the recitation, years in service is given specific consideration during the application and hiring process. Appendix, pp. 4 and 5 (Plaintiff's miscellaneous summary judgment documents).

13-20.  Admitted.


**The Commission's Policy and Procedure For Promoting Employees**

21.    Admitted.

22.    Admitted with the clarification that there is no relevance of that matter to this case.

23-29.  Admitted.

2

### The April 19, 1999 Duty Officer Position

30-33.    Admitted.

34.    Admitted with the clarification that the Bachelor's Degree requirement is immaterial in light of the determination that Plaintiff met the minimum education and training requirements for the job.  Appendix, pp. 60 (Deposition of Joann Gitto-Davis, pp. 26-27).

35-37.    Admitted.

38.    Admitted with the clarification that Plaintiff was equally qualified or more qualified for the position than any of the applicants, the Panel only recommended two (2) individuals, although five (5) were interviewed and there were three positions open. Appendix, pp. 2-8.  In other promotion situations, at least three (3) names are generally recommended for single positions when there are three (3) or more candidates for the position.  Appendix pp. 112 (Deposition of William Capone, pp. 24); Appendix pp. 80-81 (Deposition of Gregory Richards, pp 10-14).

39.    Admitted.  By way of further answer, Joseph Sullivan was appointed to the Communications Center Manager position by Joseph McCool.  Appendix pp. 40-41 (Frank dep., pp 12-14).  Appointments to the Duty Officer position were made by the Deputy Executive Director occupying the position immediately superior to McCool, and McCool had significant influence over the hiring process for communications center personnel.  Appendix pp. 82 (Richards dep., pp. 18-20).  Both Sullivan and McCool spoke with Ron Frank about the fact that Harry Williams was not "doing any favors for

3

himself" by supporting Terri Edwards in her complaints of discrimination against the Turnpike commission, and Sullivan specifically warned Williams "to stay out of the middle of it." Frank dep., pp. 29-31.

40-43. Admitted.

44.    Admitted with the clarification that only two (2) names were recommended despite the existence of three (3) vacancies to fill, and despite the general practice of recommending three (3) candidates for a position if that many or more responded. See response to 38.

45.    Admitted.

46.    Denied. While Defendant's recitation must be credited as a legitimate, non-discriminatory justification for Plaintiff's non-selection, the evidence strongly supports the contrary, reasonable inference that Plaintiff did not receive the promotion because he engaged in protected activities and was specifically told that his future with the Turnpike Commission would be in jeopardy if he continued to assist his co-worker in her discrimination complaints. See answers to 38 and 39. Moreover, Capone was questioned extensively during his deposition concerning the factual basis for his opinion, and he had none. Appendix pp. 114-15 (Capone dep., pp. 30-35).

47.    Admitted that Capone could only state Plaintiff did not possess the "necessary skills" despite the fact that Capone was repeatedly asked for one or more examples of the observations of Plaintiff's performance that supported his opinion, but could give none. See preceding response.

4

48.    Admitted in part.  Although Capone testified that Jumper and Wickard were both better qualified than Williams, he failed to state any specific reason why or how they were better qualified for the position.

49.    Admitted.  With the clarification that Capone only so testified after having been led by his counsel to do so.

50.    Admitted.

51.    Admitted.

52.    Admitted with the clarification that Mr. Frank swore to making that statement.  By way of further answer, the statement was made to Frank by both Sullivan and McCool.  As operations Center Manager, Sullivan is the Duty Officers' supervisor, and was in part responsible for the June 1999 selection.  Frank dep. pp. 8-9.  Moreover, as "supervisor of the area" where the Duty Officer position was located, McCool was directly involved in, and responsible for, the hiring decisions at issue.  Appendix pp. 82-83 (Richards dep. pp. 19-22).

53.    Admitted.

54.    Denied.    The relevant statement of purposes of this case was communicated to Plaintiff as the expressed sentiment of Joseph McCool, who was directly responsible for the selection decisions at issue in this case.  See answer to 52; see Appendix pp. 1, 17-18, 23-30.

55.    Denied. responsibility for selection decisions is made by the supervisor of the area, who in this case was Mr. McCool.  Appendix 82-83 (Richards dep. 19-22), and Sullivan, who is McCool's subordinate, participated on the panel.  Moreover, the fact that McCool was not part of the selection panel is immaterial, particularly when McCool's

direct subordinate, Joseph Sullivan, was involved in the process, and Sullivan also told Frank to warn Plaintiff that his future with the Commission was being jeopardized by assisting Edwards.   See responses to 39 and 46.

56.    Denied.   Sullivan was extensively involved in such discussions.   Frank dep. pp. 29-31.

### The July 1999 Duty Officer Position

57-58. Admitted.

59.    Admitted, but immaterial because Defendant has never denied receiving the Plaintiff's application.

60.    Admitted.

61.    Admitted in part.   While Plaintiff's name is not on the log, he submitted an application.

62.    Denied as stated.

63.    Denied.  Plaintiff's name could be intentionally excluded.

64.    Admitted.

65.    Denied.  Plaintiff testified that he sent one.

66.    Admitted.  By way of further answer, the records relative to this selection decision, i.e., the third position that was vacant but not filled in June, clearly show that Joseph McCool is responsible for selection decisions to the position of Duty Officer. Appendix pp. 87-88 (Richards dep. pp. 38-39).

67.    Admitted.

### The November 2000 Duty Officer Position

68-73.  Admitted.

74.  Denied.  Richards was acting Director of Safety and Operations (McCool's former position), and was responsible for the selection decision at issue.  By way of further answer, this fact demonstrates the nature of McCool's involvement in the selection process.

75.  Denied as stated.  While Richards purported to more rigidly apply the job performance criteria, the fact is that the qualifications and job description remained the same at all times.  Plaintiff had been found qualified in previous selection decisions, there was nothing in his extensive experience with the Turnpike Commission to suggest any shortcomings in his performance, and Plaintiff had at all times met "the bar."

76.  Denied.  At the time of the test, all applicants had been determined to be qualified by H.R., and, at most, the typing criteria should have only been a factor relied upon in making the selection decision.  Appendix pp. 60 (Davis dep. pp. 25-27).

77.  Admitted.

78-80.  Denied as stated.  See response to 75 and 76.  Defendants have offered no evidence that Bretzman is authorized to change the selection criteria for the Commission, or that he can override a decision by Human Resources finding an employee qualified for the position.  Moreover, Defendants have offered no evidence to show any performance deficiencies concerning Plaintiff stemming from his typing speed, and the comparative typing tests reveal accuracy errors that have not been considered.  See Defendant's Exhibit Z.

81.  Admitted.

7

Form PTC (502005208)

PENNSYLVANIA TURNPIKE COMMISSION
HARRISBURG

**To:**      Jeffrey L. Hess            thru        Joanne Gitto Davis
            Director of Purchases                  Director of Human Resources

**From:**    Joseph P. McCool
            Director of Safety and Operations Center

**Date:**    April 20, 1999

**Subject:   ATTACHED ADVERTISEMENT FOR
            TWO COMMUNICATIONS CENTER DUTY OFFICERS**

Please run the attached advertisement for the subject positions for one Sunday on
April 25, 1999 in the following newspapers:

> **Harrisburg Patriot News**
> **Philadelphia Inquirer**
> **Pittsburgh Post Gazette**

These advertisements should be charged to Cost Center 131.

APPROVED:

_____          _4-21-99_
        Joanne Gitto Davis                Date

JPM:jb
Attachment

Cc:  Deborah L. Everly
     Joseph Sullivan
     File

**EXHIBIT**
1
7-12-02

**PTC 0734**

4/23/99

## VACANCY NOTICE

PLEASE READ THIS ENTIRE ANNOUNCEMENT CAREFULLY. SEVERAL REQUIREMENTS FOR CONSIDERATION FOR MANAGEMENT POSITIONS HAVE BEEN MODIFIED. THE INSTRUCTIONS CONTAINED IN THIS ANNOUNCEMENT MUST BE FOLLOWED IN ORDER TO BE CONSIDERED FOR THE VACANT POSITION.

*Two management positions of Communications Center Duty Officer are available within the Operations Center Department located in the Central Office. Interested and qualified employees who wish to be considered for this position must submit an updated application or resume and a copy of their most recent performance evaluation (if applicable) to the Human Resources Department by 4:30 p.m. on May 7, 1999. APPLICATIONS RECEIVED SUBSEQUENT TO THIS DATE WILL NOT BE CONSIDERED.

The positions are responsible for management of operations at the Turnpike Operations/Communications Center, and report to the Operations Center Manager. Center handles calls from motorists, dispatches state police, ambulance, fire, towing services; renders other information services and participates in operation of Intelligent Transportation Systems and advice to media. Work is performed with considerable independence, requires clear speaking and writing skills, and the ability to type 35 wpm.

The minimum experience and training requirements for this position include a bachelor's degree, completion of APCO 40 hour Telecommunicator Course, and five years of experience in Administration of Public Safety and Incident Management Systems; or any equivalent combination of experience and training.

This position is a management salary range 7. A copy of the job description for this position can be obtained from the Human Resources Department.

Interested candidates must present an updated application or resume that thoroughly identifies the type of education and work experience they have which they believe qualifies them for this position. ALL APPLICATIONS WILL BE SCREENED BY HUMAN RESOURCES TO DETERMINE THOSE CANDIDATES WHO MEET THE MINIMUM EXPERIENCE AND TRAINING REQUIREMENTS OF THE POSITION. ONLY THOSE WHO MEET THE QUALIFICAITONS WILL BE PRESENTED TO THE DEPARTMENT HEAD FOR FURTHER REVIEW AND CONSIDERATION.

If you need an accommodation to participate in the selection process, please contact the Commission's ADA Coordinator at extension 4281.

*THIS VACANCY NOTICE IS BEING AMENDED TO INCLUDE AN ADDITIONAL COMMUNICATIONS CENTER DUTY OFFICER POSITION. A TOTAL OF THREE (3) POSITIONS ARE AVAILABLE.



EXHIBIT
3

PTC 0537

2

Form PTC (502005208)

**PENNSYLVANIA TURNPIKE COMMISSION**
**HARRISBURG**
May 12, 1999

**SUBJECT:**  Candidates for
Communications Center Duty Officer

**TO:**  John T. Martino
Acting Deputy Executive Director –
Customer Service

**FROM:**  Joanne Gitto Davis
Director of Human Resources

I have reviewed the resumes submitted to the Department of Human Resources for the three (3) Communications Center Duty Officer positions.  They are attached for your review for the next step in the selection process.  All of the candidates who appear to meet minimum educational experience and training requirements for the position are so designated on the attached Promotion Application Log.

At the conclusion of the selection process, Human Resources will inform the candidates who were not selected.  Please inform me of the candidates who were given interviews.

If you have questions or need assistance, please contact me.

JGD:pah

Attachments

PTC 0736

# PROMOTION APPLICATION LOG

Position: Communications Center Duty Officer
Location: Central Office
Date Posted: April 23, 1999
Date Closed: May 07, 1999

| Applicant Name | Address | Qualified? Yes | Qualified? No | Location | Date of Hire | Received |
|---|---|---|---|---|---|---|
| Gregory W. Brooks | P.O. Box 3256 / Philadelphia, PA 19130 | | X | External | 04/25/90 | 05/06/99 |
| Joel Davis | P.O. Box 2002 / Harrisburg, PA 17105 | | X | External | | 04/28/99 |
| Steve Detwiler | 431 Wolfel Avenue / St. Marys, PA 15857 | | X | Radio Operator II Control Center | | 04/22/99 |
| Debra Etzweiler | 232 Creek View Drive / Millersburg, PA 17061 | X | | Executive Secretary I Field Technologies | 04/08/1988 | 04/27/99 |
| James Fox | 20 Ridgewood Drive / Gettysburg, PA 17325 | X | | External | | 05/05/99 |
| Martin Havrilla | 836 Florida Avenue / Pittsburgh, PA 15228 | | X | External | | 04/27/99 |
| Eric Hame | 516 W. Siddonsburg Road / Dillsburg, PA 17019 | X | | Radio Operator I Control Center | 06/23/1992 | 04/29/99 |
| Fred Jumper | 132 South Ridge Road / Boiling Springs, PA 17007 | | X | Control Center | 01/23/1995 | 04/29/99 |
| Darwin Kelj, Jr. | 3925 North 110th Avenue / Avondale, AZ 85323 | | X | External | 04/29/99 | 05/02/99 |
| Carl Krause, Jr. | 15 Eastwick Lane / Carlisle, PA 17013 | | X | External | | 04/27/99 |
| Brian McCombie | 2041 Swatara Street / Harrisburg, PA 17104 | | X | Radio Operator II Control Center | 08/03/1976 | 05/03/99 |
| James Mulvihill, Jr. | 226 Spartan Drive / Monroeville, PA 15146 | | X | External | | 05/07/99 |
| Paul O'Toole | 4035 Thicket Lane / Harrisburg, PA 17110 | X | | External | 05/28/1993 | 05/03/99 |
| Michael Potosky | P.O. Box 178 / Fredericksburg, PA 17026 | | X | Equipment Operator I Mt. Gretna Maintenance | | 05/07/99 |
| Joseph Quairoli | 944 East High Street / Bellefonte, PA 16823 | X | | External | | 05/07/99 |
| Jason Skelly | | | X | | | |

EXHIBIT

| Name | Address | | | Role | | |
|---|---|---|---|---|---|---|
| Robert Ware | 3212 W. Fountain Street Philadelphia, PA 19121 | | X | External | 02/07/1986 | 05/04/99 |
| Dale Wickard II | 8 Ralen Drive Boiling Spring, PA 17007 | X | | Radio Operator II Control Center | | 04/28/99 |
| David William | 31 Pleasanton Drive East Berlin, PA 17316 | | X | External | 02/02/1981 | 04/26/99 |
| Harry Williams, Jr. | 319 Caravan Court Middletown, PA 17057 | X | | Radio Operator II Control Center | | |

(Rev. 12/98)                                          DATE: June 1, 1999

## Recommended Personnel Actions

Job Title:  Duty Officer

**Vacant Position:**          Department: Communications

Location: Central Office

---

### Applicants' Statistics:

| | Internal | External | Total |
|---|---|---|---|
| **Total Number of Applicants** | 7 | 13 | 20 |
| **Applicants Not Qualified** | 4 | 8 | 12 |
| **Applicants Qualified** | 3 | 5 | 8 |
| **Applicants Interviewed** | 3 | 2 | 5 |
| **Applicants Recommended** | 2 | 0 | 2 |

Note: 2 External Applicants Declined Their Invitation For An Interview.
      1 External Applicant was non-responsive to telephone messages to schedule interview.

### Names and titles of persons conducting interview:

| Name | Title |
|---|---|
| Joseph R. Sullivan | Communications Center Manager |
| Joseph L. Rispoli | Safety Department Manager |
| William J. Capone | Director of Marketing |

---

### Explanation of the Interview and Selection Process:

A list of standard questions was compiled and asked of each applicant. Each applicant was provided with the job description, management benefits package and salary range schedule. Interviews were scheduled and all interviews were conducted at the Central Office.  William Capone was the lead interviewer.  Applicants were given an opportunity to ask questions or add additional information.

PTC 0244

(Rev. 12/98)

DATE: June 4, 1999

## Recommended Personnel Actions

**Vacant Position:**

Job Title: _Duty Officer_

Department: _Communications_

Location: _Central Office_

### Recommended candidates in alphabetical order and the justification for recommendation:

Fred E. Jumper, Radio Operator I has excellent qualifications including seven years experience as a radio operator in the Operations Center. He is highly regarded by his co-workers and his superiors. He has excellent customer service, incident management, administrative experience, as well as good computer training and experience.

Dale G. Wickard, II, Radio Operator II has excellent qualifications including thirteen years experience as radio operator in the Operations Center. He is highly regarded by his peers and supervisors for his leadership shown as a Radio Operator II (shift leader) with excellent customer service, incident management, administrative experience, as well as good computer training and experience.

No other candidates recommended.

### Attachments

Please attach the following to this worksheet:

- A copy of the _employment application(s)/resume(s)_ of the recommended candidates

PTC 0245

# *Recommended Personnel Actions*

### <u>Vacant Position:</u>

Job Title: Duty Officer
Department: Communications
Location: Central Office

- The most recent performance evaluation of the internal candidate(s) if available


*Joseph R. Sullivan    Operation Center Manager*    OC/04/99

Signature – Title                                  **Date**

*John R M    6/9/99*

**DED Signature**

PTC 0246

319 Caravan Court
Middletown, Pa 17057-2814
(717)-944-4770

*Computer Experience*
*windows*
*Excel spreadsheets*

April 23, 1999

Pennsylvania Turnpike Commission
c/o Ms. Joanne Gitto-Davis, Director
Human Resources
PA Route 230 & Eisenhower Boulevard
Highspire, Pennsylvania 17034

Dear Ms. Gitto-Davis:

I am applying for the position in my department as Communications Center Duty Officer, which was posted on April 23, 1999 in the Central Office. I feel my experience as a Radio Operator and Radioman in the United States Navy, would be in the best interest for the Pennsylvania Turnpike Commission.

As you can see from my resume, I have been in the field of communications for over 26 years with supervisory skills. Before coming to the Pennsylvania Turnpike Commission, I completed the following while serving in the United States Navy:

- Operated and maintained teletypewriter equipment
- Operated radio transmitters and receivers
- Maintained message center files and operating logs; update communications publications
- Transmit, receive, route, and log radio messages
- Made sure applicable security measures were observed
- Advised on capabilities, limitations, and condition of radio equipment
- Operated and coordinate communications systems including automated networks, satellite data links, and the full spectrum of voice and teletype circuits
- Operated cryptographic equipment

As a Radio Operator, I have received the following training and implemented it to the present Pennsylvania Turnpike Commission (standards):

- EMD
- APCO
- CPR

PTC 0227

Ms. Joanne Gitto-Davis                    2                    April 23, 1999

- NCIC/CLEAN System
- Incident Command
- VMS Board

    With all of my extensive training, there will be minimal learning time and immediate results. I would like very much to meet with you and am available to explain in depth both my qualifications and aspirations. I am confident that my background will be beneficial for our department and that I will continue to be a valuable asset to the Pennsylvania Turnpike Commission.

    Please call at your convenience to set up a meeting. Your consideration is greatly appreciated.

Sincerely,

*Harry E. Williams Jr.*

Harry E. Williams, Jr.

Enclosures

HEW/tle

cc:  J. Sullivan
     R. Frank
     File

PTC 0228

319 Caravan Court
Middletown, Pa 17057-2814
Phone 717-944-4770

# Harry E. Williams, Jr.

| | |
|---|---|
| **Objective** | Communications Center Duty Officer |

**Work experience**      1996 - Present          PA Turnpike Commission          Harrisburg, Pa

**Radio Operator II**

- Act as shift supervisor and will assume the immediate responsibility for The operation of the communications center during my shift. Work is performed under the supervision of the Operations Control Center Supervisor and follow standard operating procedures as set forth in the Rules and regulations of the Federal Trade Communications Commission and the Pennsylvania Turnpike Commission.

1981 – 1996          PA Turnpike Commission          Harrisburg, Pa

**Radio Operator I**

- Responsible for operation of the communications system and must possess a thorough knowledge of all Turnpike operations, encompassing police, maintenance, fare collection, and fire/ambulance services. Work is performed under the supervision of a technical superior and follows standard operating procedures as set forth in rules and regulations of the Federal Communications Commission and the Pennsylvania Turnpike Commission.

**Military experience**      1972 – 1980          United States Navy

**Radioman (Communications Center Operator or Telecommunications Specialist)**

- Utilized the operation of a CRT, keypunching, dispatching, sending and receiving messages over the teletype, and keyboarding. Mission as a sailor was to protect and serve the United States Government and to safeguard "confidential" information that could be vital to the national security of the United States of America. Attended Radioman "A" Class School in Bainbridge, Maryland. Also attended Radioman "C" Class School in San Diego, California. Handled messages from secret, top secret, confidential---to priorities. I also handled "Kryptomaterial".

**Security clearance**      Received Top Security Clearance while serving in the United States Navy

**Awards received**      Received Good Conduct Medal, Letter of Appreciation, and Letter of

PTC 0229

Accommodation

**Professional**          American Legion
**memberships**

**Volunteer**             Special Olympics
**experience**

**References**            Available upon request

PTC 0230

Form PTC (502005208)

**PENNSYLVANIA TURNPIKE COMMISSION**
HARRISBURG
July 21, 1999

**SUBJECT:**   Commission Action

**TO:**       Joseph M. McCool
              Director of Safety and Operations Center

**FROM:**     Joanne Gitto Davis
              Director of Human Resources

On July 20, 1999, the Commissioners approved the following personnel actions:

- Your request to repost internally and advertise externally for a
  Communications Center Duty Officer position as per your memorandum
  dated June 22, 1999.

- Your request to post and fill two Radio Operator 1 positions and a Radio
  Operator 2 position as per your memorandum dated June 23, 1999.

Please contact Human Resources when you wish to post these vacancies.

JGD:pah

c:    J. T. Durbin
      D. L. Everly
      J. T. Martino

July 28, 1999

## VACANCY NOTICE

PLEASE READ THIS ENTIRE ANNOUNCEMENT CAREFULLY. SEVERAL REQUIREMENTS FOR CONSIDERATION FOR MANAGEMENT POSITIONS HAVE BEEN MODIFIED. THE INSTRUCTIONS CONTAINED IN THIS ANNOUNCEMENT MUST BE FOLLOWED IN ORDER TO BE CONSIDERED FOR THE VACANT POSITION.

A management position for a Communications Center Duty Officer is available within the Operations Center Department located in the Central Office. Interested and qualified employees who wish to be considered for this position must submit an updated application or resume and a copy of their most recent performance evaluation (if applicable) to the Human Resources Department by 4:30 p.m. on August 10, 1999. APPLICATIONS RECEIVED SUBSEQUENT TO THIS DATE WILL NOT BE CONSIDERED.

The position is responsible for management of operations at the Turnpike Operations/Communications Center, and reports to the Operations Center Manager. The Center handles calls from motorists, dispatches state police, ambulance, fire, towing services; renders other information services and participates in operation of Intelligent Transportation Systems and advice to media. Work is performed with considerable independence, requires clear speaking and writing skills, and the ability to type 35 wpm.

The minimum experience and training requirements for this position include a bachelor's degree, completion of APCO 40 hour Telecommunicator Course, and five years of experience in Administration of Public Safety and Incident Management Systems; or any equivalent combination of experience and training.

This position is a management salary range 7. A copy of the job description for this position can be obtained from the Human Resources Department.

Interested candidates must present an updated application or resume that thoroughly identifies the type of education and work experience they have which they believe qualifies them for this position. ALL APPLICATIONS WILL BE SCREENED BY HUMAN RESOURCES TO DETERMINE THOSE CANDIDATES WHO MEET THE MINIMUM EXPERIENCE AND TRAINING REQUIREMENTS OF THE POSITION. ONLY THOSE WHO MEET THE QUALIFICAITONS WILL BE PRESENTED TO THE DEPARTMENT HEAD FOR FURTHER REVIEW AND CONSIDERATION.

If you need an accommodation to participate in the selection process, please contact the Commission's ADA Coordinator at extension 4281.

August 9, 1999

## VACANCY NOTICE

The Pennsylvania Turnpike Commission is seeking highly qualified applicants for the following position in the Harrisburg Office:

### Communications Center Duty Officer

The successful candidate will be responsible for management of operations at the Commission's Operations/Communications Center and reports to the Operations Center Manager. The Center handles calls from motorists, dispatches State Police, ambulance, fire, towing services; renders other information services; and participates in operation of Intelligent Transportation Systems and advice to media. Work is performed with considerable independence, requires clear speaking and writing skills, and the ability to type 35 wpm.

Applicants for this position should have a bachelor's degree, completion of APCO 40-hour Telecommunicator Course, and five years of experience in Administration of Public Safety and Incident Management Systems; or any equivalent combination of experience and training.

If you need an accommodation to participate in the pre-employment process, please contact the ADA Coordinator, (717) 939-9551, Ext. 4281. The Pennsylvania Turnpike Commission is an Equal Opportunity Employer and offers competitive salaries, attractive fringe benefits and retirement program. There is a Pennsylvania residency requirement that must be met.

Please mail or fax your resume and salary requirements by **August 13, 1999** to:

Ms. Joanne Gitto Davis
Human Resources Department
Pennsylvania Turnpike Commission
P. O. Box 67676
Harrisburg, PA 17106-7676
FAX: (717) 986-8760

PTC 0763

# PROMOTION APPLICATION LOG

**Position:** Communications Center Duty Officer
**Location:** Central Office
**Date Posted:** July 27, 1999
**Date Closed:** August 10, 1999

| Applicant Name | Address | Qualified? | | Location | Date of Hire | Received |
|---|---|---|---|---|---|---|
| | | Yes | No | | | |
| Daniel Bretzman | 304 Old Stonehouse Road, South Mechanicsburg, PA 17055 | X | | External | N/A | 08/10/99 |
| Cindy Dietz | 213 Gross Avenue Dover, PA 17315 | X | | External | N/A | 08/13/99 |
| Thomas Dolan, Jr. | 1950 Reservoir Drive Carlisle, PA 17013 | X | | External | N/A | 08/11/99 |
| Debra Etzweiler | 232 Creek View Drive Millersburg, PA 17061 | | X | Executive Secretary I Field Technologies | 04/08/1988 | 08/05/99 |
| Diane Jordan | RR #1 Box 367 Middleburg, PA 17842 | X | | External | N/A | 08/11/99 |

PTC 0758

(Rev. 12/98)                                    DATE: <u>September 20, 1999</u>

## *Recommended Personnel Actions*

### **Vacant Position:**

Job Title: <u>Operations Center</u>
<u>Duty Officer</u>
Department: <u>Operations</u>
Location:  Central Office

### **Applicants' Statistics:**

| | Internal | External | Total |
|---|---|---|---|
| **Total Number of Applicants** | 1 | 4 | 5 |
| **Applicants Not Qualified** | 1 | 0 | 1 |
| **Applicants Qualified** | 0 | 4 | 4 |
| **Applicants Interviewed** | 0 | 3* | 3 |
| **Applicants Recommended** | 0 | 3 | 3 |

*One applicant did not respond to attempts to schedule an interview.

### **Names and titles of persons conducting interview:**

| Name | Title |
|---|---|
| Joseph P. McCool. | Director of Safety & Operations |
| William J. Capone | Director of Marketing |
| Dennis Genevie | Risk Manager |
| | |

### **Explanation of the Interview and Selection Process:**

A list of standard questions was completed and asked of each applicant.  Each applicant was provided

With the job description, management benefits package and salary range schedule.  Interviews were

Scheduled and all interviews were conducted at the Central Office.  Applicants were given an opportunity

To ask questions or add additional information.  The interview team reached consensus on the

Candidates that are recommended.

(Rev. 12/98)

DATE: <u>September 20, 1999</u>

## *Recommended Personnel Actions*

<u>**Vacant Position:**</u>

Job Title: Operations Center
              Duty Officer
Department: Operations
Location: Central Office

**Recommended candidates in alphabetical order and the justification for recommendation:**

*3* Daniel Bretzman – Mr. Bretzman is qualified for the position of Duty Officer.  He has ten years experience as a dispatcher II in Cumberland County and is therefore familiar with many of the responsibilities of a Duty Officer.

*2* Cindy Dietz – Ms. Dietz is qualified for the position of Duty Officer.  Ms. Dietz has been a Dispatcher for seven years and a supervisor for seven years in York County.  The combination of her dispatching and supervisory experience provides a background that is similar to the Duty Officer position.

*1* Diane Jordan – Ms. Jordan will enjoy a seamless transition into the Duty Officer position.  With a total of twenty years experience culminating as the Coordinator of Emergency Services in Snyder County she provides a wealth of experience virtually identical to our Duty Officer's responsibilities.

## <u>Attachments</u>

Please attach the following to this worksheet:

- A copy of the <u>employment application(s)/resume(s)</u> of the **recommended** candidates

- The <u>most recent performance evaluation</u> of the **internal** candidate(s) if available

Signature – Title    Dir. Safety & Opers Ctr    Date 9/21/99

DED Signature

PTC 0743

2ND JOB RESUME

2ND BID SHEET + 2ND TIME I BID ON
THIS DUTY OFFICERS JOB TURNPIKE
HIRED A WOMAN OVER ME FROM THE
OUTSIDE WITHOUT ANY TURNPIKE EXPERIENCE.

PTC Form 72-87      JOB BID FORM
Rev. 1-87

COMMUNICATIONS
Work Loc. of Posted Position

JULY 27, 1999
Date Posted

CENTRAL OFFICE
Location of Posted Position
(Dist./Div./C.O.)

DUTY OFFICER
Position Posted

JULY 28, 1999   0830 A.M.
Date and Time Bid Submitted

HARRY EDWARD WILLIAMS JR   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
Print Name and Social Security Number

RADIO OPERATOR 2   COMMUNICATIONS   CENTRAL OFFICE
Present Job Title and Location

Harry E. Williams Jr
Bidder's Signature

PLEASE SUBMIT ALL BIDS TO DIST./DIV. or in C.O., TO HUMAN RESOURCES DEPT.

19

319 CARAVAN COURT
MIDDLETOWN, PA 17057-2814
(717)-944-4770


JULY 28, 1999

PENNSYLVANIA TURNPIKE COMMISSION
C/O MS. JOANNE GITTO-DAVIS DIRECTOR
HUMAN RESOURCES
PA ROUTE 230 AND EISENHOWER BLVD.
HARRISBURG, PA. 17106

DEAR MS. GITTO-DAVIS,
    I'AM APPLYING FOR THE POSITION IN MY DEPARTMENT AS
COMMUNICATIONS CENTER DUTY OFFICER, WHICH WAS POSTED
ON JULY 27, 1999 IN THE CENTRAL OFFICE. I FEEL MY
EXPERIENCE AS A RADIO OPERATOR TWO AND 2ND CLASS
RADIOMAN IN THE UNITED STATES NAVY, WOULD BE IN THE
BEST INTEREST FOR THE PENNSYLVANIA TURNPIKE
COMMISSION.

AS YOU CAN SEE FROM MY RESUME, I HAVE BEEN IN THE FIELD
OF RADIO COMMUNICATIONS FOR OVER 26 YEARS WITH
SUPERVISORY SKILLS. BEFORE COMING TO THE
PENNSYLVANIA TURNPIKE COMMISSION, I COMPLETED THE
FOLLOWING WHILE SERVING IN THE UNITED STATES NAVY:

OPERATED AND MAINTAINED TELETYPEWRITER EQUIPMENT
SET UP AND OPERATED VARIOUS RADIO TRANSMITTERS AND
RECEIVERS
MAINTAINED MESSAGE CENTER FILES AND OPERATING LOGS;
AND UPDATED VARIOUS RADIO COMMUNICATIONS
PUBLICATIONS
TRANSMITTED, AND RECEIVED, ROUTED, AND LOGGED
NUMEROUS RADIO COMMUNICATIONS MESSAGES
MADE SURE APPLICABLE SECURITY MEASURES WERE
OBSERVED
ADVISED ON CAPABILITIES, LIMITATIONS, AND THE CONDITION
OF VARIOUS RADIO EQUIPMENT

30

OPERATED AND COORDINATED VARIOUS RADIO
COMMUNICATIONS SYSTEMS: INCLUDING AUTOMATED
NETWORKS, SATELLITE COMMUNICATION DATA-LINKS, AND
THE FULL SPECTRUM OF VOICE AND TELETYPE CIRCUITS
OPERATED CRYPTOGRAPHIC EQUIPMENT

AS A RADIO OPERATOR ONE AND TWO, I HAVE RECEIVED THE
FOLLOWING TRAINING AND IMPLEMENTED IT TO THE PRESENT
PENNSYLVANIA TURNPIKE COMMISSION (STANDARDS):

EMD
APCO
CPR
NCIC/CLEAN SYSTEM
INCIDENT COMMAND
HAR/VMS MESSAGE BOARD SIGNS
AM BROADCASTS
VARIOUS TRAINING ON DIFFERENT COMPUTERS

WITH ALL OF MY EXTENSIVE TRAINING, THERE WILL BE
MINIMAL LEARNING TIME AND IMMEDIATE RESULTS. I WOULD
LIKE VERY MUCH TO MEET WITH YOU AND I'AM AVAILABLE TO
EXPLAIN IN DEPTH BOTH MY QUALIFICATIONS AND
ASPIRATIONS. I'AM CONFIDENT THAT MY EXTENSIVE
BACKGROUND WILL BE BENEFICIAL FOR OUR DEPARTMENT
AND THAT I WILL CONTINUE TO BE A VALUABLE ASSET TO THE
PENNSYLVANIA TURNPIKE COMMISSION.

PLEASE CALL ME AT YOUR CONVENIENCE TO SET UP A
MEETING. YOUR CONSIDERATION IS GREATLY
APPRECIATED.

SINCERELY,

HARRY E. WILLIAMS JR.

ENCLOSURES

HEW/TLE

CC: JOSEPH SULLIVAN
    RONALD FRANK
    FILE

Form PTC (502005208)

**Pennsylvania Turnpike Commission**
**HARRISBURG**
November 3, 1999

**SUBJECT:**   Commission Action

**TO:**        Joseph P. McCool
               Director of Safety and Operations

**FROM:**      Joanne Gitto Davis
               Director of Human Resources

On November 2, 1999, the Commissioners approved the following:

- Your request to post internally and, if necessary, advertise externally for a
  Communications Center Duty Officer position as per your memorandum
  dated October 15, 1999.

- Your request to post internally and advertise externally for the Operations
  Center Manager position as per your memorandum dated October 15, 1999.

Please contact Human Resources when you wish to post these positions.

JGD:pah

c:   J. T. Durbin
     D. L. Everly
     G. R. Richards

**PTC 0418**

Cindy Ann Dietz
213 Gross Avenue
Dover, PA 17315
717-292-2932

Thursday, November 25, 1999

Joanne Gitto Davis
Director of Human Resources

Dear Ms. Davis:

I am writing to you regarding a phone call I received from "Joe" at the Turnpike Commission a few weeks ago. He called to inquire whether I was still interested in the Communications Duty Officer position I had applied for back in August. At that time I advised him I was still very interested and he suggested I send a letter and update my application with any additional training I may have had in the meantime.

Please add the following training to my resume:

| | |
|---|---|
| 10/27/99 | How to Handle People with Tact and Skill / CareerTrack Training |
| 11/17/99 | Supervising a Diverse Workforce / County of York |
| 11/18/99 / 11/19/99 | Introduction to Microsoft Word 97 & Microsoft Outlook |

Thank you for your consideration. I believe I could be a valuable addition to your staff given the chance.

Sincerely,

Cindy A. Dietz

Cindy A. Dietz

CD

Form PTC (502005208)



**PENNSYLVANIA TURNPIKE COMMISSION**
**HARRISBURG**
January 6, 2000

**SUBJECT:**   Candidates for Position of
Communications Center Duty Officer

**TO:**   Gregory R. Richards
Deputy Executive Director –
Finance and Administration

**FROM:**   Joanne Gitto Davis
Director of Human Resources

I have reviewed the resumes submitted to the Department of Human Resources for the Communications Center Duty Officer position, which was posted December 1-15, 1999. They are attached for your review for the next step in the selection process.  The candidates who appear to meet minimum educational experience and training requirements for the position are so designated on the attached Promotion Application Log.

At the conclusion of the selection process, Human Resources will inform the candidates who were not selected.  Please inform me of the candidates who were given interviews.

If you have questions or need assistance, please contact me.

JGD:pah

Attachments

**PTC 0443**

# Promotion Application Log

Position: Communications Center Duty Officer
Location: Central Office
Date Posted: 12-1-99
Date Closed: 12-15-99

| Applicant Name | Address | Qualified? Yes | Qualified? No | Location | Date of Hire | Received |
|---|---|---|---|---|---|---|
| Burczewski, James F. | 914 Afton Street Philadelphia, PA 19111 | | X | Supplemental Toll Collector District 4 | 12-7-98 | 12-17-99 |
| Davis, Joel L. | P. O. Box 2002 Harrisburg, PA 17105 | X | | Radio Operator 2 Operations Center | 4-25-90 | 12-15-99 |
| Havrilla, Martin M. | 1040 Lisburn Road Camp Hill, PA 17011 | X | | Radio Operator 1 Operations Center | 9-24-99 | 12-7-99 |
| McCall, James A., Jr. | 9 Kensington Square, Mechanicsburg, PA 17055 | | X | Toll Collector Gettysburg Pike | 11-17-97 | 12-8-99 |

EXT. CANDIDATE
(operator-modester)

C: G.R. RICHARDS

DATE: 3/8/00

**PTC 0427**

260

# Promotion Application Log

Position: Communications Center Duty Officer
Location: Central Office
Date Posted: 12-1-99
Date Closed: 12-15-99

| Applicant Name | Address | Qualified? Yes | Qualified? No | Location | Date of Hire | Received |
|---|---|---|---|---|---|---|
| Burczewski, James F. | 914 Afton Street Philadelphia, PA 19111 | | ✓ | Supplemental Toll Collector District 4 | 12-17-98 | 12-7-99 |
| Davis, Joel L. | P. O. Box 2002 Harrisburg, PA 17105 | ✓ | | Radio Operator 2 Operations Center | 4-25-90 | 12-15-99 |
| Havrilla, Martin M. | 1040 Lisburn Road Camp Hill, PA 17011 | ✓ | | Radio Operator 1 Operations Center | | |
| McCall, James A. Jr. | 9 Kensington Square, Mechanicsburg, PA 17055 | ✓ | ✓ | Toll Collector Gettysburg Pike | 11-17-97 | 12-8-99 |
| EARLY, MARK James BROWNIC OEITZ, CRAIG | | | | | | |

# Promotion Application Log

**Position:** Communications Center Duty Officer
**Location:** Central Office
**Date Posted:** 11-28-00
**Date Closed:** 12-11-00                                     Externally:  12-15-00

| Applicant Name | Address | Qualified? Yes | Qualified? No | Location & Position | Date Of Hire | Received |
|---|---|---|---|---|---|---|
| Black, Duane N., III | 90 Hanover Street Middletown, PA 17057 | ✓ | | No AAPCO | | 12-15-00 |
| Fithian, William T. | 329 Sunnyside Road Newmanstown, PA 17073 | ✓ | | NO AAPCO | | 12-6-00 |
| Fleck, Richard A. | 32 Risky Road Lewistown, PA 17044 | | ✓ | | | 12-13-00 |
| Leiss, Todd A. | | | ✓ | Radio Operator 1 Control Center | 11-29-99 | 11-27-00 |
| Williams, Harry E., Jr. | | | ✓ | Radio Operator 2 Control Center | 2-2-81 | 12-11-00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**PTC 0497**

28

(Rev. 12/98)                                    DATE: January 24, 2000

## *Recommended Personnel Actions*

### Vacant Position:

Job Title: Duty Officer
Department: Communications
Location: Central Office

### Applicants' Statistics:

|  | Internal | External | Total |
|---|---|---|---|
| Total Number of Applicants | 4 | 2 | 6 |
| Applicants **Not Qualified** | 2 | 0 | 2 |
| Applicants **Qualified** | 2 | 2 | 4 |
| Applicants **Interviewed** | 2 | 2* | 4 |
| Applicants **Recommended** | 2 | 2 | 4 |

*Two external candidates from the prior Duty Officer posting were included in this process with the concurrence of Human Resources.

### Names and titles of persons conducting interview:

| Name | Title |
|---|---|
| Joseph P. McCool | Director of Safety & Operations |
| William J. Capone | Director of Marketing |
| Dennis Genevie | Risk Manager |
|  |  |

### Explanation of the Interview and Selection Process:

A list of standard questions was completed and asked of each applicant. Each applicant was provided with the job description, management benefits package and salary range schedule. Interviews were scheduled and all interviews were conducted at the Central Office. Applicants were given an opportunity to ask questions or add additional information. The interview team reached consensus on the candidates that are recommended.

PTC 0428

(Rev. 12/98)

DATE: January 24, 2000

## *Recommended Personnel Actions*

### **Vacant Position:**

Job Title: Duty Officer
Department: Communications
Location: Central Office

### Recommended candidates in alphabetical order and the justification for recommendation:

**Daniel Bretzman** – Mr. Bretzman is qualified for the position of Duty Officer. He has ten years experience as a Dispatcher II in Cumberland County and is therefore familiar with many of the responsibilities of a Duty Officer.

**Joel Davis** – Mr. Davis is qualified for the position of Duty Officer. Mr. Davis has ten years experience with the Pennsylvania Turnpike Commission, including four years as a Radio Operator and one year as a Radio Operator 2 (Shift Leader).

**Cindy Deitz** – Ms. Dietz is qualified for the position of Duty Officer. Ms. Deitz has 14 years experience in York County including over seven years supervisory experience. The supervisory experience provides excellent Background for a Duty Officer position. The supervisory experience and her emergency management experience Make her an excellent candidate for the Duty Officer position.

**Martin Havrilla** is qualified for the position of Duty Officer. Mr. Havrilla has a military background but only Limited turnpike telecommunications experience.

### Attachments

Please attach the following to this worksheet:

- A copy of the employment application(s)/resume(s) of the **recommended** candidates

- The most recent performance evaluation of the **internal** candidate(s) if available

**Signature – Title** *Director – Safety & Ops Ctr*          1/26/00          **Date**

**DED Signature**

PTC 0429

30

# Information Record

Name _Joanne  G - D._          Subject _Duty Officer_

Organization _____     Telephone - Business _____

Address _____          Home _____

_____                  Fax _____

_____                  Other _1/7/00_

| Date | Follow-up | Notes |
|------|-----------|-------|
| | | Joanne - AOK to go ahead with the 2. |
| | | Per Joe McCool, - from the last |
| | | go round on DO's - |
| | | Cindy Daly |
| | | Daniel Bretzman ~~~~~~~~ |
| | | are applicable to this posting. |
| | | To conserve time, let's have the |
| | | same team interview the 2 new |
| | | candidates, then choose from the |
| | | 4. |
| | | Greg Richards |
| | | 1/7/00 |
| | | Check file regarding the above issue |

©1997 Franklin Covey Co. Printed in USA

Original–MO 17429

Form PTC (502005208)

**PENNSYLVANIA TURNPIKE COMMISSION**
**HARRISBURG**
January 2, 2001

**SUBJECT:**  Communications Center Duty Officer

**TO:**  Gregory R. Richards
Deputy Executive Director –
Customer Service

**FROM:**  Joanne Gitto Davis
Director of Human Resources

I have reviewed the resumes submitted to the Department of Human Resources for the Communications Center Duty Officer position which was posted internally November 28 – December 11, 2000 and advertised externally December 3-15, 2000. They are attached for your review for the next step in the selection process. The candidates who appear to meet minimum education, experience, and training requirements for the position are so designated on the attached Promotion Application Log.

At the conclusion of the selection process, Human Resources will inform the candidates who were not selected. Please inform me of the candidates who were given interviews.

If you have questions or need assistance, please contact me.

JGD:pah

Attachments

**PTC 0499**

32

# Promotion Application Log

**Position:** Communications Center Duty Officer
**Location:** Central Office
**Date Posted:** November 28, 2000
**Date Closed:** December 11, 2000

**Advertised externally:**

December 3-15, 2000

| Applicant Name | Address | Qualified Yes | Qualified No | Location & Position | Date Of Hire | Received |
|---|---|---|---|---|---|---|
| Black, Duane N., III | 90 Hanover Street<br>Middletown, PA 17057 | X | | | | 12-15-00 |
| Fithian, William T. | 329 Sunnyside Road<br>Newmanstown, PA 17073 | | X | | | 12-6-00 |
| Fleck, Richard A. | 32 Risky Road<br>Lewistown, PA 17044 | X | | | | 12-13-00 |
| Leiss, Todd A. | | X | | Radio Operator 1<br>Control Center | 11-29-99 | 11-27-00 |
| Williams, Harry E., Jr. | | X | | Radio Operator 2<br>Control Center | 2-2-81 | 12-11-00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

PTC 0498

33

(Rev. 12/98)

DATE: January 17, 2001

## *Recommended Personnel Actions*

### **Vacant Position: Duty Officer**

Job Title: Duty Officer

Department: Operations Center

Location: Cost Center 131

## Applicants' Statistics:

| | Internal | External | Total |
|---|---|---|---|
| **Total Number** of Applicants | 2 | 3 | 5 |
| Applicants **Not Qualified** | 1 | 2 | 3 |
| Applicants **Qualified** | 1 | 1 | 2 |
| Applicants **Interviewed** | 1 | 1 | 2 |
| Applicants **Recommended** | 1 | | |

## Names and titles of persons conducting interview:

| Name | Title |
|---|---|
| Joe Rispoli | Safety Manager |
| Dan Bretzman | Operations Center Manager |
| | |
| | |

## Explanation of the Interview and Selection Process:

The interview process contained past work practices and history performance. Questions were determined to evaluate the applicants ability to manage the traffic flow of the Pa. Turnpike as well as employee supervision. The knowledge of the Turnpike assisted in the selection of the applicant. The applicants ability to supervise and train employee's and determination of performing above standards were valuable assets to the Commission.

**PTC 0507**

34

(Rev. 12/98)

DATE: January 17, 2001

## *Recommended Personnel Actions*

### **Vacant Position: Duty Officer**

Job Title: Duty Officer

Department: Operations Center

Location: Cost Center 131

Recommended candidates in alphabetical order and the justification for recommendation:

Todd Leiss: This applicant was selected from the internal list. The applicant is presently an instructor for Harrisburg Area Community College in the field of Telecommunicator training. The applicant is certified by the Associated Public Safety Communications Official, Inc. (APCO) as a master Instructor. The applicant has numerous certificates and training in the communications field and will be an asset to our training program. Mr. Leiss is presently a Radio Operator with the Commission and has a thorough knowledge of the geographical locations of all facilities. The selection is also based on the ability to communicate well with others and the fact that past work history shows this individual has supervisory skills.

**Attachments**

Please attach the following to this worksheet:

PTC 0508

35

(Rev. 12/98)

DATE: January 17, 2001

## Recommended Personnel Actions

### Vacant Position: Duty Officer

Job Title: Duty Officer

Department: Operations Center

Location: Cost Center 131

- A copy of the employment application(s)/resume(s) of the **recommended** candidates

- The most recent performance evaluation of the **internal** candidate(s) if available

DED of Customer Service

**Signature – Title**

**DED Signature**

1/17/01

**Date**

PTC 0509

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARRY E. WILLIAMS JR.,          )
                                )
    Plaintiff               )
                                )          Civil Action No.
    vs.                     )          No. 1:CV-01-0877
                                )
PENNSYLVANIA TURNPIKE           )
COMMISSION,                     )
                                )
    Defendant               )

**ORIGINAL**

DATE:                    JULY 18, 2002

PROCEEDING:              VIDEO DEPOSITION

APPEARANCE:

    For the Plaintiff        ANDREW OSTROWSKI, ESQUIRE
                             4311 N. 6TH STREET
                             HARRISBURG, PA 17110

    For the Defendant        MARVIN L. WEINBERG, ESQUIRE
                             FOX, ROTHSCHILD, O'BRIEN &
                             FRANKEL
                             2000 MARKET STREET, TENTH FLOOR
                             PHILADELPHIA, PA 19103-3291

Exhibit A

37

SHEET 1   PAGE 1

1    Video Reporter:    And video is now
2  on.  Good morning ladies and gentleman let
3  me advise you that audio and video are now
4  in operation.  My name is Albert Rodriquez
5  and I have been hired by P.R. Video to take
6  this deposition for the plaintiff, Ronald
7  Frank.
8    Frank:    Ronald Frank.
9    Video Reporter:    Would you spell
10  that for me?
11    Frank:    R.o.n.a.l.d. Last name is
12  F.r.a.n.k.
13    Video Reporter:    My name is Albert
14  Rodriquez; my address is 2146 Spruce Park,
15  Lebanon, Pennsylvania 17046.  This case is
16  in the United States District Court for the
17  Middle District of Pennsylvania.  It is
18  docketed at number 1-CV-010877.  The caption
19  is Harry E. Williams, Jr. versus The
20  Pennsylvania Turnpike Commission.  The
21  deponee is Ronald Frank.  Ronald Frank has
22  already been sworn in.  Would counsel please
23  identify themselves and provide their
24  address and phone number for the record.
25    Attorney Ostrowski: Andrew Ostrowski,

PAGE 2

1  4311 North Sixth Street, Harrisburg.  I am
2  counsel for plaintiff, Harry Williams and
3  Harry Williams, Sr.
4    Attorney Weinberg:  Marvin Weinberg,
5  counsel for the Pennsylvania Turnpike
6  Commission, 2000 Market Street, 10th Floor,
7  Philadelphia 19103.
8    Video Reporter:    Alright you may
9  begin.
10    Attorney Weinberg:  The usual
11  stipulations?
12    Attorney Ostrowski: The usual
13  stipulations.
14    Q:  My name is Andy Ostrowski, we have
15  met before and we are here today to give a
16  deposition now in the Harry Williams versus
17  Pennsylvania Turnpike Commission matter.
18  You understand that, correct?
19    A:  That is correct.
20    Q:  And you received a subpoena to be
21  here today and are appearing in response to
22  that subpoena.  Is that correct?
23    A:  That's correct.
24    Q:  When did you retire from the
25  Turnpike Commission?

PAGE 3

1    A:  July 1st 1999.
2    Q:  And at the time you retired, you
3  retired from the position of duty officer?
4    A:  That is also correct.
5    Q:  How long sir had you been a duty
6  officer?
7    A:  Just several months.
8    Q:  Can you give any more specific
9  time period?
10    A:  Probably three or four months.
11    Q:  So, roughly March/April of 1999
12  you became a duty officer?
13    A:  That is correct.
14    Q:  At that time and prior to that
15  period of time you were Operation Center
16  Manager, correct?
17    A:  That's correct.
18    Q:  How long was it that you were
19  Operation Center Manager?
20    A:  Approximately ten years.
21    Q:  And during your term as Operation
22  Center Manager, the position of Duty Officer
23  was created, correct?
24    A:  That's correct.
25    Q:  Do you recall the year that was?

PAGE 4

1    A:  Probably 1998, I'm not sure
2  though.
3    Q:  And there were I believe, four
4  Duty Officer positions created?  Why don't
5  you tell me rather than have me testify?
6    A:  There was Duty Officer positions
7  that were made; that were not filled until
8  1999, but I am not sure exactly how many of
9  them there.  I don't recall the number.
10    Q:  Okay.  How many were filled when
11  the position was first created?
12    A:  Three.
13    Q:  And were there additional
14  vacancies at that point?
15    A:  I don't recall.
16    Q:  But you said that there were more
17  positions created that weren't filled then?
18    A:  No, I didn't say that.  I said I
19  don't recall.
20    Q:  I know, but before, your first
21  response was that there may have been more,
22  but.?
23    A:  There may have been, but I don't
24  recall.
25    Q:  Okay, were you involved in the

SHEET 2    PAGE 5

1  process of creating that position?
2      A:  No, I was not.
3      Q:  How was that undertaken?
4      A:  That was undertaken through the
5  director at the time was the one that
6  proposed it to the Commission, which was
7  Joseph McCool.
8      Q:  And he was the Director of Safety
9  and Operations?
10     A:  That is correct.
11     Q:  And how was process conducted of
12  filling those initial three positions?
13     A:  It was posted on the board for
14  people to apply and then there was an
15  interview process and then they were hired.
16     Q:  Did you participate in the
17  interview process?
18     A:  No I did not.
19     Q:  Do you know who did participate in
20  the interview process?
21     A:  Ah, Bill Capone, for one and I
22  think that was at the time, I know Bill
23  Capone participated, but me and Mr. McCool
24  did not participate because they were going
25  to work for us.

PAGE 6

1      Q:  Okay.  And why because they were
2  going to work for you why did that have any
3  bearing on the matter?
4      A:  Well, I guess because most of the
5  people that applied were internal so, they
6  tried to keep the politics and the
7  friendship out of it.
8      Q:  And when the three initial Duty
9  Officers were selected; were they all
10  internal candidates?
11     A:  Yes they were.
12     Q:  And do you know how many in
13  addition to those three had applied for
14  those positions?
15     A:  Well, I know Mr. Williams did, but
16  I don't know how many other people might
17  have.
18     Q:  And who were those three
19  individuals who filled those positions?
20     A:  Gregory Rausch, Angela Rudy were
21  the first ones that could have been Dale
22  Wickard, but I am not positive in that.  Oh,
23  that's right, Dave Dabrowsky, yes and Joe
24  Sullivan.
25     Q:  So there were four positions at

PAGE 7

1  that point?
2      A:  Yes.
3      Q:  And that was in 1998.  To the best
4  of your recollection was that correct?
5      A:  I believe that actually started
6  that was when the process started, but I
7  don't think they started really until 1999.
8      Q:  Mr. Sullivan was promoted to the
9  position of Operations Center Manager and
10  you were demoted to the Duty Officer.  Is
11  that correct?
12     A:  That's correct.
13     Q:  Other than that one change in the
14  Duty Officer position before your
15  retirement, did any other persons leave that
16  position?
17     A:  Not before my retirement, no.
18     Q:  And was there discussions before
19  your retirement of plans to fill additional
20  vacancies?
21     A:  I don't know.  Remember I was
22  demoted so, I was not in their loop.
23     Q:  Did you ever hear anything about
24  any plans to fill additional vacancies?
25     A:  I didn't hear anything, no.

PAGE 8

1      Q:  So, on your retirement date,
2  before you were actually retired, there were
3  four Duty Officers and other than you and
4  Joe Sullivan kind of switching places,
5  everything else was the same.  Is that
6  correct?
7      A:  That is correct.
8      Q:  Tell me when did you first find
9  out that you were being demoted?
10     A:  When I was taken up into Mr.
11  Kennedy's office with Mr. McCool and told
12  that I was being demoted.
13     Q:  And how long before your demotion
14  did that meeting take place?
15     A:  About a day.
16     Q:  And what did they say to you as to
17  the basis for the demotion?
18     A:  They told me that I was too easy
19  on the people who worked for me; that I was
20  not a disciplinarian enough and they were
21  switching me and Mr. Sullivan at the time.
22     Q:  Did you have?  Were there any
23  discussions with you prior to that, about
24  your performance?  Was there any
25  dissatisfaction with your performance?

1    A:   No.
2    Q:   Did they give you any specific
3  examples of issues that caused them concern
4  as it relates to your performance?
5    A:   Just that I was too easy on the
6  employees and I was not managing and - - to
7  the level that the Executive Director, Mr.
8  Kennedy, who was I guess, Associate
9  Executive Director - -.
10   Q:   And again, this was you said about
11 three or four months before your retirement?
12   A:   That's right.  That's why I
13 retired.
14   Q:   So prior to that time you had not
15 planned to retire in 1999?
16   A:   No, not all.
17   Q:   Were you fully vested in your
18 pension?
19   A:   Well, they had a buyout, which
20 said that I could retire with full
21 retirement and my health insurance.  I could
22 see the handwriting on the wall.  The next
23 move was out the door, so I took it.
24   Q:   So, what do you mean, a "buyout"?
25 They offered that to you, specifically?

1    A:   Not to me specifically.  The State
2  had a buyout so that's.
3    Q:   An early out.?
4    A:   Buyout, right.
5    Q:   And Mr. Kennedy and Mr. McCool
6  first met with you about your demotion did
7  they initially propose a termination or was
8  it always, you know, we are just going to
9  demote you and put you.?
10   A:   I asked them specifically if I was
11 being terminated and they specifically told
12 me no.  It was my choice to retire.  They
13 didn't tell me there was a buyout and you
14 need to go, no.
15   Q:   If there wasn't the early out
16 bill, when would you have been eligible for
17 your full retirement benefit?
18   A:   2004.
19   Q:   And you had otherwise intended to
20 stay until 2004?
21   A:   Yes.
22   Q:   Did Harry Williams submit an
23 application packet to you for a Duty Officer
24 position in 1998?  Is that correct?
25   A:   Yes.

1    Q:   And were the Duty Officer
2  positions being created around that time?
3    A:   Yes.
4    Q:   And do you know why it was
5  submitted to you?
6    A:   It was submitted to me because
7  that's where all the internal people
8  submitted to me and I passed them on.
9    Q:   Do you know how many applications
10 you received?
11   A:   I don't remember.  I was not the
12 only other person in the plot.  I can
13 remember that one of the radio operators,
14 Marsha Evans, applied.  There were several
15 other people that applied.
16   Q:   When you received an application
17 did you receive it and hold it until you got
18 them all, or how did you handle that?
19   A:   Yes, there was a closing date for
20 the opening of the particular job, which at
21 that time all the packets were turned over
22 to Director McCool that turned them over to
23 where ever he sent them.
24   Q:   And all of them came to you and
25 you turned them over to Director McCool?

1    A:   Right.
2    Q:   And then did you have any further
3  involvement in the selection process?
4    A:   None at all.
5    Q:   Do you recall in early 1999 there
6  were disciplinary issues that involved Terri
7  Edwards that related to her performance?
8    A:   Well, since that's a personnel
9  matter and its already in litigation, should
10 I answer Marv or not?
11   Attorney Weinberg:  To the best of your
12 knowledge.  Answer it.
13   A:   Yes.
14   Q:   And was in the context of your
15 demotion was Terri Edwards' name mentioned?
16   A:   I don't recall?
17   Q:   What about John Curanzy?
18   A:   I doubt John Curanzy was.
19   Q:   How about Dawn Hamilton?  Was she
20 discussed?
21   A:   No.  I don't think there were any
22 specific names mentioned.
23   Q:   Okay.  Do you know why Joe
24 Sullivan was the one that they proposed for
25 the Operations Center Manager position?

SHEET 4   PAGE 13

1   A:   Yes, I can tell you why.
2   Q:   Why is that?
3   A:   Because him and McCool were both
4   of the same heritage.  They hung out
5   together and Sullivan behind my back was
6   stabbing me allegedly.
7   Q:   Okay and what were those
8   allegations?
9   A:   That I was not doing my job and
10  that.  See the Director of Safety at the
11  time had retired and they never filled the
12  position.  Part of my position is.
13  Q:   At the time, when you say the
14  time, what time?
15  A:   At the time I got demoted.  He had
16  left approximately one year before that.
17  Q:   Who McCool?
18  A:   Clarence Wright.
19  Q:   Okay.
20  A:   And what happened is that I was in
21  charge of all the fire and ambulance
22  services on the turnpike in his absence, so
23  what would happen is that if I was in, lets
24  say, Allegheny County because of a meeting
25  with fire companies and so forth and I

PAGE 14

1   wasn't in the office; instead of Sullivan
2   doing the job as Duty Officer and supporting
3   me, he would go and complain to McCool that
4   I was never in the office and that I was not
5   doing my job.
6   Q:   And how did you learn about that?
7   A:   After the fact.
8   Q:   From who?
9   A:   Through my secretary and also
10  several other people in the department.
11  Q:   What other people in the
12  department?
13  A:   Well, my secretary at the time was
14  Deborah Ertzweiler and Cathy, what's her
15  last name?  Bowers and Larson Lundcrest,
16  people like that nature that are -.
17  Q:   Were those people in the Safety.?
18  A:   No, they were in Communications.
19  Q:   Was Communications different than
20  Safety?
21  A:   Yes, I was just assisting with the
22  Safety Department until they filled that
23  position.
24  Q:   Okay.  I thought Mr. McCool was
25  the Safety Operations?

PAGE 15

1   A:   He was supposed to be, but I used
2   to handle all of the fire department issues.
3   Q:   And when did that change?
4   A:   The day I left as supervisor, as
5   manager.
6   Q:   Did you ever have any discussion
7   with Joe Sullivan concerning him going to
8   Mr. McCool and talking about you and raising
9   issues with him?
10  A:   Yes, but I don't; I mean he can't
11  back that up, obviously, at the moment, it's
12  past tense, but we discussed it.
13  Q:   What did you discuss with him?
14  A:   We discussed the fact that him and
15  I had worked together for many years and
16  that I thought that it was rotten for what
17  he had done to me and that he would get his
18  in six months later because of his drunken
19  binges he would quit.
20  Q:   And how did he respond to your
21  accusations?
22  A:   He was pretty hostile about it.
23  Q:   Did you deny that he did anything?
24  A:   No, he did not deny it.
25  Q:   Did he confirm that he didn't?

PAGE 16

1   A:   Well, he confirmed the fact that
2   him and McCool were friends and that they
3   used talk and McCool would ask him questions
4   about me, yes.
5   Q:   Now did he say to you anything
6   about Mr. McCool had to say about you?
7   A:   No.  Not that I remember.
8   Attorney Weinberg:  Do you want to take
9   a break?
10  A:   No, I don't want to take a break,
11  I was just wondering, we have not gotten to
12  the point yet of what we are here for.
13  Attorney Weinberg:  He's aware of the
14  time restriction.
15  Attorney Ostrowski: I understand you
16  want to be out of here by 11:00.
17  A:   No, I go to work at 11:00, so.
18  You're costing me by the hour, so let's move
19  on.
20  Q:   Now did you ever have any
21  conversations with Harry Williams about
22  interactions between Terri Edwards and John
23  Curanzy?
24  A:   Well, I don't know, Terri Edwards
25  and I.  Williams and I, I'm sorry about

1 that, Harry; were good friends. We worked
2 together for probably fifteen, eighteen
3 years. We worked at midnight together. I
4 was for about the last eight or nine of
5 those years I had been his midnight
6 supervisor when I got my promotion, I
7 promoted him to the midnight supervisor's
8 job. Not only because of the fact that he
9 was a friend, but he was loyal and he did a
10 good job. He knew what he was doing and
11 Harry and I, if I was in there on wicked
12 snowstorm or bad accident or whatever, we
13 would go down and have soda or something and
14 we would discuss things, a lot of times on a
15 personal note. John Curanzy, he was an
16 interesting fellow and I am sure that
17 somewhere along the line I'd come up, but if
18 it was anything detrimental, I don't
19 remember at this time, but if you want to
20 refresh my memory, I will see if I remember.
21      Q:   Yeah, I will, but I want to
22 sidetrack for second.
23      A:   That's alright.
24      Q:   When did you promote Harry?  When
25 you got promoted to.?

1      A:   That's correct.
2      Q:   And was there a vacancy or.?
3      A:   Yeah, it was my vacancy.
4      Q:   The position when you left, it was
5 not Duty Officer?
6      A:   No, it was not.
7      Q:   What was it?
8      A:   It was called Senior Radio
9 Operator.
10      Q:   And how many Senior Radio
11 Operators were there?
12      A:   There were four permanent and then
13 if there not one on duty.  The most senior
14 person working that night was the Senior
15 Radio Operator.
16      Q:   And at the time immediately before
17 you were promoted to Operation Center
18 Manager, who were the other Senior Radio
19 Operators?
20      A:   Jim Mulvihill, who is still in
21 that position, Marsha Evans and myself and
22 Joe Sullivan.
23      Q:   Was Dale Wickard there at the
24 time?  Not as a Senior Radio Operator, but
25 as a Radio Operator?

1      A:   Correct that, but your right.
2 What happened is that Marsha had been the
3 Senior Operator from 4-12?  There was an
4 opening on daylight, she took the opening,
5 which she relinquished her Senior Radio
6 Operator position and Dale Wickard had taken
7 over the 4-12 shift as the Senior Radio
8 Operator.
9      Q:   Did Marsha Evans go to the
10 daylight shift as a Senior Radio Operator?
11      A:   No.
12      Q:   She just wanted to work days.  A
13 Radio Operator position came open, she took
14 that position?
15      A:   That's correct.  And took the loss
16 in pay to work daylight so she could be home
17 in the evening with her child.
18      Q:   How long was that before you were
19 promoted?
20      A:   Oh it was probably a year or so
21 before I promoted.
22      Q:   And why was that position made
23 available for Dale Wickard and not do you
24 know if that position was posted?
25      A:   Yes it was.

1      Q:   And he competed and was selected
2 for the position?
3      A:   He was the most senior person
4 because of the fact that is a Union job, so
5 he had been the most senior qualified person
6 so he automatically was put in that
7 position.
8      Q:   So at that time you were Union as
9 well?
10      A:   No.
11      Q:   As Senior Radio Operator?
12      A:   As Senior Radio Operator, yes.
13      Q:   So, the effect of the Senior Radio
14 Operator changed to Duty Officer took it
15 from the Union to a management position.  Is
16 that correct?
17      A:   They start at Senior Operator
18 positions and they also do the officer
19 positions.
20      Q:   Prior to the creation of the Duty
21 Officer position and while you were
22 Operations Center Manager, did you have
23 occasion to fill any Senior Radio Operator
24 positions?
25      A:   Well, I'm sure I did, yes.  Well,

SHEET 6  PAGE 21

1  Dale actually did.
2      Q:   So, Marsha Evans left after you
3  became Operations Center Manager?
4      A:   Yeah, that's right.
5      Q:   So at that time Harry Williams had
6  already been given or promoted?
7      A:   Yes, he applied for the job.  He
8  was the most senior qualified person for the
9  position and I acquired him to that
10  position.
11      Q:   Did Dale Wickard apply?
12      A:   Yes, but Harry had more seniority.
13      Q:   If you take seniority out of the
14  evaluation, and you have to choose between
15  Dale Wickard and Harry Williams for that
16  Senior Radio Operator position, who would
17  you have chosen?
18      A:   The job was a midnight position,
19  which is a job that Harry had worked for
20  fifteen years.  Harry was the most qualified
21  person to work each shift as the realm
22  idiosyncrasies.  Harry was a person that at
23  3:00 in the morning you would call the - -
24  because the cops were there, whatever, Harry
25  was the most qualified person and he would

PAGE 22

1  have got the job.
2      Q:   If you will suppose that Harry
3  Williams and Dale Wickard has both applied
4  for a Senior Operator position on third
5  shift that was neither of theirs; who under
6  those circumstances would you have selected?
7      A:   On the midnight shift?
8      Q:   No, if Harry.?
9      A:   On the midday shift?  I would
10  still probably would have picked Harry.
11      Q:   And just based on his performance
12  or did your personal friendship have
13  anything to do with that?
14      A:   Oh no.  His performance.  His
15  years of service.  He had been there a lot
16  longer than Dale.
17      Q:   And was Fred Jumper employed in
18  the Communications Center when you
19  Operations Center Manager?
20      A:   That's correct.
21      Q:   Was he a two or a one?
22      A:   No, he was not a Radio Operator
23  one.
24      Q:   He was a one.  And do you know did
25  he ever bid on any of the vacancies that

PAGE 23

1  came up?
2      A:   At the time he did not have enough
3  seniority to move forward.
4      Q:   How was his performance?
5      A:   Great.  We need twenty more like
6  him.
7      Q:   Comparing him to Harry.  Did one
8  of them stand out versus the other?
9      A:   I used to always tell Harry that
10  he should be on midnight the rest of his
11  life because of the simple fact that I
12  always feared that if Harry ever went
13  daylight he would have got himself in a lot
14  of trouble, because Harry had a short fuse
15  at times and Fred was the kind of person
16  that could have been a preacher or
17  something, he was very smooth with the
18  public.
19      Q:   Do you recall the situation where
20  Terri Edwards was accused of threatening
21  John Curanzy?  Threatening to have her
22  husband come down and take care of him or
23  something to that effect?
24      A:   inaudible.
25      Q:   Do you recall that?

PAGE 24

1      A:   Yes.
2      Q:   Did Harry approach you and tell
3  you that John Curanzy told him that Terri
4  never threatened him?
5      A:   Yes.
6      Q:   And did he also tell you that
7  Curanzy said he did that to get back at
8  Terri for writing him up?
9      A:   Yes.
10      Q:   Was that when you were Operations
11  Center Manger?
12      A:   Yes it was.
13      Q:   Was that in one discussion?
14      A:   Yes.
15      Q:   After you and Harry had that
16  discussion, did you talk about what Harry
17  had told you with anybody else?
18      A:   No.
19      Q:   You never addressed Mr. Sullivan
20  or McCool?
21      A:   No.
22      Q:   Did you after Harry addressed that
23  with you, have any discussions with McCool
24  about Terri Edwards?
25      A:   There was a lot of discussions

1  over the tenure of Terri Edwards, yes.
2      Q:   Did Mr. McCool ever express to you
3  that he wanted to get rid of Terri Edwards?
4      A:   I think we already handled that in
5  the other depositions, so I don't think.
6  That had nothing to do with Harry, so let's
7  move on.
8      Q:   That's not for you to determine
9  whether it has anything to do with Harry.  I
10 believe that it does.
11     A:   Okay, then I don't recall.
12     Q:   So, then let me just ask you this.
13 Be clear that when you just said so, I don't
14 recall, was that a truthful answer?
15     A:   Yes.
16     Q:   And you know you're under penalty
17 of perjury for not telling the truth here
18 today?
19     A:   Ah huh.
20     Q:   If I suggest to you that Joe
21 McCool made it clear to you that he wanted
22 Terri Edwards out of the Turnpike
23 Commission.  Do you have any reason to
24 disagree with me?
25     A:   No I don't.

1      Q:   Did you also speak with Paul
2  Heckman about the situation between John
3  Curanzy and Terri Edwards?
4      A:   I don't know if I did not.  I
5  figured that Terri was going to come in, but
6  John Curanzy has been dead for a long time
7  and knows there was a problem; Harry took
8  care of the problem.  It was an ongoing
9  situation, as you know with Terri Edwards,
10 but did I talk to Paul Heckman about John
11 Curanzy, I can't tell you honestly if I did
12 or I did not.
13     Q:   Did you ever have any discussions
14 with Joe McCool about Harry Williams?
15     A:   Not that I can recall.
16     Q:   How about with Mike Kennedy?  Did
17 you have any discussions with him about
18 Harry Williams?
19     A:   No, I can tell you that for a
20 fact.
21     Q:   After you were then demoted to the
22 Duty Office position and again, I think you
23 said that four positions remained occupied
24 until you retired.    Correct?
25     A:   Yeah, they could not fill my

1  position until I left.
2      Q:   When was that?  How long before
3  you retired did you learn about the early
4  out bill?
5      A:   Ah, I had to wait till July 1st
6  because of my date of employment and that
7  was last day.  I just made it by the last
8  day.  I had gone to see the Retirement Board
9  about, let's see, probably in February or
10 March.
11     Q:   Did you know at that point that
12 they were going to offer it?
13     A:   Yes, that's why I went up there.
14     Q:   Now, before you retired, do you
15 recall there was a posting for two vacancies
16 in the Duty Officer position?
17     A:   I don't know.  You see what
18 happened is that I retired July 1st, but
19 because of all my comp. time and my vacation
20 time, I hadn't worked after Memorial Day.
21     Q:   When did you inform the Turnpike
22 that you were going to be retiring?
23     A:   I notified them May 1st, in that
24 area.  But, to answer your question that you
25 didn't ask yet, Dale and Fred were not

1  appointed until after my departure.
2      Q:   No, I understand that.  Thank you.
3  So you don't know anything about there being
4  a posting for two or recall anything?
5      A:   I don't recall, no.
6      Q:   Did you ever have any discussions
7  with Harry Williams about his future with
8  the Turnpike Commission?
9      A:   Yes I do.
10     Q:   What did you and he discuss?
11     A:   Harry Williams and I, like I said
12 earlier used to go down and we use to have a
13 lot of discussions and one of the
14 discussions I had with him, which was my
15 personal opinion was the fact that he was
16 getting himself in the middle of the Terri
17 Edwards, which was very volatile and even
18 though it was never mentioned, I am sure was
19 one of the reasons why I was demoted.  And I
20 told him that he needed to stay out of the
21 middle of it.  I don't remember the exact
22 words, but he needed to refrain from being
23 in the middle.
24     Q:   And when in relation to your
25 retirement do you recall having that

SHEET 8   PAGE 29

1  conversation?
2     A:   Well, I had only been midnight
3  duty officer for several months.  It was in
4  the timeframe of somewhere between February
5  and Memorial Day when I departed.
6     Q:   Harry, in a deposition in the
7  Terri Edwards matter testified.  I will read
8  you his testimony. He's referring to you.
9  "He told me that he told me on both
10 occasions that Mr. Joe McCool told him to
11 tell me that I am jeopardizing my job with
12 the PA Turnpike.  I was jeopardizing
13 retirement and I was jeopardizing my chance
14 to become a duty officer for stepping out of
15 ranks and for coming to the aid of helping
16 with Ms. Edwards."
17    A:   I don't remember if that was Mr.
18 McCool that said that or not, but I do
19 remember having that conversation with
20 Harry.
21    Q:   And did someone also suggest that
22 to you that Harry was not doing himself any
23 favors so to speak?
24    A:   I think Mr. Sullivan did for sure,
25 but I can't say Mr. McCool did or did not.

PAGE 30

1  Even though you know in the last deposition
2  my opinion of Mr. McCool and the fact - but
3  I can't obviously say that he's the one that
4  told me that.
5     Q:   I appreciate that.  You say you do
6  recall Mr. Sullivan saying this, in what
7  context?
8     A:   Mr. Sullivan even once he got
9  promoted, he used to come to me and he used
10 to go to Mr. Rausch all the time and
11 discuss.  Mr. Sullivan had a problem of
12 keeping personnel issues within the confines
13 of his ears and he used to go talk to
14 everybody that would listen to him.  And Mr.
15 Sullivan had talked to me at least twice
16 that I could remember about the situation
17 with Harry getting involved in the middle of
18 Ms. Edwards' problems with the Commission.
19    Q:   And again, was that before you
20 were demoted or after?
21    A:   After.
22    Q:   So while he was Operations
23 Manager?
24    A:   That's correct.
25    Q:   Can you tell anymore specifically

PAGE 31

1  what he said.  You said on two occasions?
2     A:   Yes, I remember at least two
3  occasions.  And I know for a fact that on
4  one occasion that could have it - - because
5  he did tell me that, to warn Harry to stay
6  out of the middle of it.
7     Q:   He told you to warn Harry?  And
8  did you understand that he got that
9  suggestion from Mr. McCool?  Is that what
10 you are saying?
11    A:   Well, I don't know if I.  I can't
12 say that for a fact.  I don't know where he
13 got it.
14    Q:   Okay.  Did Sullivan ever mention
15 McCool in any of those discussions with you?
16    A:   Sullivan, what happened is once
17 Sullivan became supervisor/manager he found
18 out what I was going through and Sullivan
19 used to complain profusely about Mr. McCool
20 to me?
21    Q:   About what type of things?
22    A:   About letting us hang out to dry.
23 And as far as you know, changing the
24 direction the department was going.  His
25 personnel matters.

PAGE 32

1     Q:   So, did in your explanation did
2  Joe Sullivan's opinion of Mr. McCool change
3  after Mr. Sullivan became Operations Center
4  Manger?
5     A:   Most definitely.
6     Video Reporter:    Could I break a few
7  minutes?  Andy, do you want to suspend?
8     Attorney Ostrowski: Yeah, I'm sorry.
9     Video Reporter:    The time now is
10 10:45 we are suspending video and audio
11 operations.
12    Video Reporter: The time now is 10:46
13 we are back on the video and audio.
14    Mr. Frank: I was reminded of what we
15 had discussed preparation for this and Mr.
16 McCool did tell me to talk to him in
17 reference of his promotion was going to be
18 effected by his being with Terry Edwards.
19    Q:   Mr. McCool did tell you that.
20    A:   Yes yes.
21    Q:   Okay. Can you tell me anymore
22 about what he said or why he said it?
23    A:   I believe you will also find it in
24 there he called her a f__.
25    Q:   And Mr. McCool said that?

SHEET 9   PAGE 33

1      A:   Yes. I believe to tell him not to
2  suppport the f___
3      Q:  Mr. McCool told you to tell Harry
4  not to support the Fuckin Niger.
5      A:   That's correct.
6      Q:   And Mr. McCool told you that
7  because Harry was supporting Terry Edwards
8  he was jeopardizing his chance to become a
9  duty officer.
10      A:   That's correct.
11      OSTROWSKI:    That's all I have. Thank
12  you.
13      MR. WEINBERG:  To your knowledge did
14  Mr. McCool play any role whatsoever in the
15  promotion process from radio officer from
16  duty officer to your knowledge?
17      A:   No. That was handled by Mr.
18  Sullivan and I think Mr. Rispoli.
19      Q:   To your knowledge did Mr. McCool
20  communicate his alleged feelings to Ms.
21  Edwards or Mr. Williams to any of those
22  individuals?
23      A:   Not to my knowledge.
24      Q:   Thank you.
25      OSTROWSKI:    Do you know Mr. Capone?

PAGE 34

1      A:   Oh yes very well.
2      Q:   What was his position.
3      A:   He was in charge of marketing and
4  he's the one that handles all the public
5  information things he was that you call the
6  senior duty officers the people senior staff
7  who you called for large incidents. At one
8  time our department before the _ worked for
9  Mr. Capone originally he had become my boss.
10      Q:   Originally who did you say
11  was responsible for operations duty
12  selection?
13      A:   Mr. Capone was one of the
14  interviewers and Mr. Rispoli, and Mr.
15  Sullivan picked the people in my absence.
16      Q:   Okay and you had discussions with
17  Mr. Sullivan regarding discussion of Terry
18  Edwards is that correct?
19      A:   Oh yes. That's all Thank you.
20      VIDEO REPORTER:    Time now is 10:50
21  p.m. the deposition of Ronald Frank is now
22  completed we are suspended audio and video
23  operations.

## P.R. VIDEO, INC 

### 1

1-cv-010877 [1] 2:5
10:45 [1] 63:10
10:46 [1] 63:12
10:50 [1] 68:7
10th [1] 3:6
11:00 [2] 32:3,4
17046 [1] 2:2
19103 [1] 3:7
1998 [3] 7:1 13:3 20:11
1999 [6] 5:1,11 7:8 13:7 18:2 23:5
1st [4] 5:1 53:5 54:5,10

### 2

2000 [1] 3:6
2004 [2] 20:5,7
2146 [1] 2:1

### 3

3:00 [1] 42:10

### 4

4-12 [2] 37:3,7
4311 [1] 3:1

### A

absence [2] 26:9 68:2
accident [1] 33:12
accusations [1] 30:8
accused [1] 46:7
acquired [1] 41:9
actually [3] 13:5 15:2 41:1
addition [1] 11:13
additional [3] 7:13 14:6,11
address [2] 2:1,11
addressed [2] 48:6,9
advise [1] 1:3
ah [3] 10:8 50:6 53:5
aid [1] 58:2
albert [2] 1:4,13
allegations [1] 25:8
alleged [1] 66:7
allegedly [1] 25:6
allegheny [1] 26:11
already [4] 2:9 23:9 41:6 49:4
alright [2] 3:8 34:10
ambulance [1] 26:8
andrew [1] 2:12
andy [2] 4:1 63:7
angela [1] 12:7
answer [4] 23:10,12 50:1 54:11
anybody [1] 48:4
appearing [1] 4:8
application [2] 20:10 22:3
applications [1] 21:9
applied [6] 11:5,13 22:1,2 41:7 43:3
apply [2] 10:1 41:11
appointed [1] 55:1
appreciate [1] 59:5
approach [1] 47:2
approximately [2] 6:7 26:3
area [1] 54:11
around [1] 21:2
assisting [1] 28:8

associate [1] 17:8
attorney [9] 2:12 3:4,10,12 23:11 31:8,13 32:2 63:8
audio [4] 1:3 63:10,13 68:9
automatically [1] 39:6
available [1] 38:10
aware [1] 31:13

### B

back [4] 25:5 29:11 47:7 63:13
bad [1] 33:12
based [1] 43:11
basis [1] 16:4
bearing [1] 11:3
became [4] 5:12 41:3 62:4 63:3
become [3] 58:1 65:8 67:9
begin [1] 3:9
behind [1] 25:5
believe [5] 7:3 13:5 49:10 64:10 65:1
benefit [1] 20:4
best [2] 13:3 23:11
between [4] 32:9 42:1 51:2 57:4
bid [1] 44:12
bill [4] 10:8,9 20:3 53:4
binges [1] 30:6
board [2] 9:13 53:8
boss [1] 67:9
both [3] 25:3 43:3 57:9
bowers [1] 28:2
break [3] 31:9,10 63:6
buyout [5] 18:6,11 19:2,4,13

### C

call [2] 42:10 67:5
called [3] 35:8 64:11 67:7
came [3] 22:11 37:13 45:1
candidates [1] 11:10
capone [5] 10:8,10 66:12 67:9,13
caption [1] 2:5
care [2] 46:9 51:8
case [1] 2:2
cathy [1] 28:1
caused [1] 17:3
center [12] 6:2,6,9 13:9 24:12 36:4 40:9 41:3 44:5,6 47:11 63:3
chance [2] 57:13 65:8
change [3] 13:13 29:3 63:2
changed [1] 40:1
changing [1] 62:10
charge [2] 28:8 67:3
child [1] 38:4
choice [1] 19:12
choose [1] 42:1
chosen [1] 42:4
circumstances [1] 43:6
clarence [1] 26:5
clear [2] 49:13 50:8
closing [1] 22:6
come [4] 34:4 46:9 51:5 59:9
coming [1] 68:2
commission [8] 2:7 3:6 4:4,12 9:6 50:10 55:8 60:5
communicate [1] 66:7
communications [3] 28:5,6 44:5
comp [1] 54:6
companies [1] 26:12
comparing [1] 45:7



**P.R. VIDEO, INC**

competed [1] 39:1
complain [2] 27:3 62:6
completed [1] 68:9
concern [1] 17:3
concerning [1] 29:7
conducted [1] 9:11
confines [1] 59:12
confirm [1] 30:12
confirmed [1] 31:1
context [2] 24:1 59:7
conversation [2] 57:1 58:6
conversations [1] 32:8
cops [1] 42:11
correct [27] 4:5,6,9,10 5:4,13 6:3,4,10,11 9:10 13:4,11,12 15:6,7 20:11 35:1 37:1 38:2 40:3 44:7 52:11 60:11 65:5,10 68:5
costing [1] 32:5
counsel [3] 2:9 3:2,5
county [1] 26:11
court [1] 2:3
created [5] 6:10 7:4,11 8:4 21:2
creating [1] 9:1
creation [1] 40:7
curanzy [10] 24:4,5 32:10 34:2 46:8 47:3,7 51:3,6,11

### D

dabrowsky [1] 12:10
dale [10] 12:8 36:10 37:6 38:10 41:1,11 42:2 43:3 44:3 54:12
date [3] 15:1 22:6 53:6
dave [1] 12:10
dawn [1] 24:6
day [6] 16:2 29:4 53:7,8 54:7 57:5
daylight [4] 37:4,10 38:3 45:13
days [1] 37:12
dead [1] 51:6
deborah [1] 28:1
definitely [1] 63:5
demote [1] 19:9
demoted [8] 13:10 14:9 15:9,12 26:2 52:8 56:6 60:7
demotion [4] 15:13 16:4 19:6 24:2
deny [2] 30:10,11
departed [1] 57:5
department [8] 27:10,12 28:9 29:2 62:11 67:8
departure [1] 55:1
deponee [1] 2:8
deposition [5] 1:6 4:3 57:6 59:1 68:8
depositions [1] 49:5
determine [1] 49:8
detrimental [1] 34:5
different [1] 28:6
direction [1] 62:11
director [7] 9:5,8 17:7,9 22:9,12 25:10
disagree [1] 50:11
disciplinarian [1] 16:7
disciplinary [1] 23:6
discuss [4] 29:13 34:1 55:10 59:11
discussed [4] 24:7 29:12 30:1 64:2
discussion [4] 29:6 47:13 48:3 68:4
discussions [11] 14:5 16:10 48:10,12 51:13 52:4 55:6,13 56:1 62:2 68:3
dissatisfaction [1] 16:12
district [2] 2:3,4
docketed [1] 2:5
doing [5] 25:9 27:2,5 33:10 58:9
done [1] 30:4
door [1] 18:10

doubt [1] 24:5
down [3] 33:13 46:9 55:12
drunken [1] 30:5
dry [1] 62:9
during [1] 6:8
duty [25] 5:3,5,12 6:9 7:4,6 11:8 13:10 14:1 15:3 20:10 21:1 27:2 35:5,13 40:1,7 52:9 54:3 57:3 58:1 65:9 66:3 67:6,11

### E

each [1] 42:8
earlier [1] 55:12
early [4] 19:3 20:2 23:5 53:3
ears [1] 59:13
easy [2] 16:5 17:5
edwards [17] 23:7 32:9,11 46:7 48:11 49:1,3 50:9 51:3,9 56:4 57:7 58:3 64:5 65:7 66:8 68:5
edwards' [2] 24:2 60:5
effect [2] 39:13 46:10
effected [1] 64:5
eight [1] 33:4
eighteen [1] 33:2
eligible [1] 20:3
employed [1] 44:4
employees [1] 17:6
employment [1] 53:6
enough [2] 16:7 45:2
ertzweiler [1] 28:1
evaluation [1] 42:1
evans [4] 22:1 36:8 37:9 41:2
even [3] 56:4 59:1,8
evening [1] 38:4
everybody [1] 60:1
everything [1] 15:5
exact [1] 56:8
exactly [1] 7:8
examples [1] 17:3
executive [2] 17:7,9
explanation [1] 63:1
express [1] 49:2

### F

f.r.a.n.k [1] 1:12
fact [11] 27:7 30:1 31:1 33:8 39:4 45:11 52:7 56:2 59:2 61:3,12
far [1] 62:10
favors [1] 58:10
feared [1] 45:12
february [2] 53:9 57:4
feelings [1] 66:7
fellow [1] 34:3
few [1] 63:6
fifteen [2] 33:2 42:7
figured [1] 51:5
fill [4] 14:6,11 40:10 52:12
filled [6] 7:7,10 8:4 12:6 25:11 28:9
filling [1] 9:12
find [2] 15:8 64:10
fire [3] 26:8,12 29:2
first [5] 7:11 8:7 12:8 15:8 19:6
floor [1] 3:6
forth [1] 26:12
forward [1] 45:3
found [1] 62:4
four [7] 5:10 7:3 12:12 15:3 17:11 35:12 52:10
frank [8] 1:7,8,8,11 2:8,8 64:1 68:8



## P.R. VIDEO, INC

fred [3] 44:4 46:2 54:12
friend [1] 33:9
friends [2] 31:2 33:1
friendship [2] 11:7 43:12
fuckin [1] 65:4
full [2] 18:7 20:4
fully [1] 18:4
further [1] 23:2
fuse [1] 46:1
future [1] 55:7

### G

gentleman [1] 1:2
getting [2] 56:3 60:4
give [3] 4:2 5:8 17:2
given [1] 41:6
got [9] 22:4 26:2 33:6 34:12 43:1 45:13 59:8 61:8,13
gotten [1] 31:11
great [1] 45:5
gregory [1] 12:7
guess [2] 11:4 17:8

### H

hamilton [1] 24:6
handle [2] 22:5 29:2
handled [2] 49:4 66:4
handles [1] 67:4
handwriting [1] 18:9
hang [1] 62:9
happen [1] 26:10
happened [4] 26:7 37:2 54:5 62:3
harrisburg [1] 3:1
harry [42] 2:6 3:2,3 4:3 20:9 32:8 33:1,11 34:11 41:5,12 42:2,6,7,9,11 43:2,
8,10 45:7,9,12 46:1 47:2 48:2,3,9 49:6,9 51:7 52:1,5 55:7,11 57:6 58:7,9
60:4 61:5,7 65:3,7
health [1] 18:8
hear [2] 14:10,12
heckman [2] 51:2,10
helping [1] 58:2
heritage [1] 25:4
himself [3] 45:13 56:3 58:9
hired [2] 1:5 10:2
hold [1] 22:4
home [1] 38:3
honestly [1] 51:11
hostile [1] 30:9
hour [1] 32:5
hung [1] 25:4
husband [1] 46:9

### I

identify [1] 2:10
idiosyncrasies [1] 42:9
immediately [1] 36:3
inaudible [1] 46:11
incidents [1] 67:7
individuals [2] 12:6 66:9
inform [1] 54:8
information [1] 67:5
initial [2] 9:12 11:8
initially [1] 19:7
instead [1] 27:1
insurance [1] 18:8
intended [1] 20:6
interactions [1] 32:9

interesting [1] 34:3
internal [3] 11:5,10 21:7
interview [3] 10:2,4,7
interviewers [1] 68:1
involved [3] 8:12 23:6 60:4
involvement [1] 23:3
issues [5] 17:3 23:6 29:2,9 59:12

### J

jeopardizing [4] 57:11,12,13 65:8
jim [1] 36:7
job [12] 22:7 25:9 27:2,5 33:8,10 39:4 41:7 42:5,6 43:1 57:11
joe [9] 12:10 15:4 24:10 29:7 36:9 50:7 52:1 57:10 63:2
john [9] 24:4,5 32:9 34:2 46:8 47:3 51:2,6,10
joseph [1] 9:7
jr [1] 2:6
july [3] 5:1 53:5 54:5
jumper [1] 44:4

### K

keep [1] 11:6
keeping [1] 59:12
kennedy [3] 17:8 19:5 52:3
kennedy's [1] 15:11
kind [2] 15:4 46:2
knowledge [5] 23:12 65:13 66:3,6,10
knows [1] 51:7

### L

ladies [1] 1:2
large [1] 67:7
larson [1] 28:2
last [6] 1:11 28:2 33:4 53:7,7 59:1
later [1] 30:5
learn [2] 27:6 53:3
least [2] 60:2 61:2
leave [1] 14:2
lebanon [1] 2:2
left [5] 26:3 29:4 35:4 41:2 53:1
letting [1] 62:9
level [1] 17:7
life [1] 45:11
line [1] 34:4
listen [1] 60:1
litigation [1] 23:9
long [6] 5:5 6:5 15:13 38:5 51:6 53:2
longer [1] 44:3
loop [1] 14:9
loss [1] 38:2
lot [6] 34:1 44:2 45:13 48:12 55:13
loyal [1] 33:9
lundcrest [1] 28:2

### M

made [4] 7:7 38:9 50:8 53:7
management [1] 40:2
manager [11] 6:3,6,9 13:9 24:12 29:5 36:5 40:9 41:3 44:6 60:10
managing [1] 17:6
manger [2] 47:11 63:4
many [7] 7:8,10 11:12 12:3 21:9 30:2 35:10
march [1] 53:10
march/april [1] 5:11
market [1] 3:6
marketing [1] 67:3
marsha [5] 22:1 36:8 37:2,9 41:2

## P.R. VIDEO, INC

marv [1] **23:10**
marvin [1] **3:4**
matter [4] **4:4 11:3 23:9 57:7**
matters [1] **62:12**
mccool [34] **9:7 10:10 15:11 19:5 22:9,12 25:3 26:4 27:3 28:11 29:8 31:2, 3,6 48:7,10 49:2 50:8 52:1 57:10 58:5,12 59:2 61:9 62:2,6 63:2 64:3,6,12 65:3,6 66:1,6**
mean [2] **18:11 29:10**
meeting [2] **16:1 26:11**
memorial [2] **54:7 57:5**
memory [1] **34:7**
mention [1] **62:1**
mentioned [3] **24:2,9 56:5**
met [2] **4:2 19:6**
midday [1] **43:9**
middle [6] **2:4 56:3,8,10 60:4 61:6**
midnight [7] **33:3,5,7 42:5 43:7 45:10 57:2**
might [1] **12:3**
mike [1] **52:3**
minutes [1] **63:7**
moment [1] **29:11**
months [5] **5:7,10 17:11 30:5 57:3**
morning [2] **1:2 42:10**
most [8] **11:4 35:13 39:3,5 41:8 42:7,12 63:5**
move [4] **18:10 32:5 45:3 49:7**
ms [3] **58:3 60:5 66:7**
mulvihill [1] **36:7**
myself [1] **36:8**

### N

name [6] **1:4,11,13 4:1 24:2 28:2**
names [1] **24:9**
nature [1] **28:3**
need [2] **20:1 45:5**
needed [2] **56:7,9**
neither [1] **43:5**
never [5] **25:11 27:4 47:4 48:6 56:5**
next [1] **18:9**
niger [1] **65:4**
night [1] **36:1**
nine [1] **33:4**
none [1] **23:4**
north [1] **3:1**
note [1] **34:2**
nothing [1] **49:6**
notified [1] **54:10**
number [3] **2:5,11 7:9**

### O

obviously [2] **29:11 59:3**
occasion [2] **40:10 61:4**
occasions [3] **57:10 61:1,3**
occupied [1] **52:10**
offer [1] **53:12**
offered [1] **18:12**
office [4] **15:11 27:1,4 52:9**
officer [21] **5:3,6,12 6:9 7:4,6 13:10 14:1 20:10 21:1 27:2 35:5 40:1,5,8 54: 3 57:3 58:1 65:9 66:2,3**
officers [3] **11:9 15:3 67:6**
okay [11] **7:10 8:12 11:1 24:10 25:7 26:6 28:11 49:11 62:1 64:8 68:3**
once [2] **59:8 62:3**
one [19] **9:5 10:8 13:13 21:13 24:11 26:3 35:13 44:8,10,11 45:7 47:13 55: 13 56:6 59:3 61:4 67:4,7,13**
ones [1] **12:8**

ongoing [1] **51:8**
only [3] **21:12 33:8 57:2**
open [1] **37:13**
opening [3] **22:7 37:4,4**
operation [5] **1:4 6:2,6,8 36:4**
operations [13] **9:9 13:9 24:12 28:12 40:9 41:3 44:6 47:10 60:9 63:3,11 67:11 68:10**
operator [17] **35:9 36:2,11,12 37:3,6,8,10,13 39:11,12 40:1,4,10 42:3 43:4 44:9**
operators [3] **21:13 35:11 36:6**
opinion [3] **56:2 59:2 63:2**
originally [2] **67:9,10**
ostrowski [8] **2:12,12,13 4:1 32:2 63:8 65:11 66:12**
other [11] **12:3 13:13 14:2 15:3 21:12 22:2 27:10,11 36:5 45:8 49:5**
otherwise [1] **20:6**
out [16] **11:7 15:9 18:10 19:3 20:2 25:4 32:3 41:13 45:8 50:9 53:4 56:7 58: 1 61:6 62:5,9**
over [5] **22:8,9,12 37:7 49:1**

### P

p.m [1] **68:8**
p.r [1] **1:5**
pa [1] **57:12**
packet [1] **20:10**
packets [1] **22:8**
park [1] **2:1**
part [1] **25:12**
participate [3] **10:3,6,11**
participated [1] **10:10**
particular [1] **22:7**
passed [1] **21:8**
past [1] **29:12**
paul [2] **51:1,10**
pay [1] **38:3**
penalty [1] **50:3**
pennsylvania [5] **2:2,4,7 3:5 4:4**
pension [1] **18:5**
people [12] **10:1 11:5 12:3 16:6 21:7 22:2 27:10,11 28:3,4 67:6 68:2**
performance [7] **16:11,12 17:4 23:7 43:11 44:1 45:4**
period [2] **5:9 6:2**
perjury [1] **50:4**
permanent [1] **35:12**
person [9] **21:12 36:1 39:3,5 41:8 42:8,9,12 46:2**
personal [3] **34:2 43:12 56:2**
personnel [3] **23:8 59:12 62:12**
persons [1] **14:2**
philadelphia [1] **3:7**
phone [1] **2:11**
picked [2] **43:10 68:2**
place [1] **16:1**
places [1] **15:4**
plaintiff [2] **1:6 3:2**
planned [1] **18:2**
plans [2] **14:6,11**
play [1] **66:1**
please [1] **2:9**
plot [1] **21:12**
point [4] **8:1 13:1 31:12 53:11**
politics [1] **11:6**
position [32] **5:3 6:9 7:11 9:1 13:9 14:1,3 20:11 24:12 25:12,12 28:10 35: 4 36:8 37:6,13 38:1,9,11 39:2,7 40:2,8 41:9,10 42:3,5 43:4 52:9 53:1 54:3 67:2**
positions [12] **7:4,6 8:4 9:12 12:1,6,12 21:2 40:5,6,11 52:10**
positive [1] **12:9**

## P.R. VIDEO, INC



posted [2] 9:13 38:11
posting [2] 54:2 55:4
preacher [1] 46:3
preparation [1] 64:2
pretty [1] 30:9
prior [4] 6:1 16:10 18:1 40:7
probably [6] 5:10 7:1 33:2 38:7 43:10 53:9
problem [3] 51:7,8 59:11
problems [1] 60:5
process [8] 9:1,11 10:2,4,7 13:6 23:3 66:2
profusely [1] 62:6
promote [1] 34:11
promoted [8] 13:8 33:7 34:12 36:4 38:6,8 41:6 59:9
promotion [3] 33:6 64:4 66:2
propose [1] 19:7
proposed [2] 9:6 24:11
provide [1] 2:10
public [2] 46:5 67:4
put [2] 19:9 39:6

### Q

qualified [4] 39:5 41:8 42:7,12
question [1] 54:11
questions [1] 31:3
quit [1] 30:6

### R

r.o.n.a.l.d [1] 1:11
radio [18] 21:13 35:8,10 36:2,5,11,12 37:5,7,10,13 39:11,12,13 40:10 42:3 44:9 66:2
raising [1] 29:8
ranks [1] 58:2
rather [1] 7:5
rausch [2] 12:7 59:10
read [1] 57:7
really [1] 13:7
realm [1] 42:8
reason [1] 50:10
reasons [1] 56:6
recall [17] 6:12 7:9 8:2,6,11 23:5 24:3 46:6,12 49:11 50:1 52:2 54:2 55:4,5 56:12 59:6
receive [1] 22:4
received [3] 4:7 21:10 22:3
recollection [1] 13:4
record [1] 2:11
reference [1] 64:4
referring [1] 57:8
refrain [1] 56:9
refresh [1] 34:7
regarding [1] 68:4
related [1] 23:7
relates [1] 17:4
relation [1] 56:11
relinquished [1] 37:5
remained [1] 52:10
remember [11] 14:8 21:11,13 31:7 34:6,7 56:8 58:4,6 60:3 61:2
reminded [1] 64:1
reporter [8] 1:1,9,13 3:8 63:6,9,12 68:7
respond [1] 30:7
response [2] 4:8 8:8
responsible [1] 67:11
rest [1] 45:10
restriction [1] 32:1
retire [4] 4:11 18:2,7 19:12

retired [9] 5:2,3 15:2 17:13 25:11 52:11 53:3 54:1,5
retirement [10] 14:2,4,6 15:1 17:11 18:8 20:4 53:8 56:12 57:13
retiring [1] 54:9
rid [1] 49:3
rispoli [2] 66:5 68:1
rodriquez [2] 1:4 2:1
role [1] 66:1
ronald [5] 1:6,8 2:8,8 68:8
rotten [1] 30:3
roughly [1] 5:11
rudy [1] 12:7

### S

safety [6] 9:8 25:10 28:4,7,9,12
same [2] 15:5 25:4
saying [2] 59:6 61:10
second [1] 34:9
secretary [2] 27:9,13
see [8] 18:9 25:10 34:7 53:8,9 54:4
selected [11] 11:9 39:1 43:6
selection [2] 23:3 67:12
senior [22] 35:8,10,13 36:1,5,11 37:3,5,7,10 39:3,5,11,12,13 40:4,10 41:8 42:3 43:4 67:6,6
seniority [3] 41:12,13 45:3
sent [1] 22:10
service [1] 44:2
services [1] 26:9
several [4] 5:7 22:1 27:10 57:3
shift [6] 37:7,10 42:8 43:5,7,9
short [1] 46:1
sidetrack [1] 34:9
simple [1] 45:11
since [1] 23:8
sir [1] 5:5
situation [4] 46:6 51:2,9 60:3
six [1] 30:5
sixth [1] 3:1
smooth [1] 46:4
snowstorm [1] 33:12
soda [1] 33:13
someone [1] 58:8
somewhere [2] 34:4 57:4
sorry [2] 32:12 63:8
specific [3] 5:8 17:2 24:9
specifically [5] 18:12 19:1,10,11 60:12
spell [1] 1:9
spruce [1] 2:1
sr [1] 3:3
stabbing [1] 25:6
staff [1] 67:6
stand [1] 45:8
start [1] 40:4
started [3] 13:5,6,7
state [1] 19:1
states [1] 2:3
stay [3] 20:7 56:7 61:5
stepping [1] 58:1
still [2] 36:7 43:10
stipulations [2] 3:11,13
street [2] 3:1,6
submit [1] 20:9
submitted [3] 21:5,6,8
subpoena [2] 4:7,9
suggest [2] 50:7 58:8

posted – suggest

51

## P.R. VIDEO, INC

suggestion [1] 61:9
sullivan [23] 12:11 13:8 15:4 16:8 24:11 25:5 27:1 29:7 36:9 48:6 58:11 59:6,8,11 60:2 62:1,3,4,5 63:3 66:5 68:2,4
sullivan's [1] 63:2
supervisor [2] 29:4 33:6
supervisor's [1] 33:7
supervisor/manager [1] 62:4
support [1] 65:4
supporting [2] 27:2 65:7
suppose [1] 43:2
supposed [1] 29:1
suppport [1] 65:2
suspend [1] 63:7
suspended [1] 68:9
suspending [1] 63:10
switching [2] 15:4 16:8
sworn [1] 2:9

### T

talked [1] 60:2
ten [1] 6:7
tense [1] 29:12
tenure [1] 49:1
term [1] 6:8
terminated [1] 19:11
termination [1] 19:7
terri [16] 23:6 24:2 32:9,11 46:7 47:3,8 48:11 49:1,3 50:9 51:3,5,9 56:3 57:7
terry [3] 64:5 65:7 68:4
testified [1] 57:7
testify [1] 7:5
testimony [1] 57:8
theirs [1] 43:5
themselves [1] 2:10
third [1] 43:4
though [3] 7:2 56:5 59:1
threatened [1] 47:4
threatening [2] 46:7,8
three [7] 5:10 7:12 9:12 11:8,13 12:5 17:11
till [1] 53:5
timeframe [1] 57:4
today [3] 4:2,8 50:5
together [4] 25:5 30:2 33:2,3
took [6] 18:10 37:4,13 38:2 40:1 51:7
tried [1] 11:6
trouble [1] 46:1
truth [1] 50:4
truthful [1] 50:1
turned [3] 22:8,9,12
turnpike [9] 2:7 3:5 4:4,12 26:9 50:9 54:8 55:8 57:12
twenty [1] 45:5
twice [1] 60:2
two [5] 44:8 54:2 55:4 61:1,2
type [1] 62:8

### U

under [2] 43:5 50:3
understand [4] 4:5 32:2 55:2 61:8
undertaken [2] 9:3,4
union [3] 39:4,8 40:2
united [1] 2:3
until [8] 7:7 13:7 20:7 22:4 28:9 52:11 53:1 55:1
up [6] 15:10 29:11 34:4 45:1 47:8 53:13
usual [2] 3:10,12

### V

vacancies [5] 8:1 14:7,11 44:12 54:2
vacancy [2] 35:2,3
vacation [1] 54:6
versus [3] 2:6 4:3 45:8
vested [1] 18:4
video [14] 1:1,1,3,5,9,13 3:8 63:6,9,10,12,13 68:7,9
volatile [1] 56:4

### W

wait [1] 53:5
wall [1] 18:9
wanted [3] 37:12 49:3 50:8
warn [2] 61:5,7
weinberg [7] 3:4,4,10 23:11 31:8,13 65:13
whatever [2] 33:12 42:11
whatsoever [1] 66:1
whether [1] 49:9
wickard [7] 12:9 36:10 37:6 38:10 41:11 42:2 43:3
wicked [1] 33:11
will [5] 34:7,8 43:2 57:7 64:10
williams [16] 2:6 3:2,3 4:3 12:2 20:9 32:8,12 41:5 42:2 43:3 52:1,5 55:7,11 66:8
within [1] 59:12
wondering [1] 31:11
words [1] 56:9
work [6] 10:12 11:2 32:4 37:12 38:3 42:8
worked [7] 16:6 30:2 33:1,3 42:6 54:7 67:8
working [1] 36:1
wright [1] 26:5
writing [1] 47:8

### Y

year [3] 6:12 26:3 38:7
years [6] 6:7 30:2 33:3,5 42:7 44:2

# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYVLANIA

| | | |
|---|---|---|
| HARRY E. WILLIAMS | ) | NO 1:CV-01-0877 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| PENNSYLVANIA TURNPIKE | ) | |
| COMMISSION, | ) | |
| Defendant | ) | **JURY TRIAL DEMANDED** |

DATE:              JULY 12, 2002

PROCEEDING:    VIDEO DEPOSITION
                        JOANN GITTO DAVIS

ORIGINAL

APPEARANCES:

    For the Plaintiffs

        ANDREW OSTROWSKI, ESQ.
        4311 N. 6TH STREET
        HARRISBURG, PA 17110

    For the Defendants:

        MARVIN WEINBERG, ESQ.
        FOX, ROTHSCHILD, O'BRIEN &
        FRANKEL
        2000 MARKET STREET, TENTH FL.
        PHILADELPHIA, PA 19103-2706

SHEET 1    PAGE 1

1    TONY MARCECA:  Good afternoon ladies
2  and gentlemen.  Be advised the video and audio is
3  in operation.  My name is Tony Marceca.  My
4  address is 2219 Dixie Drive, York, Pennsylvania
5  17402.  I've been contacted by PR video to be the
6  video operator for this deposition.  The case is
7  in the United States District Court of the Middle
8  District of Pennsylvania.  It's title Harry E.
9  Williams, Jr., Plaintiff vs. Pennsylvania
10  Turnpike Commission, Defendants.  It's a Civil
11  Action 1: CV-01-0877.  The deposition is being
12  held in the Law Offices of Mr. Andrew Ostrowski,
13  4311 N. 6th Street, Harrisburg, Pennsylvania and
14  the video deposition is being taken on behalf of
15  the Plaintiff, Mr. William, or Harry E. Williams,
16  Jr.  The time is 1:41 p.m. on the 12th of July
17  2002 and would the witness please raise their
18  right hand and swear after me.  State your name,
19  full name.
20    MS. DAVIS:  Joann Gitto Davis
21    TONY MARCECA:  Joann?
22    MS. DAVIS:  Gitto Davis
23    TONY MARCECA:  Do you want that spelled?  And do
24  you swear to tell the truth, the whole truth, so help
25  you God?

PAGE 2

1    MS. DAVIS:  I do.
2    TONY MARCECA:  Thank you.
3    MR. OSTROWSKI:  Usual stipulations?
4    MR. WEINBERG:  Usual stipulations.
5    TONY MARCECA:  Would you identify yourself Mr.
6  Ostrowski.
7        MR. OSTROWSKI:  Yes, Andrew Ostrowski,
8  Counsel for Plaintiff
9    MR. WEINBERG:   Marvin Weinberg, Counsel for Turnpike
10  Commission.
11    TONY MARCECA:  Heather
12    MS. SHARPE:  Heather Sharpe, Assistant Counsel for
13  the Pennsylvania Turnpike Commission.
14    MR. WILLIAMS:  Harry Williams
15    MR. OSTROWSKI:  Ms., may I approach you as Davis?
16    MS. DAVIS:  That's correct.
17  Q    My name is Andy Ostrowski and we were introduced
18  just before I sat down here today.  And you understand
19  that you're here today to give a deposition in
20  connection with the lawsuit that Harry Williams had
21  brought against the Pennsylvania Turnpike Commission?
22  A    Yes
23  Q    Have you given depositions in the past?
24  A    No sir.
25  Q    OK, what's your, I'm gonna dispense with a lot of

PAGE 3

1  the formality.  Just at any time if you need to take a
2  break or anything just let me know and we'll do that.
3  A    OK
4  Q    OK?  How long have you been employed by the
5  Pennsylvania Turnpike Commission?
6  A    About 5 « years.
7  Q    And you're currently employed with the
8  Pennsylvania Turnpike Commission?
9  A    Yes
10  Q    And is your position currently Director of Human
11  Resources?
12  A    Yes
13  Q    And have you held that position at all times since
14  you've been with the Pennsylvania Turnpike Commission?
15  A    Yes
16  Q    Prior to your employment with the Pennsylvania
17  Turnpike Commission, how were you employed?
18  A    As the Director of Labor and Employee Relations at
19  RESORTS INTERNATIONAL Casino.
20  Q    RESORTS International Casino?
21  A    Yes
22  Q    And how long did you hold that position?
23  A    16, about 16 years
24  Q    OK, is that Atlantic City?
25  A    That's Atlantic City.

PAGE 4

1  Q    And when did you, when, do, do you have a, a
2  degree, Bachelor's Degree?
3  A    I do have a Bachelors of Science of Degree in
4  Industrial and Labor Relations with Cornell University,
5  New York.
6  Q    OK, and when did you get that?
7  A    When?
8  Q    Yes
9  A    1976
10  Q    And could you just run through your employment
11  history from 1976 until you started with RESORTS?
12  A    I worked at RESORTS.
13  Q    OK, how is it that you became employed with the
14  Pennsylvania Turnpike Commission?  I mean how did you
15  become aware of the position and what did you do to get
16  the position?
17  A    I believe I saw it advertised and applied for the
18  position.
19  Q    OK and with whom did interview when you, when you,
20  after you applied for the position?
21  A    I interview with Deb Davis, Debbie Everling and
22  John Durbin.
23  Q    OK and has your, your title been at all time
24  Director of Human Resources?
25  A    Yes

SHEET 2    PAGE 5

1  Q    And has your office structure remained the same at
2  all times during the 5 « years you've been there?
3       MR. WEINBERG:  Objection.  What do you mean by
4  office structure?
5  Q    Well, how's, how, how's your office staffed?
6  A    With the Human Resources specialists.
7  Q    You're the Director and I'm assuming that's the
8  top position in the office, correct?
9  A    Yes
10 Q    And then how many other people are employed or
11 assigned to that office?
12 A    Approximately 20
13 Q    OK, and they're all Human Resource Specialists?
14 A    Not all of them, but Human Resources related
15 positions, classifications.
16 Q    Could you describe for me how the, in terms of
17 its, its higher archival structure how your office is
18 set up.  You know whether you have units underneath you
19 or if they're broken down into areas of responsibility?
20 A    I have three direct reports.  I shouldn't say
21 that.  I have three functional areas: Manager of Labor
22 and Employee Relations, Manager of Compensation and
23 Benefits and HRIS and a Manager of EEO and Training and
24 Development and Staffing Specialists.
25 Q    OK and how long have those three direct reports,

PAGE 6

1  those positions been in place?
2  A    The last few years.
3  Q    OK, was there a change in the structure of your
4  office at some point during your tenure?
5  A    Yes
6  Q    And do you know when that change occurred?
7  A    Approximately the beginning of 2000, maybe 1999.
8  I can't recall.
9  Q    OK and prior to the change how was your office set
10 up in terms of, you know, areas of responsibility?
11 A    It wasn't, it was just the Human Resources
12 Department.
13 Q    OK and you were going kind of fast, I couldn't
14 write it all down.  One unit or area is Labor and
15 Employee Relations?
16 A    Correct
17 Q    The second one, what was that one?
18 A    Compensation Benefits and HRIS
19 Q    What is HRIS?
20 A    Human Resources Information Systems
21 Q    And then the third one was EEO?
22 A    Training and Development
23 Q    Training and Development.Who was the labor and
24 employment specialist at this point?
25 A    Manager

PAGE 7

1  Q    Manager
2  A    Vince Kline
3  Q    And how long has Mr. Kline been at that position?
4  A    I'd say approximately three years.
5  Q    OK and prior to Mr. Kline who was in that
6  position?
7  A    I don't understand your question.
8  Q    Before Mr. Kline was Labor and Employment Manager,
9  who was Labor and Employment Manager?
10 A    No one.
11 Q    OK, you, that's, he came in when you restructured
12 your office?
13 A    No, he was a Labor Relations Specialist before
14 that and then was promoted to Manager.
15 Q    OK, but was it, the position of Labor Employment,
16 Labor Employee Relations Manager a new position when he
17 filled it?
18 A    He was promoted.
19 Q    He was.?
20 A    promoted.He was a Labor Relations Specialist.  He
21 was promoted to a combined certain classifications
22 under him and he was promoted to Manager of Labor and
23 Employee Relations.
24 Q    Right, so prior to him being promoted to that
25 position, that position didn't exist?

PAGE 8

1  A    That's correct.
2  Q    OK and let's try if you can keep the reference to
3  1999 timeframe.  How man personnel were in the Human
4  Resource office at that point?  Roughly, if you don't
5  know exactly?
6  A    I don't know at that point.  When I started there
7  were about nine and I started in 1996.
8  Q    OK
9  A    Things fluctuate, they change over the years.  I
10 don't know.
11 Q    OK and now how many is it?
12 A    20
13 Q    20.Has your office taken on additional
14 responsibilities over your term as Director of Human
15 Resources?
16 A    The scope of the position, the scope of the work
17 has expanded.
18 Q    In what, in what sense?
19 A    In all areas, in all facets of HR.
20 Q    OK.  What are the facets of HR?
21 A    Labor and Employee Relations, Compensation
22 Benefits and Human Resources Information Systems, EEO
23 and Training and Education and Staffing.
24 Q    OK.  Are there things that your office is doing
25 now that it wasn't doing when you first started,

SHEET 3    PAGE 9

1  functions being performed?
2  A    Functions are still the same the same the
3  functions, but functional responsibilities have
4  expanded.
5  Q    OK, but when you say responsibilities have
6  expanded am I incorrect in looking at that as
7  additional responsibilities being brought in to the
8  office that weren't previously in the office?
9  A    If I understand that correctly, yes, yes.
10 Q    OK, so what functions are being performed now that
11 weren't being performed.
12 A    The same functions, it's just that the, the
13 project work entering into the functions have been
14 expanded.  I don't know how else to explain it.  The
15 scope of the responsibilities haven't expanded.
16 Instead of having maybe four projects when I first
17 started, there's about 400 projects now going on.
18 Q    Like, what types of projects?
19 A    OK, for example, Human Resources Information
20 Systems; we didn't have a system.  We, when I got
21 there, we, we, we contracted with and, and had this
22 system, in, implemented.  So that's a major project and
23 it's an ongoing project in our Compensation Benefits
24 area.
25 Q    OK

PAGE 10

1  A    So things like that.  So the scope has expanded.
2  Functional areas have remained the same.
3  Q    OK, good enough.
4  A    OK
5  Q    What, what involvement does your office have in
6  the disciplinary process for employee discipline
7  matters?
8  A    Can you.
9  Q    Meaning is there, is there a certain level, a
10 prescribed level at which Human Resources office
11 becomes an active participant in the process?  You know
12 I'm assuming that maybe a verbal warning is something
13 that can occur within the work unit between supervisor
14 and subordinate and then you know, written warning,
15 perhaps the same way and then is there some level of
16 discipline that mandates direct Human Resources
17 involvement?
18 A    If an employee for example is going to be
19 suspended it comes to my attention and I sign off on
20 whether or not the suspension actually takes place.
21 Q    OK and when you say you sign off on that is that
22 you have the final word on that?
23 A    At that level I approve it.  The final say is with
24 the Executive Director.
25 Q    OK, and is that the same for terminations?

PAGE 11

1  A    Yes
2  Q    And when you approach something is it pretty much
3  rubber stamped as a matter of course?  I mean not,
4  maybe rubber-stamped isn't a fair way to characterize
5  it but, is it, is your approval always or routinely
6  accepted by the Executive Director?
7  A    For the most part.
8  Q    OK, can you recall any instances where you had
9  approved a particular disciplinary action that the
10 Executive Director overturned you on?
11 A    No, not at this moment.
12 Q    OK and when you are administering discipline or
13 not administering, when you, with your involvement in
14 the process at the approval point of the suspension or
15 termination, what do you do prior to giving your
16 approval?  You know if you have a general approach to
17 things, well, I talked to such and such and so and so
18 and I review whatever information?
19 A    The manager of Labor and Employee Relations will
20 further investigate the request.  I collaborate with
21 him and we can make a decision on whether or not it's
22 approved or not.
23 Q    OK and what's the manager of Labor and Employee
24 Relations name again?
25 A    Vince Kline

PAGE 12

1  Q    Vince Kline, and you said prior to him being
2  Manager of Labor and Employee Relations he was a Labor
3  and Employment Specialist?
4  A    Yes
5  Q    Were there other Labor and Employment Specialists
6  at the time that he also was a Labor and Employment
7  Specialist?
8  A    No
9  Q    And how long, was he in the office when you
10 started?
11 A    No
12 Q    Who was, were there, who was the Labor and
13 Employment Specialist prior to Mr. Kline?
14 A    Phil Oberton
15 Q    OK and was Mr. Oberton in the office when you
16 started?
17 A    Yes
18 Q    And do you in the course of the disciplinary
19 process you communicate with the Labor and Employment
20 Specialist or Manager concerning whatever labor issues
21 are involved?
22 A    Can you repeat that?
23 Q    In the course of your administration of the
24 disciplinary process your, you, do you work primarily
25 work with the Labor and Employment Specialist?

SHEET 4    PAGE 13

1  A    I don't administer discipline.
2  Q    OK well in.
3  A    The Department Head does.
4  Q    So when you approve a disciplinary action it goes
5  back to the Department Head?
6  A    That's correct, the DED.
7  Q    OK, for the Department Head to then implement?
8  A    Or the DED whoever does it once it leaves my hands
9  I don't know who actually administers it.
10  Q    OK.  Were you.I don't know if you know, but I also
11  represented Terry Edwards who also has a lawsuit
12  outstanding against Pennsylvania Turnpike.  Are you
13  aware of her lawsuit?
14  A    Yes, but I didn't know you represented her though.
15  Q    OK.  That, I guess that's not important.
16  A    I wouldn't know that.
17  Q    Were you involved, well I guess, your name shows
18  up on some of the documents.
19  A    Everything
20  Q    .in that case too.  OK.  At any point in the
21  disciplinary process as it related to Terry Edwards,
22  did you see anything that was prepared or provided by
23  Mr. Williams, any memorandum that he wrote concerning
24  what he perceived as the treatment of Terry Edwards?
25  A    No

PAGE 14

1  Q    Did you ever have any in the context of the
2  disciplinary process as it relates to Terry Edwards;
3  did you ever have any discussions of Harry Williams
4  with anybody?
5  A    No
6  Q    In, in the process leading up to Terry Edward's
7  termination, could, could you just ex, explain what
8  your involvement was, when you became aware of the
9  issues, what the issues were and how that progressed
10  until she was terminated?
11  A    I don't recall the particulars at this point in
12  time.
13  Q    OK.  Do you recall who it was that you interacted
14  with from her department in the process?
15  A    I believe the DED at the time is; the acting DED
16  was John Martino.
17  Q    OK, did you and Mr. Martino actually have
18  discussions concerning the disciplinary process as it
19  relates to Terry Edwards?
20  A    I really don't recall but if it had it was on a
21  limited basis.  I really didn't get that involved in
22  that case.
23  Q    OK, did you ever conduct any independent
24  investigation of any of the matters that were at issue
25  in her case?

PAGE 15

1  A    No
2  Q    And if you could just describe for me what your
3  involvement was.  Were you just in a review capacity
4  were you in an investigative capacity, were you in a
5  director in capacity?
6  A    In my capacity as Director of HRI, I may, I
7  reviewed the request to terminate from John Martino.
8  That's standard procedure.
9  Q    Ok the request to terminate is standard procedure
10  but that originates with the DED?
11  A    Yes, the DED and Department Head, yes.
12  Q    DED and Department Head?
13  A    Well it may be DED or and/or Department Head.
14  Q    OK.  Do you recall, do you have any interactions
15  with Joseph McCool concerning Terry Edwards, any
16  discussions with him about Terry Edwards and
17  disciplinary process?
18  A    I don't recall at this moment.
19  Q    OK.  Now what, what is your roll, in, I mean as
20  Director of Human Resources in the promotion process as
21  it relates to vacancies or the posting and
22  advertisement of position vacancies in the Turnpike
23  Commission?  Could you kind of give me a general sense
24  of the process?
25  A    I'm responsible for the posting process.

PAGE 16

1  Q    OK and what is the posting process?  When does,
2  when does posting process actually begin and what
3  happens after that?
4  A    Once there is approval from the Commissioners who
5  approve a vacant position and its ability to be posted.
6  Q    OK, how does the request, the vacancy request get
7  to the Commissioners?
8  A    From the DED to the personnel committee.
9  Q    OK does the personnel committee of the Board of
10  Commissioners
11  A    The personnel committee for the PTC
12  Q    OK.  Do you participate in that committee?
13  A    No
14  Q    Does that committee comprise of the Commissioners?
15  A    No
16  Q    No
17  A    No, the top-level executives of the organization.
18  Q    OK.  Who is your direct report?
19  A    ? name is Blair Fishburn.
20  Q    And what is Mr. Fishburn's; a Chief Financial
21  Officer is it?
22  A    DED of Finance and Administration
23  Q    OK and is that position only been your direct
24  report?
25  A    Yes

1 Q    OK, since the time you first started?
2 A    No
3 Q    No, well, when, who was it before?
4 A    Deb Davis, Director of Policy and Administration.
5 I initially accepted the position.
6 Q    OK and are those the only two direct reports that
7 you've had since you been with Turnpike Commission?
8 A    Yes
9 Q    And was there a restructuring or reorganization
10 that led you a change from reporting to, from Ms. Davis
11 to Mr. Blair.
12 A    Fishburn
13 Q    Fishburn?
14 A    Yes
15 Q    When did that occur?
16 A    The end of 1999, I believe.  I don't recall.
17 Q    OK.  Do you have a, do; do you know what Harry
18 William's complaints are or what his complaint is
19 about?
20 A    By preparing for the depositions I learned about
21 it.
22 Q    OK, that he's essentially challenging the, the,
23 his non-selection for a couple vacancies that came up
24 in the Communications Center?
25 A    Yes

1 Q    OK and do you have a recollection of, you know, a
2 present recollection even after reviewing, you know and
3 preparing for this deposition of the processes involved
4 in his non-selections?
5 A    I don't get involved in the process.
6 Q    But do you, do you recall being involved?  Do you
7 recall the process that, that Harry Williams is
8 complaining about?
9 A    His particular process?
10 Q    Yes
11 A    I mean I know the, the proc, the, the, you know
12 the bidding process.
13 Q    And the general rule
14 A    Yes
15 Q    Do you recall the process as it related to the
16 Communications Center Duty Officer positions that were
17 posted and presumably filled back in 1999?  Do you have
18 a present recollection?
19 A    ?
20 Q    OK, well the first, I guess we can do it by
21 looking at the documents.  There's a document before
22 you with a sticker on it marked as Exhibit 1.  It's,
23 it's a collection of various documents that I assembled
24 and put together and know I tried to have some, some
25 logical order to it.

1 A    Yes
2 Q    .but, you know I didn't know what, what went with
3 everything else, so this is my ordering and it's not
4 the way I received from the Turnpike Commission, just
5 so, so you know and understand that.  The first page of
6 that document of Exhibit 1 is PTC0734.  Could you just,
7 I can read the document and understand generally what
8 it is but, could you explain for me more about where in
9 the process this documented generated?
10 A    Yes, this is in the initial step of the process in
11 which the DED has approval to post and fill a
12 particular position.  If it's on the external market
13 then I request to the Purchasing Director, actually
14 he's the purchasing Manager, to advertise for the
15 positions; standard procedure.
16 Q    When you say this is a request from the DED, is
17 that the DED or the .
18 A    Department Head
19 Q    And, and in this case, Joe McCool is the
20 Department Head, correct?
21 A    That's correct.
22 Q    So this, this request to advertise position
23 vacancies came through Mr. McCool?
24 A    Correct
25 Q    And who is Jeffery L. Hess?

1 A    He's the Managing, he's the Purchasing Manager.
2 Q    OK, do you know why, what his involvement in the
3 process is, or why this was sent through you to him?
4 A    Yes because he makes contact with the newspapers
5 and advertises.
6 Q    OK, he.
7 A    On my behalf
8 Q    OK, he's acting on your behalf in that capacity?
9 A    Yes
10 Q    Is there a point in which, there's a decision made
11 as to the way the position is going to be posted?
12 Meaning are there times that the position is, is posted
13 internally as opposed to externally and vice-versa?
14 A    Yes
15 Q    And how is that determination made?
16 A    At the personnel committee's level when the DED
17 applies for positions to be posted they either apply
18 for it to be posted internally or internally and
19 externally.  In this case because it was an external
20 post, I mean because I see that this is going to be
21 posted externally, the position was requested to be
22 posted internally and externally.
23 Q    OK, so from the outset this position, Duty Center
24 or Communication Center Duty Officer was to be posted
25 internally and externally?  Is that correct?

SHEET 6   PAGE 21

1  A    Well I'd have to see first the backup but it looks
2  it, you know it appears that way here.
3  Q    Well is there ever a time that a position is
4  posted externally without also being posted internally?
5  A    Typically not, but I don't recall.  I post more
6  than a 100 positions in a year, I, I can't keep track
7  of all of them.
8  Q    I understand.  And back in, on April 20th of 1999,
9  Deb Eberly was, what was her position?
10 A    Associate Executive Director
11 Q    OK and was she your, was she a direct report?
12 A    No
13 Q    Now do you know who's responsible for drafting the
14 advertisement?
15 A    Yes
16 Q    Who is, who is responsible for that?
17 A    DED and Department Head.
18 Q    OK and you use DED and Department Head, you seem
19 to use them interchangeably a lot, is that, I mean are
20 they in some sense functional equivalents?
21 A    No
22 Q    No
23 A    A DED is higher than a Department Head.  I
24 should've said DED and/or Department Head.
25 Q    OK

PAGE 22

1  A    In this case it could've been, I don't recall, Joe
2  McCool because he was the De, he was the Department
3  Head at the time because there was an acting DED.
4  Q    OK.  The third page of this document, PTC0736 it's
5  the next page.  That is a memorandum from you to Mr.
6  Martino dated May 12, 1999.  And it references resumes
7  submitted to the Department Human Resources for three
8  Communications Center Duty Officer positions.  Were
9  there three positions that were available at that time?
10 A    It appears that there were three Communication
11 Center Duty Officers available, yes, positions.
12 Q    OK and the reason for the question is that, you
13 know the first page the subject; the memorandum from
14 Joe McCool says it has a advertisement for two
15 Communication Center Duty Officers.  And what I'm, I'm
16 just trying to understand, if only two of them were
17 posted externally or if there, if there is a
18 discrepancy there?
19 A    I, I can't recall.
20 Q    OK.  Well, subsequent to May 12, 1999 were there
21 or as of May 12, 1999 were there three vacancies in the
22 position of Communication Center Duty Officer?
23 A    I believe there were.
24 Q    OK.  Do you recall what is the, the prescribed
25 procedure for the posting of vacancies, meaning are

PAGE 23

1  there certain processes that is mandatory to follow
2  because your dealing with Union covered positions?
3  Meaning, are all positions, does it say, well lets
4  leave.
5  A    This is not a Union position.
6  Q    The Duty Officer position is Non-Union?
7  A    Right
8  Q    OK, well that's, now but are there non-the-less
9  procedures that must be followed in advertising,
10 posting, in filling, even what I'll call, is this a
11 Management Level position?
12 A    Management position
13 Q    OK.  Are there prescribed procedures for filling
14 those positions?
15 A    Yes
16 Q    And must they be filled on a competitive basis?
17 A    Well Policy Letter 65 dictates the process.
18 Q    OK and Policy Letter what, what, does it call
19 for, does it mandate a competitive selection process?
20 A    Yes
21 Q    OK.  And this, on the May 12, 1999 memorandum.
22 A    Yes
23 Q    Do you recall how many, how many resumes you
24 forwarded to Mr. Martino?
25 A    No

PAGE 24

1  Q    And in the second sentence they are attached for
2  your review for the next step in the selection process.
3  What is your understanding of the next step in the
4  selection process?
5  A    For the DED's to review the list and/or Department
6  Head to review the list that I send and then set up the
7  interview process; the actual interviews.
8  Q    OK, so after, after this memorandum, what was your
9  next involvement in the process?
10 A    Once the selection by the DED or Department Head
11 is made, they forward the list of names to me on a
12 Candidate Selection Personnel Action form.
13 Q    OK, OK.  Flip to the, the next page PTC00634,
14 0635, actually the next six pages or eight pages are
15 various versions, actually the next 10 pages, various
16 versions of that same general format.
17 A    Yes
18 Q    This is a Promotion Application Log.
19 A    Yes
20 Q    Is this a document that's generated from your
21 office?
22 A    That's correct.
23 Q    And is this, was this document also forwarded to
24 Mr. Martino as part of the packet that you sent over?
25 A    Yes

SHEET 7    PAGE 25

1  Q   On.
2  A   In addition to resumes and applications
3  Q   Thank you.  The PTC0634 is that, is that your
4  handwriting on the Deb, Deborah Ertzweiler and Fred
5  Jumper lines?
6  A   No
7  Q   Is the, the qualifications, the decision as to
8  qualify, that appears to be something or determination
9  that is made in your office is that correct?
10 A   Yes
11 Q   And what is involved in making that determination?
12 A   We would at the job description, where it says
13 minimum education requirements, educational and
14 training requirements and look at the resumes of each
15 candidate or application of each candidate, the updated
16 application to determine whether or not the individual
17 has the qualifications for the position.  If they do,
18 then we indicate it on this form and send it to the
19 DED.
20 Q   OK.  Now is there any additional process after the
21 preparation of the Promotion Application Log for
22 reviewing qualifications?  Meaning, can someone at some
23 point say no, he or she was not qualified for the
24 position?
25 A   The DED has that ability.

PAGE 26

1  Q   OK and is that something that's communicated
2  through your office?
3  A   For the most part, yes.
4  Q   Now was there, and I think in all of these
5  versions of this document, Harry Williams appears in
6  the, under the, had to check for an X next to the.
7  A   qualify
8  Q   .except for PTC0241, there's one that has
9  handwritten checkmarks in it?
10 A   OK
11 Q   Are you on that one?
12 A   Yes
13 Q   And Harry Williams has a checkmark under NO for
14 qualified.  Do you know when in the process these
15 checkmarks were, or who, who placed the checkmarks on
16 this document?
17 A   No, I don't.
18 Q   OK.  Did you ever see this document before?
19 A   I, I can't recall.  I mean all I can say is that
20 the finished product that goes in the DED's, is my, is
21 my Promotion Application Log that I sent with my, with
22 the memo.  The ones were they're typed in, comes from
23 my office.  Anybody could've done that.  I don't know.
24 Q   OK, OK I'm just asking if you have a recollection.
25 A   Yes, no.

PAGE 27

1  Q   So as far as you're concerned Harry Williams or as
2  far as the Human Resources Office for the Turnpike
3  Commission is concerned, Harry Williams was qualified
4  for the position?
5  A   In accordance with this, it says he's qualified
6  for the position.
7  Q   OK and, and.
8  A   Posted, the position that he applied for posted
9  April 23, 1999 to May 7, 1999, that was correct.
10 Q   OK and when, when making that determination that
11 qualification determination, is there some flexibility
12 in terms of the job description or the, the basic
13 education and training requirements?
14 A   Could you repeat that again?
15 Q   Is there some, some flexibility that you have in
16 making the qualified or not qualified determination as
17 it relates to the, the qualification criteria?
18 A   Either you make the requirements or you don't.
19 Q   OK, well, cause I note that, and this is, this is
20 a document that we had marked or that was marked
21 Defendants Exhibit 1 during Mr. William's deposition.
22 There might even be a copy of it in the packet.  This
23 is a job titled Communications Center Duty Officer that
24 has under qualifications; education, Bachelor's Degree
25 and completion of APCO, A-P-C-O 40 hour

PAGE 28

1  telecommunicator course or any equivalent combination
2  of experience in training and, and Mr. Williams doesn't
3  have a Bachelor's Degree.  Is that, is it fair to say
4  then that he met the equivalent combination.
5  A   or any equivalent combination of experience in
6  training
7  Q   OK
8  A   That's correct.
9  Q   OK, I just don't want to be at a point where the
10 Turnpike Commission is gonna take the position that
11 Harry Williams is not qualified for this position.  Has
12 your opinion or position on Mr. William's
13 qualifications for the Communications Center Duty
14 Officer position changed at any time since May 12,
15 1999?  I mean do you understand the question?
16 A   On here it says he was qualified for the position
17 for which he posted April 23, 1999 to May 7, 1999.
18 Q   OK and that's your determination?
19 A   On this log, the ? chart that is sent to the DED,
20 he was qualified for this particular posting.
21 Q   OK, and has your, your opinion changed since May
22 of 1999 as to whether Harry Williams was qualified for
23 that position at that time?
24 A   I don't have an opinion on that.
25 Q   OK

SHEET 8   PAGE 29

1  A    I mean it's either
2  Q    Either he does or he doesn't?
3  A    It's either it comes before me at the time and I
4  make the necessary determination whether or not he's
5  qualified.
6  Q    OK
7  A    OK?
8  Q    Fair enough. On the Promotion Application Log.
9  A    Yes
10  Q   .there also is a category for date of hire.  What
11  is the significance or why is that information on the
12  reflected on the Promotion Application Log?
13  A    We just, for all internal candidates we want it to
14  show how long the person's been here, for no other
15  reason than that.
16  Q   Is there consideration given to the seniority of,
17  of applicants per position?
18  A    It has nothing to do with the interview process.
19  Q   OK.  Is there any, does it, does it bear any
20  relation to the selection process?
21  A    No
22  Q   And, do you, did you, were you responsible for
23  developing this format, this Promotion Application Log?
24  A    Possibly, this was a long time ago.  I don't
25  recall.

PAGE 30

1  Q   OK, I'm just trying to understand if there's any
2  reason that Date of Hire is something that's recorded
3  on the Promotion Application Log.  And can, are there
4  any reasons that you know, are aware of that, that is
5  recorded?
6  A    No, no particular reason.
7  Q   OK.  On PTC0238 and 0239 there's some, some
8  handwriting, and actually might be different
9  handwriting, but on the first, first page of that, it
10  says delete.  Is that your handwriting?
11  A    Yes
12  Q   OK and was that deleted to reflect Terry Edwards
13  termination?
14  A    That's correct.
15  Q   And then on the second page.
16  A    Yes
17  Q   .there's a notation that says change and it was a
18  change of to no qualified unto yes qualified.
19  A    Yes
20  Q   Is that your handwriting?
21  A    That's correct.
22  Q   OK and who's, who were you directing to make that
23  change and to delete you know the Terry Edwards?
24  A    One of my staff members who reviewed this first.
25  Q   OK and do you recall why the, the determination

PAGE 31

1  was made to change the qualification recommendation as
2  to Mr. Skelly and Mr. Ware, W-A-R-E?
3  A    Not at this time.
4  Q   OK.  After all those promotions, or what do they
5  call them, Promotion Application Log documents, there's
6  a recommended personnel action dated June 4, 1999.
7  A    Yes
8  Q   Just leave that in front of you for now, cause I
9  want to ask you a couple more general questions.
10  A    Yes
11  Q   Was, was Mr., who was responsible for this
12  selection decision?  Was that Mr. McCool?
13        MR. WEINBERG:  Do you have the right page?
14  Q   I'm not asking the question.
15        MR. WEINBERG:  I threw a reference to 0244.
16  Q   I had her refer to that and then told her that I
17  wasn't gonna refer to that.  I mean, if, if, if it
18  helps you to answer that question, then by all means
19  refer to it.
20        MR. WEINBERG:  Could you repeat the question?
21  Q   Yes, actually it may.  My question was who was
22  responsible for the determination as to this personnel
23  action?  And if you look to 0246.
24  A    Well, Joe Sullivan signed the signature ?
25  Q   OK and also and Mr. Martino?

PAGE 32

1  A    and John Martino
2  Q   Whats.
3  A    So the two, John Martino is the acting DED, so the
4  two of them were responsible.
5  Q   But the request came from Mr. McCool?
6  A    That's correct.
7  Q   Correct?  Do you know why he would not have been
8  involved in the process?
9  A    No I don't.
10  Q   OK.  Are there, are there prescribed procedures
11  for how the interview process is to be conducted?
12  A    The DED is responsible for scheduling and
13  conducting the interviews.
14  Q   OK, what about, like in this case, PTC0244
15  references three persons conducting the interview.
16  A    Yes
17  Q   Do you know how that team or committee is
18  assembled?
19  A    Well it's in accordance with Policy Letter 65, but
20  the DED typically assigns the interview panel.
21  Q   The DED typically.
22  Head, yes.
23  Q   What does the, what were you referring to 65..
24  A    Policy Letter 65
25  Q   Policy Letter 65, what does that provide for in

SHEET 9   PAGE 33

1  terms of assembling the interview panel?
2  A    Well it just says there's a panel that, that is
3  assembled for the purpose of interviewing candidates.
4  Q    OK, does it have any further specifications as to
5  who should or should not be on the panel?
6  A    Usually there are Department Heads, two or
7  Managers.
8  Q    Is there some expectation of there being
9  familiarity with the general work done by the position
10 for which the interviews are being conducted?
11 A    That's left, left up to the DED.  It's not in
12 Policy Letter 65.
13 Q    OK.  So anything then that's not in Policy Letter
14 65 is left up to the DED or the responsible official?
15 Is that correct?
16 A    ? makes the executive decision to have who he
17 wants on this panel.
18 Q    OK.  At the bottom of 0244 and understand, well
19 I'll just clarify, you didn't prepare this document,
20 correct?
21 A    No
22 Q    OK.  Have you seen this document before?
23 A    Yes I see it when I take it to the Administration
24 Committee for their review.
25 Q    OK and from, after this document is signed or

PAGE 34

1  after June 4, 1999; if this occurred in the normal
2  course it would've gone from, form Mr. Martino, if
3  that's his signature to you?
4  A    That's correct.
5  Q    OK and you recognize on the third page of that
6  document 246 that that actually is Mr. Martino's
7  signature?
8  A    It appears that it is his.
9  Q    OK and as opposed to being Mr. McCools?
10 A    Yes
11 Q    OK.  Now I'm back to page 244, the first page of
12 the document.
13 A    Yes
14 Q    When it says a list, I'm at the bottom,
15 explanation of the interview and selection process; a
16 list of standard questions was compiled and asked of
17 each applicant.
18 A    Yes
19 Q    .Do you have an understanding of what standard
20 questions, I mean do you have a form or something in
21 your offices?
22 A    No
23 Q    OK
24 A    No
25 Q    So whoever drafted that would know.

PAGE 35

1  A    The Department Head or the DED compiles the list
2  of questions.
3  Q    OK
4  A    Typically
5  Q    OK.  Now this also, it recommends, or it states
6  under applicants recommended that there were two total
7  applicants recommended.
8  A    Yes
9  Q    Do you, do you know what the status of the third
10 position was at this point?
11 A    Not at this point.
12 Q    OK.  I think, I think I asked, well I'm sure I
13 asked the question but I'm not sure I remember the
14 answer, in the normal course then this is a document
15 that would go directly to you?
16 A    That's correct.
17 Q    And then, what, what did you do, do you recall
18 this document actually coming to you?
19 A    They all come to me.
20 Q    Ok.  What do you do with them when, after you get
21 them?
22 A    I, once I receive this then I put the position on
23 the Administration Committee agenda for the next
24 committee meeting.
25 Q    OK

PAGE 36

1  A    .and then it goes before the committee.  This
2  document goes before the committee.
3  Q    OK, to either approve or disapprove of the action?
4  A    That's correct.
5  Q    And then if, if the committee approves, what's the
6  process after that?
7  A    Then it goes to formal commission for approval, to
8  the Commission for formal approval.
9  Q    OK and then from the Commission to you?  I mean
10 don't, you send out the letters don't you?
11 A    Yes
12 Q    Yes
13 A    Then it goes back to me once I hear from the
14 Commissioners that there's approval granted for this
15 position, then I send out the letter to the individual
16 letting, informing them of the position.
17 Q    OK.  Now from the time that you submitted the May
18 12, 1999 memorandum to Mr. Martino until you received
19 the June 4, 1999 recommended personnel actions, do you
20 know if you had any, any involvement of any nature in
21 this process; either general discussions about how the
22 process was going or specifically as it relates to
23 direction being given?
24 A    Like I said I have over in excess of 100 positions
25 in any given year so, no I don't recall that.

SHEET 10   PAGE 37

1  Q   OK.  Do you recall having any discussions of,
2  about Harry Williams at any time in that selection
3  process?
4  A   No I don't.
5  Q   I'm gonna, I'm on 0742 now.
6  A   Yes
7  Q   Is that were you are?
8  A   Yes
9  Q   OK, I may have this a little bit out of order.  Is
10 there a, a Promotion Application Log for every posting?
11 A   Yes
12 Q   And, I do have this somewhat out of order, 742, if
13 you flip the whole way back one, about seven or eight
14 pages there's a, a Promotion Application Log and that.
15 A   Yes
16 Q   . does not reflect Harry Williams, correct?
17 A   That's correct.
18 Q   OK.  And then following that page.
19 A   Yes
20 Q   .is a July 21, 1999 memorandum from you to Joseph
21 McCool.
22 A   Yes
23 Q   On July 20, 1999 the Commissioners approved the
24 following personnel actions.
25 A   Yes

PAGE 38

1  Q   .number one, your request to repost internally and
2  advertise externally for Communications Center Duty
3  Officer position as per your memorandum dated June 22,
4  1999.
5  A   Yes
6  Q   Do you, do you know if there was a decision made
7  to not fill a third Communications Center Duty Officer
8  position back in June 1999?
9  A   I don't recall.
10 Q   OK.  Then, about four pages after that Promotion
11 Application Log that was PTC0758, there is, well you
12 have, you have that memorandum we just referred to.
13 A   Yes
14 Q   .a vacancy notice, two vacancy notices.
15 A   Yes
16 Q   .then a document that doesn't have a PTC number
17 because this is a document that, that came from Mr.
18 Williams.
19 A   Yes
20 Q   .and that and the two following, or three
21 following pages.
22 A   Yes
23 Q   .appear to be, or strike that, do you, do you
24 recognize that first page as a Pennsylvania Turnpike
25 Commission job bid form?

PAGE 39

1  A   What I recognize is this job bid form is only used
2  for Union employees.
3  Q   Pardon me?
4  A   It's only used for Union employees, a Union
5  employee job, job bid.
6  Q   OK.  Now why is this only used for Union employee
7  job bid?
8  A   Because of the process for applying for a Union
9  position and the pro, a separate process applying for a
10 Management position.
11 Q   OK.  Then there's a letter attached that follows
12 that dated July 28, 1999.
13 A   Yes
14 Q   .referencing application, it's to you, referencing
15 Mr. William's application for the position as
16 Communication Center Duty Officer posted on July 27,
17 1999.
18 A   Yes
19 Q   ..Do you recall receiving this letter?
20 A   No I do not.
21 Q   OK.  Is there any reason that you're aware of that
22 Mr. William's name does not appear on the Promotion
23 Application Log that's PTC0758?
24 A   0758, 0758, 0758, but what date is that?
25 Q   That's August 10, 1999.

PAGE 40

1  A   Well, this must be back some further than this
2  thing.  Well his name is not on here it's obvious.
3  Q   Right, do you know of any reason why his name
4  would not be on here?
5  A   Well it wouldn't be on there if he hadn't made
6  application for the position.
7  Q   Do you have any reason to believe that he didn't
8  make application for the position, other than the fact
9  that his name isn't on there?
10 A   Well if it's not on the log then it didn't come in
11 to the office, cause every position, every candidate
12 that applies for a position is on the log.
13 Q   OK.  Now, if, if you can assume just for purposes
14 of my question that you did receive the July 28, 1999
15 correspondence, if you did receive that, is there any
16 reason that his name would not have been placed on the
17 Promotion Application Log?
18 A   Well.
19 Q   If that's all you received.
20 A   I can't make that assumption but what I can say is
21 that if we had received this, this job bid form, which
22 is only used for Union employees, bidding on a Union
23 position, we call the applicant and let them know, the
24 candidate know that this is the improper way to file,
25 to apply for a Management position.  We would redirect

SHEET 11   PAGE 41

1  them to complete the necessary Management related form
2  and/or submit an application or resume. Not a form,
3  strike that, an application and resume.
4  Q    OK is there an application and resume; I mean did
5  everybody, what is an application?
6  A    A, a job application.
7  Q    OK does the Pennsylvania Turnpike have forms
8  called job applications?
9  A    Employment applications
10 Q    Employment applications?
11 A    Yes
12 Q    OK if, how does someone external apply for a
13 position.
14 A    They send in a resume.
15 Q    OK, they don't need a job application?
16 A    No an application or a resume and it says it very
17 clearly stated on the vacancy notice.
18 Q    OK, well the July 28, 1999 correspondence.
19 A    Yes
20 Q    .the second paragraph says as you can see from my
21 resume I've been in the field of radio communications
22 for over 26 years, etc., etc..
23 A    Yes
24 Q    .Was, again assuming, assuming this was sent if
25 not, you know received by you was there any reason

PAGE 42

1  that, if there was a resume attached this was a
2  insufficient application?
3  A    Well if the resume was an updated resume, I don't
4  see a resume here, we would use the resume.
5  Q    That would be a sufficient application?
6  A    But if only this came in, this.
7  Q    Only this in what?
8  A    .this, this second job resume, this, this job bid
9  form that is used only for designated Union posted
10 positions and this letter it is insufficient for, to
11 make application on this basis.
12 Q    OK and what if that's all that came in, you just
13 would've excluded Mr. Williams.
14 A    No, I said prior, that I would call him.
15 Q    All right
16 A    .and let him know or any candidate that they have
17 to make application the way it says on the job posting.
18 Q    OK.  If you, well I'll give you that.do you, do
19 you, do you have any, any, or what reasons could you
20 offer to explain why Harry William's name was not on
21 the Promotion Application Log for the July 27, 1999
22 position?
23      MR. WEINBERG:  I'm gonna object.  You've, you've
24 already asked that question twice and she's answered it
25 twice.

PAGE 43

1  Q    OK well, I just wanna clarify, I understand and I
2  don't want to labor it, but if you could, one more
3  time, just any reasons that you could think of, whether
4  no reasons known to you or that, you know based upon
5  your experience would be known to you that Mr.
6  William's name was not on the Promotion Application Log
7  for the July 27, 1999 posting?
8  A    Any candidate who doesn't make application's name
9  is not on the log.
10 Q    OK, so one reason is he didn't make application?
11 A    It's not, if I don't have an HR of the date, that
12 the vacancy notice comes down, the person's name is not
13 on the log.
14 Q    Any other reasons that someone's name wouldn't be
15 on the log?
16 A    No
17 Q    OK
18 A    No
19 Q    Has there ever been an instance that you're aware
20 of where someone has made application for a vacancy and
21 their name has not appeared on Promotion Application
22 Log?
23 A    None that I can recall, no.
24 Q    Did you have any discussions in around July 1999
25 concerning Mr. William's?  Did you, strike that.  Do

PAGE 44

1  you recall, and I think you already testified, but I'll
2  ask you again, if you received that letter the July 28,
3  1999 letter.
4  A    I don't ever recall receiving it.
5  Q    In the normal course, after you receive a cover
6  letter and resume, what do you do with that?
7  A    It comes in to HR, it's time-stamped to ensure
8  that it met that it met the deadline date for the
9  vacancy, it goes in a file, someone prepares the log
10 and it goes to the DED.
11 Q    OK.  Do you and you typically acknowledge receipt
12 of application for every applicant?
13 A    Say that again.
14 Q    Do you typically acknowledge receipt of
15 applications for every applicant?
16 A    Yes
17 Q    OK.  PTCO224 it's interview questions, Duty
18 Officer Safety and Operation Center.
19 A    Yes
20 Q    Have you ever seen this document before?
21 A    No
22 Q    Do you recognize any of the handwriting on that
23 document?
24 A    I do not.
25 Q    OK.  Do you know if the comment under number one,

SHEET 12   PAGE 45

1 under Harry William's feels one of the best qualified,
2 if that comment has any relation to the decision not to
3 fill the third Duty Officer position?
4 A    I have no knowledge of any of this.
5 Q    There following that is, you know some, a letter
6 and resume forwarded by Mr. Williams.  Look through
7 that.  I'm not gonna ask anything about that right now.
8 A    Date?
9 Q    April 23, 1999
10 A    OK
11 Q    Flip past that stuff until you get to the next job
12 bid form.  And you have that job bid form dated, or for
13 a posted date of November 28th of 2000.
14 A    Yes
15 Q    And it says position posted Communications Center
16 Duty Officer, correct?
17 A    Yes
18 Q    Do you know Mr. William's.PTC0497
19 A    Wait a second, where is that?
20 A    That's.
21 A    at the end
22 Q    Yes, it's about four or five pages from the back.
23 A    OK
24 Q    OK that reflects Harry William's name with a
25 checkmark under qualified.  Do you recognize that

PAGE 46

1 checkmark?
2 A    No
3 Q    OK, the following page then is, is an X under
4 qualified for Harry Williams.  Is that, do you
5 recognize that as a document that, that would've come.
6 A    It's generated in my office.
7 Q    OK and it's for the position that was posted
8 November 28, 2000.
9 A    Yes, yes
10 Q    Is there, was the job bid form that was submitted
11 that we looked at a few minutes ago, was that
12 sufficient for his posting or his application for that
13 position?
14 A    No it would not have been there had to be either a
15 resume attached or an updated application, employment
16 application.  And from this package, or from these two
17 things, I don't see it here, so.I'm sure it went to the
18 DED.
19 Q    OK then do you recall ever contacting Mr. Williams
20 and informing him that you know an application you
21 received should've been taken somewhere else?
22 A    Me, me personally?
23 Q    Yes
24 A    No
25 Q    OK

PAGE 47

1 A    Today is the first I ever had contact with him.  I
2 never met him before, I never saw him before.  I
3 introduced myself today for the very first time.
4 Q    OK, but did you ever telephone contact?
5 A    No
6 Q    OK
7 A    No, no contact, what so ever.
8 Q    OK, now was there a point at which, you know
9 whether you told him or someone else that you know told
10 him, him being Mr. Williams, that he should take an
11 application and resume to a Susan Trout as opposed to
12 your office?
13 A    I have no knowledge of that.
14 Q    OK
15 A    She doesn't work for me.
16 Q    OK.  Is there any reason why anybody would tell
17 him to take an application to Susan Trout?
18 A    Not to my knowledge.  No one in HR, the process is
19 owned in HR.
20 Q    I'm on the page after that November 28, 2000 job
21 bid form, considerably back where you are.
22 A    What's the number?
23 Q    PTC0418, maybe two thirds of the way through
24 A    Are they in number order?  0418 here it is.
25 Q    a memorandum from you to Mr. McCool.

PAGE 48

1 A    Yes
2 Q    ? Commission Action.  On November 2, 1999 the
3 Commission, Commissioners approved the following:  your
4 request to post internally and if necessary advertise
5 externally for Communications Center Duty Officer
6 position as per your memorandum dated October 15, 1999.
7 If you contrast with this second item, your request to
8 post internally and advertise externally; what does the
9 internally post internally and if necessary advertise
10 externally, what's the significance of that?
11 A    That's left up to the Department Head if they
12 wanna just only post it internally, they can; if they
13 wanna post internally and externally they have that
14 discretion.
15 Q    At any, for any decision?
16 A    No, only if it says that.
17 Q    OK, now why, why would you state it in those
18 terms, request to post internally and if necessary to
19 advertise externally?
20 A    Because for the second one you must post
21 internally and advertise externally.    The first you
22 have the option.
23 Q    OK, why.
24 A    At the discretion of the DED
25 Q    Why must the, the second one be done both ways?

1  A    Because that's how you made application for it to
2  the personnel committee.  So you have to fulfill what
3  you've requested.
4  Q    OK, so is that to say that in the first request
5  that that came in strictly as.
6  A    That's take verbatim from the request to the
7  personnel committee, yes.
8  Q    OK
9  A    That's how it goes to the Commission, and that's
10  how the Commission approves the request; the same
11  format as the personnel committee.
12  Q    So you would, you would expect then to see, if we
13  had the October 15, 1999 memorandum a request to post
14  internally and I'm using this as a direct quote.  This
15  right here, if, if as you explained that's the way this
16  worked out, the October 15, 1999 request would have
17  stated that it was a quote, "request to post internally
18  and, if necessary advertise externally etc. etc.".  Is
19  that, that would be contained within the request?
20  A    That is how the request is made is how it appears
21  then on this, on the memo that goes to the DED.
22  Q    OK
23  A    .to indicate approval for that particular request.
24  Q    Now about four pages after that there's a and it
25  might be in there upside down, there's an October or

PAGE 50
1  November 25, 1999 letter from Cindy Ann Ditz or Deitz,
2  D-I-E-T-Z to you, saying I am writing to you regarding
3  a phone call I received from "Joe" at the Turnpike
4  Commission a few weeks ago.  He called; called to
5  inquire whether I was still interested in the
6  Communications Duty Officer position I had applied for
7  back in August.  It says, and it continues on.  Did you
8  ever have any with Mr. McCool about, about Ms. Dietz,
9  if that's the Joe to whom she refers?
10  A    Not that I recall.  Again we get a ton of
11  candidates in any given year.  No
12  Q    And do you know, the, the first, for the first
13  posting were Mr. Jumper and Mr. Wickard selected?
14  A    I would have to go back and look at the ?
15  Q    Well it's in the, the recommendation.
16  A    Right
17  Q    I don't know if I have.
18  A    Right, the recommendation, if it's in there then
19  Q    0245
20  A    If they were selected, they would be in a, a
21  letter from me announcing the selection.  Announcing
22  the approval from the Commissioners that they were
23  selected at the admin committee meeting.
24  Q    OK.  Is there any, any limitation on the number of
25  applicants recommended?  Meaning if there's one

PAGE 51
1  position that's to be filled, have you received
2  recommended personnel that have had four recommended
3  people for the position?
4  A    Typically for one position we have three
5  candidates.
6  Q    Three recommended.
7  A    recommended candidates
8  Q    OK and this was.
9  A    Have I gotten less than three, yes?
10  Q    OK.  And for the, the June 4, 1999 or the
11  Communications Center Duty Officer position that's
12  reflected on the June 4, 1999.
13  A    Yes
14  Q    .recommended personnel actions there were a total
15  of five applicants interviewed, correct?
16  A    Correct
17  Q    But only two recommendations.
18  A    Yes
19  Q    .for two positions, right?
20  A    Two applicants were recommended for this position.
21  Q    Yes according to, according to your May 12, 1999
22  memorandum this would be two app, two applicants, five
23  interviews for three positions and only two applicants
24  were recommended, correct?
25  A    That's what the correspondence as for May 12,

PAGE 52
1  1999.  There were three Communication Center Duty
2  Officers positions at that time.
3  Q    OK, now on PTC0245 there's a, an entry, the last
4  line under recommended candidates in alphabetical order
5  and it's justification for recommendation.
6  A    What number is that again?  I'm sorry.
7  Q    245, the second page of the June 4, 1999
8  A    Wait a second, 245, I can't find it.
9  Q    The page right after where you're beginning there.
10  A    742, 742.
11  Q    Out of order?
12  A    No, they are in order.
13  Q    Back the other way.  But hold 742 because I'm
14  gonna be using that one.
15  A    0742? 06.
16  Q    I'm sorry, again I tried to assemble these so.
17         MR. WEINBERG: 0245?
18  Q    0245, yes
19  A    Sorry
20  Q    That contains an expressed, an expressed no other
21  candidates recommended.  Is that; is that something
22  that you routinely see in a recommended personnel
23  action?
24  A    Routinely, I can't answer that routinely, I don't
25  know.

SHEET 14  PAGE 53

1  Q  Cause then.
2  A  No
3  Q  .if you, if you flip back to.
4  A  No
5  Q  .if you flip back to 742, 743
6  A  OK, 742, yes
7  Q  .and this is the one that Harry William's name was
8  not on, three applicants were interviewed.
9  A  Yes
10  Q  .and the next page, 743 indicates three candidates
11  recommended and then do, do the numbers to the left, is
12  that the ranking?
13  A  No, that is just, this was the candidate that was
14  selected, Diane Jordan.
15  Q  Who, who's designation is the one, two and three?
16  A  The administration committee members.
17  Q  And who's the administration committee members?
18  A  The executive committee which includes.did you ask
19  me that question?  Sorry.
20  Q  Yes, who, who's the.
21  A  Debbie Eberly, John Durbin and the DED's.
22  Q  OK and is the one, two and three, is that to
23  reflect a ranking of this?
24  A  No, no it reflects that if the person, first
25  person declines you go to the second person, second

PAGE 54

1  person declines, the third person.
2  Q  And why, why do you have any understanding as to
3  why the, it went in that order?
4  A  Because that's how the Department Head recommended
5  it and it was approved by the administration committee.
6  Q  OK and do you know was there a selection made?
7  A  I would have to go back and look at the letter
8  that was sent.  I believe so.
9  Q  I don't know if it's in there.  Well do, do you
10  know Ms., Ms. Jordan, she was at some point hired by
11  the Turnpike Commission, correct?
12  A  That's correct.
13  Q  OK and the PTC0743, that, that's the one that
14  Harry Williams didn't appear on.  That's signed by Joe
15  McCool.  Is that his signature?
16  A  It appears to be, yes.
17  Q  OK and do you know why he would, he would be, he
18  would sign off on the recommended personnel action for
19  this Operation Center Duty Officer position, while Mr.
20  Sullivan would've signed off on the June 4, 1999
21  recommendation, recommended personnel action?
22  A  No I don't know at the time.
23  Q  Did you ever have any discussions with anybody
24  about excluding Harry Williams from the application
25  process for the July 27, 1999 posting?

PAGE 55

1  A  No
2  Q  If you, flip to, that's about halfway back,
3  PTC0764, it's another recommended personnel action date
4  January 24, 2000.
5  A  0764?
6  Q  0764, yes
7  A  The one's in the back are 04, 0764.0763, OK
8     MR. WEINBERG:  Do you need to take a break?
9  Q  Need a break?
10     MR. WEINBERG:  Yes, sure.
11     MS. DAVIS:  I need a break thank you.
12     MR. OSTROWSKI:  Wanna come back about 3:15 or
13  so?
14     TONY MARCECA:  It's 3:04 p.m.; July 12th we
15  are taking a break.
16     TONY MARCECA:  It's a, the date is 12 July
17  2002, the time is now 3:25 p.m. and we're resuming the
18  deposition of Ms. Geto Davis.  Is that right?  OK
19     MR. OSTROWSKI:  OK, that break gave me the
20  opportunity to go pull out bulletin 65 which is the
21  Promotion Policy and Procedure for promoting employees.
22  This, is this the document that to which you refer, to
23  which you made reference earlier in your deposition?
24     MS. DAVIS:  Yes
25  Q  OK and is this a full and complete copy of

PAGE 56

1  bulletin, I think you call it Bulletin Number 65?
2  A  There was an update and this doesn't reflect the
3  update.
4  Q  OK and when was, when was there an update?
5  A  I can't recall the exact date.
6  Q  Do you know if it was before the 1999 selection
7  processes?
8  A  Before?
9  Q  Before
10  A  No
11  Q  You don't know if it was before or not?
12  A  No, I don't think it was not.
13  Q  OK, how was it, what was it, what did the update
14  cover?
15  A  I'd have to read the whole thing.
16  Q  OK, so it wasn't issued as a supplement?  It was
17  issued.
18  A  No
19  Q  .as a new.
20  A  Yes as a new, it's now not called Number 65 it's
21  called 2.7 or something.
22  Q  OK as long as you're satisfied that this is the
23  procedure that was in place.
24  A  That's, that's correct.
25  Q  OK and do you know was it the procedure that was

SHEET 15   PAGE 57

1 in place for the 2000 posting, that, I think it was
2 November 2000?
3 A    Yes
4 Q    OK and do you have any recollections as to the
5 general, the general way that this was, this was
6 changed.
7 A    Well it was modified.  For example Number 2 under
8 definition, I think included Eastern Regional Office
9 and.
10 Q    OK
11 A    .and Western Regional Office, things like that.
12 There was some minor modifications.
13 Q    OK.  Now under the procedures on the second page,
14 Number 6; generally the DED or his or her designee will
15 interview all applicants whose applications have been
16 forwarded by HR and then it says, in the event and
17 unusually large number of applications are received the
18 Deputy Executive Director has the authority to reduce
19 the number of applications to be interviewed.  What, is
20 there some criteria for determining what an
21 exceptionally large number of applicants?
22 A    That's left up to the DED.  I think I mentioned
23 that earlier.
24 Q    OK, but short of there being an exceptionally
25 large number of applications, all applicants are

PAGE 58

1 interviewed; all, all qualified applicants are
2 interviewed?  Is that correct?
3 A    Generally
4 Q    OK and then Number 7 it says, the Department
5 Manager and the respected DED will follow Commission
6 procedures in conducting interviews.  What, what, what
7 does Commission procedures mean if this is, I mean it
8 appears to be referring to something other than
9 Bulletin 65?
10 A    Well for example interviews will be conducted
11 using the same job related questions for applicants.
12 That's a requirement.  A written summary will be made
13 of each interview.  That's required.  We have a
14 training class that is entitled Interviewing The Job
15 Applicant, which every, every person who is on the
16 panel needs to go through before they can be on the
17 panel to conduct the interviewing.
18 Q    OK, then that's the Commission procedures?
19 A    Yes
20 Q    OK
21 A    Yes
22 Q    And then it says in the written summary will made
23 of each interview?  Is there a document that's called
24 summary.
25 A    No, this is it.  It's on, it's on the, the

PAGE 59

1 recommended personnel actions and this is the summary.
2 Q    OK
3 A    Under the recommended candidates in alphabetical
4 order in the justification and recommendations.  That's
5 where.
6 Q    Right, but it doesn't you know, this, this appears
7 to suggest that every candidate who's interviewed there
8 will be a summary of that interview prepared and that
9 there could be other summaries of interviews that don't
10 appear on the recommendations?
11 A    No
12 Q    No?
13 A    No, this is the summary is contained in this
14 section for each candidate who is moved forward to the
15 Administration Committee.
16 Q    OK and when does each candidate move forward to
17 the Administration Committee?
18 A    Whenever the DED concludes the selection process,
19 the interview process.
20 Q    Well this, Number 7 appears to contemplate the
21 interview process before the promotion recommendation
22 is made.  It says a summary for each interview, I mean
23 the way I read that is candidate one is interviewed,
24 there's a summary prepared?
25 A    No

PAGE 60

1 Q    Two days later candidate two is interviewed, a
2 summary prepared.
3 A    Not to my knowledge.
4 Q    OK.  Now Number 9 on the, originally third page of
5 that document, the Department Manager subject to the
6 review and approval of the respected DED shall etc.
7 etc. present recommendations in the form of a short
8 written supporting statement.
9 A    Yes
10 Q    I read that as being the portion of the policy
11 that refers to which you were identifying under
12 recommended personnel actions.
13 A    Yes
14 Q    Is that; is that a fair reading of ?
15 A    That's, this is, that's correct.
16 Q    OK now with that being clarified is there
17 something, should, should we have documents somewhere
18 that are interview summaries?
19 A    I can't.
20 Q    I can I further ask you.
21 A    I can't answer that, I, I, .
22 Q    OK
23 A    I don't, I don't know.
24 Q    Well could possibly the, I believe these are all
25 to be done by written questions?  Is that correct?

SHEET 16   PAGE 61

1 A   Interviews will be conducted using the same job
2 related questions for all applicants.
3 Q   OK is, would the notes under entries for written
4 questions would that qualify as a written summary in
5 your opinion?
6 A   Where are you?  Where are you referring to?
7 Q   Well I'm referring to for example we looked at the
8 interview questions for Harry Williams.
9 A   Yes
10 Q   Would that, would that constitute or could that
11 qualify as a written summary of the interview?
12 A   I can't answer that because I didn't develop that.
13 Q   OK.  Well you know, should I, should I be able to
14 have a document, document that is, references every
15 person interview and has somewhat of a summary of their
16 interview, whether or not they appeared on the file
17 recommendation?
18 A   We'd have to go back and talk to the people that
19 conducted the interviews.
20 Q   OK and at the point there was the one, and we
21 don't need to go and dig through it unless you want to,
22 there was the one known, I think it was the 19 or the
23 2000, 2001 selection where the candidates, there were
24 three recommendations made and then at the
25 administrative level or the committee level there was

PAGE 62

1 one, two and three the ordering done; does that
2 ordering, and I think you said that that ordering
3 doesn't reflect, doesn't necessarily reflect a ranking
4 of the candidates, is that.?
5 A   It is not a numerical ranking, that's correct.
6 Q   OK, well how is that order decided upon and what
7 order to contact which applicant?
8 A   That's done at the, at the selection process and
9 then brought forward to administration.
10 Q   OK and in your understanding if that's not
11 technically a numerical ranking, is that an order of
12 preference of whoever's conducting that review process?
13 A   Can you say that again an order of preference for
14 who?
15 Q   For the, what is it the Administrative Committee
16 or the Personnel Committee?
17 A   The Administration Committee
18 Q   The Administration Committee?
19 A   Yes
20 Q   They review the recommended personnel action and
21 the.
22 A   OK
23 Q   .specifically the recommended candidates in
24 alphabetical order and the justifications for each
25 recommendation.

PAGE 63

1 A   Yes
2 Q   .and from that, I mean if there's three people
3 being selected.
4 A   Each, each candidate is qualified for the position
5 that was recommended.
6 Q   Right
7 A   .OK and the first candidate is given this priority
8 and I give it to the first candidate and then if they
9 candidate it goes to the second and then it goes to the
10 third.  But they're all qualified for the position.
11 Q   OK and the first, second and third is that, what
12 do you understand the significance of that to be,
13 that's, other than it being the order in which the
14 persons are contacted?  Is that some expression of
15 preference for the candidate who has the number one
16 next to their name?
17 A   Well the candidate that was selected was, in this
18 one, it happens, so happens PTC073, 0743 right before
19 me and that was Dianne Jordan.  She was the candidate
20 selected for this position.  Then the question is
21 should she decline, the second candidate was, would be
22 Cindy Dietz and the third was Dan Kretzman.
23 Q   Yes and, and I.
24 A   .for this particular position.
25 Q   .I'm just trying to understand if there's any

PAGE 64

1 significance to that order.  You know why, why would a
2 Diane Jordan be contacted first other than if it was
3 someone's review of the interview summary in saying
4 well she looks like the person I'd like to have working
5 for us and if not heard Ms. Dietz is.
6 A   Well if you read the summary with a total of 20
7 years experience culminating as a coordinator of
8 emergency services in Snyder County.  She provides a
9 wealth of experience virtually then like a Duty
10 Officers responsibility so she was selected as the
11 candidate for this position.
12 Q   OK and, and.
13 A   Perhaps in the person making that decision or
14 interviewing this is the person that they wanted it for
15 the position being all the qualifications are equal in
16 these three.
17 Q   OK.  Were you at all involved in the, the creation
18 of this recommended personnel action form as a form
19 that's used?
20 A   Yes
21 Q   OK is this your creation?
22 A   Yes
23 Q   Why, why did you recommend or put the recommended
24 candidates in alphabetical order?  I mean why was that
25 included as opposed to giving this whoever's filling

SHEET 17  PAGE 65

1  out the recommended personnel action the authority to
2  rank the candidates?
3  A   I believe it was dictated by Policy Letter 65.
4  Let me think.  We did this so long ago.  That may be
5  one of the things that was changed in the 2.7.  I'd,
6  I'd have to look.
7  Q   Ok, but.
8  A   I don't recall at this moment in time why it was
9  done.  I thought it was done in conjunction with Policy
10 Letter 65, 2.7.
11 Q   Well.
12 A   2.7
13 Q   .and, and I'll suggest something to you and if
14 it's consistent with what your thinking was and
15 refreshes.
16 A   Yes
17 Q   .your recollection and you affirm or disaffirm it,
18 that, the reason that you decided that candidates
19 should be listed in alphabetical order is to leave all
20 the decision making authority to the Administration
21 Committee as opposed to allowing the Interview
22 Committee to rank the candidates?
23 A   No the decision comes forward from the interview
24 and from the panel.  They make the recommendation to
25 the Administration Committee.

PAGE 66

1  Q   OK
2  A   I mean they're in alphabetical order because
3  they're all qualified for candidates for this position.
4  Q   Right and if it wasn't alphabetical wouldn't it
5  appear that it would list them in order of their
6  preference or their ranking instead of just some firm
7  criteria such as alphabetical?
8  A   I, I don't know.  I can't answer that right now.
9         TONY MARCECA:  It's 3:40; we're going to suspend.
10        TONY MARCECA:  It's 3:41, we're back on.
11        MR. OSTROWSKI:  OK now with reference to
12 PTC0245 which is the recommended personnel action for
13 the Duty Officer, June 14, 1999 Duty Officer selection.
14 The recommended candidates were Fred Jumper and Dale
15 Wickard.
16        MS. DAVIS:  0244?
17 Q   Yes, and then the next page.
18 A   Yes
19 Q   Now had, had Harry Williams, Harry Williams was
20 qualified, correct?
21 A   If it's out on .
22 Q   We already determined that, yes.
23 A   .on the, on the, on the Promotion, on the
24 Promotion Application Log.
25 Q   .OK and it is.  But had, had the interview the

PAGE 67

1  selection committee or responsible person for this
2  selection rather than indicating no other candidates
3  recommended, recommended a third candidate and that
4  candidate was Harry Williams, his name would've been
5  listed last, correct?
6  A   If it's strict alphabetical order, yes.
7  Q   Yes and then once, once the candidates are listed
8  then the discretion as to which candidate to select is
9  out of the DED and Office Director's hands?
10 A   Right, say that again.
11 Q   Once, once the recommended personnel action, you
12 know the recommended candidates are placed on this form
13 sent to you it is effectively the actual identification
14 of the person to fill the position is out of DED and
15 the Department Head's hands, correct?
16 A   Well the DED comes to the Administration Committee
17 prepared to let the Admin Committee know who is
18 selected from the recommended candidates.  He moves the
19 selected person forward as a result of the interview
20 process.
21 Q   Well, well where is that referenced?  Where is
22 that indicated?  Cause my understanding before was that
23 process was such that the June 4, 1999.
24 A   Right
25 Q   .personnel action was prepared.

PAGE 68

1  A   Yes
2  Q   .came to you.
3  A   Yes
4  Q   .you review it, OK or whatever you do and.
5  A   I put it on the agenda.
6  Q   .and you put it on the Admin.
7  A   .That's correct.
8  Q   .istration Committee agenda.
9      A   That's correct.
10 Q   Then I understood that the Administration
11 Committee takes up the issue of which of these
12 candidates to select?
13 A   The, this comes before the Administration
14 Committee.  The DED on behalf of the Department says
15 the Duty Officer position for this, he goes through the
16 whole two pages and says, for this position it's Joann
17 Gitto Davis.
18 Q   OK
19 A   He recommends it to the Administration Committee.
20 Q   And the Administration Committee approves or
21 disapproves?
22 A   For the most part, yes.
23 Q   OK, OK and is that always the DED that performs
24 that function?
25 A   Correct

SHEET 18   PAGE 69

1  Q   So it's not.
2  A   In the absence of the DED, the Department Head
3  will come in and make the presentation.
4  Q   OK
5  A   I do not.
6  Q   OK, so unless, now in, in this, in this situation
7  if Mr. Martino was not present, who would've appeared
8  before the Administration Committee?
9  A   Whoever signed this form.
10 Q   That's Joe Sullivan Operations Head of Manager?
11 A   Or, or John Martino would've come in for this one.
12 Q   Right, the Department Head is Joe McCool, right?
13 A   Yes
14 Q   Why would he not have been called in to do that?
15 A   I mean he may have been called in to do that, but
16 typically the person who signs it, I would have to
17 check my agenda to see who came in for that particular
18 job.  Off the top of my head, I don't know.
19 Q   You, have those agenda and minutes?
20 A   They're not minutes.  It's just an agenda listing
21 what went on.
22 Q   If, if you could put your fingers on that and
23 forward it tomorrow I would appreciate that.
24 A   Yes, not a problem.
25 Q   And any other, anything else that you might have.

PAGE 70

1  A   There's nothing else.
2  Q   .I'll take that.  OK.
3  A   I prepare the agenda.
4        MR. WEINBERG:  That's the agenda for the Fred
5  Jumper, and Wickard promotion?
6        MR. OSTROWSKI:  Yes, and for all the
7  promotions.  That would be the September.  Now two
8  pages, the 742.
9        MS. DAVIS:  Yes
10 Q   .it references three applicants interviewed and
11 three applicants recommended, correct?
12 A   Yes
13 Q   And that's for one position, correct?
14 A   Correct
15 Q   And I believe, I've got my copying sideways, do
16 you, after, I don't if I just screwed up one copy or if
17 I got `em, all.
18 A   What number?
19 Q   .I can probably, let me look at that and I'll be
20 able to get to it a lot quicker.  PTC428.
21 A   Yes
22 Q   Do you have some copied sideways in there?  Or is
23 it just mine?  I think you have the same problem there.
24 Yes, not that one.  Could you show, would you mind
25 showing Marv what your referring to there.

PAGE 71

1  A   0428?
2  Q   Yes, I, sorry I messed up some of the copies.
3        MR. WEINBERG:  0428
4        MR. OSTROWSKI:  Which I think is copied
5  sideways in your packet and therefore doesn't, doesn't
6  appear as it appears there.
7        MR. WEINBERG:  That's not what we provided to
8  you, that's what you copied, right?
9        MR. OSTROWSKI:  That's what I copied.  That's
10 what you provided.
11     MR. WEINBERG:  OK
12     MR. OSTROWSKI:  Yes
13        MR. WEINBERG:  I'll just look along on this
14 for a minute, that's fine.
15     MR. OSTROWSKI:  OK
16     MR. WEINBERG:  This is not the same thing, no.
17     MS. DAVIS:  No
18     MR. OSTROWSKI:  No
19     MS. DAVIS:  This is log.
20        MR. OSTROWSKI:  I don't know if you can find
21 the same thing.
22        MR. WEINBERG:  You, you don't think it's in
23 this packet?
24        MR. OSTROWSKI:  I think it is, but I just
25 think it's askew, cause I, actually I do have it, I do

PAGE 72

1  have it here but it's, you can't really make out
2  anything on it.  That's it right there.
3        MR. WEINBERG:  0428
4        MR. OSTROWSKI:  That's 0428, yes.
5        MR. WEINBERG:  OK, go ahead.
6        MR. OSTROWSKI:  OK, now that also reflects
7  that four candidates were interviewed, correct?
8        MS. DAVIS:  Four candidates were interviewed, yes.
9  Q   And then four recommendations were submitted,
10 correct?
11 A   It looks like, that's correct.
12 Q   OK and if you flip to the next page you'll see
13 that there are four names under the .
14 A   Yes
15 Q   .and that was, that was for one position, correct?
16 A   I'd have to go back and, and look and see what the
17 application vas for the personnel committee for this
18 particular job posting.  January 24, 2000, but that
19 wasn't one of the jobs that was posted.  That job was
20 posted '99.It appears that there were two positions at
21 this point and time.
22 Q   But in the, are you at the, early 2000?
23 A   January 24, 2000
24 Q   Now where, where does it indicate to you that
25 there were two positions available?

SHEET 19   PAGE 73

1 A   Well I asked where the job with the personnel
2 committee, where the application is to the Personnel
3 Committee. I would need to look at that one.
4 Q   OK
5 A   This is 12 of '99, 6/2000.It appears it's only one
6 position.
7 Q   OK
8 A   From my January 6th correspondence to Greg
9 Richards. He was the DED at the time. Or is still the
10 DED.
11 Q   And, and there were four applicants recommended?
12 And all four were interviewed?
13 A   It appears that, yes.
14 Q   OK
15 A   Yes
16 Q   Then in the, in the June 4th of '99 way back to
17 the beginning of the 244. Do you see if you see it?
18 A   Which, which PTC number was that?
19 Q   The 244.
20 A   O244, OK
21 Q   OK you had the total applicants...
22 A   Yes
23 Q   .and five interviews, correct?
24 A   Yes
25 Q   So would it be fair to say that based on the

PAGE 74

1 Bulletin Number 65 the DED or responsible official had
2 exercised his authority to reduce the number of
3 applicants to be interviewed?
4 A   I mean I can't answer for the DED.
5 Q   OK, but that would, that would, that would be
6 consistent with what the policy provides, correct?
7 A   That's what the policy states.
8 Q   OK and those five applicants were interviewed for
9 three positions, correct?
10 A   Let me go back to it. Four applicants were
11 interviewed. Which number are we on?
12 Q   Well here's, here's.
13 A   Which one are we one?
14 Q   Well, I'm not on anything right now except this
15 that I'll show you. This is a document marked as
16 Exhibit 3 with a vacancy notice dated 4/23/99. At the
17 bottom of the notice it says this vacancy notice is
18 amended to include an additional Communications Center
19 Duty Officer position. A total of three positions are
20 available.
21 A   Yes
22 Q   .and you, do you recognize this as being the, the
23 vacancy notice for this position?
24 A   Yes
25 Q   So there were indeed three positions that were

PAGE 75

1 posted and available?
2 A   This is at 4/23/99.
3 Q   Right
4 A   .for that vacancy notice all the way dating back
5 to the first posting?
6 Q   Right, right, and then, so, and then there were,
7 there were five interviews conducted for those three
8 positions, correct?
9 A   Which, which, which are you referring?
10 Q   The June 4, 1999.
11 A   OK, OK, make sure we have this right. There were
12 five interviews for, well there were three actual
13 vacancies but it doesn't mean that there were three
14 vacancies, I mean three candidates they were going to
15 select at this posting.
16 Q   Well, why would you put that on the posting?
17 A   Because they have three vacancies.
18 Q   Well is there any reason any information that you
19 have, you know based on personal conversations that
20 you had with anybody or documentation or whatever to
21 suggest that this vacancy notice, this amended vacancy
22 notice went out with three positions available with the
23 intention of only filling two positions?
24 A   At the time the DED made a decision only to fill
25 two.

PAGE 76

1 Q   OK
2 A   I mean that's his decision not mine. I mean it
3 was approved for three at the time for the Personnel
4 Committee, but he has the, he has the discretion to say
5 I want to fill one, two or three.
6 Q   OK and of the five applicants interviewed based on
7 your understanding or your review of this information,
8 do you understand that Harry Williams to have been one
9 of those persons interviewed?
10 A   I would not know that.
11 Q   OK, do you know that though?
12 A   I don't know that, no.
13 Q   OK
14 A   I don't get involved, in the interview or
15 selection process.
16 Q   I'm going to suggest something to you based on
17 some inferences that, that I think are reasonable to
18 draw based on this information and ask you if you've
19 ever had a discussion of this nature with anybody or if
20 my, or if indeed what I'm inferring is correct, OK?
21 Three positions are posted in April of 1999, Harry
22 Williams is among the qualified applicants for the
23 position, Joe McCool doesn't want Harry Williams to
24 have a position, so.
25     MR. WEINBERG: Now I'm gonna object to the

SHEET 20   PAGE 77

1  form of these questions..
2          MR. OSTROWSKI:  Yes, and actually, I, if I
3  can break it down, I think it's an appropriate question
4  but I think I was getting to cumbersome with it.  Well
5  do you know if, if Joe McCool designated Joe Sullivan
6  to be responsible for the June 4, 1999 process to
7  insulate himself to, to create the appearance he wasn't
8  involved in, in not selecting Harry Williams?
9          MS. DAVIS:  I wouldn't know that.
10 Q    And do you know if only two people were
11 recommended for the positions because if any more were
12 recommended Harry William's name would've been on the
13 list and would've had to had one of those positions?
14 A    I don't know that either.
15 Q    And did the, did the position that was posted in
16 July 1999 was that the same position, the third
17 position that was vacant in, on April 23, 1999?
18 A    Say that again.
19 Q    The position that was posted July 27, 1999.
20 A    July 27, 1999
21 Q    .do you recall that?  Was that the same vacancy
22 that existed that was the third position that was
23 vacant on April 23, 1999?
24 A    If that was the second time it was posted, yes.
25 Q    OK and were any decisions made to exclude Harry

PAGE 78

1  Williams from the applicant pool on the July 27, 1999
2  posting?
3  A    By whom?
4  Q    By anyone that you're aware of?
5  A    Not to my knowledge.
6  Q    OK
7  A    No
8  Q    And then Joe McCool was the, the signa, signatory
9  for the September 20, 1999 selection decision, correct?
10 A    If that's what's documented on this form, that's
11 correct.
12 Q    OK
13 A    Yes
14 Q    Do you know who, who's Dennis Genevie, G-E-N-E-V-I-
15 E?  Is that how you pronounce that?
16 A    Yes, he's our Director of Risk Management.
17 Q    OK, I don't have any questions about that.
18         TONY MARCECA:  Could I change tapes?
19         MR. OSTROWSKI:  Sure
20         TONY MARCECA:  It's 3:59, July 12, 2002.
21 We're gonna suspend to change tapes.
22         TONY MARCECA:  It's now 4:00 p.m. July 12th.
23 We're continuing the deposition of Geto Davis.
24         MR. OSTROWSKI:  Now way toward the back of
25 this stack, Document Number 507, 508 and 509.

PAGE 79

1          MS. DAVIS:  Yes
2  Q    .this is the January 17, 2001 recommended
3  personnel action for the, I think it was December 15,
4  or December 11, 2000 posting.
5  A    Yes
6  Q    .correct?
7  A    Yes
8  Q    And actually if you flip to the page before, 507
9  it's PTC0498.
10 A    Yes
11 Q    .and Harry Williams appears as the one of the
12 qualified applicants for that position, correct?
13 A    Correct
14 Q    OK, then according to 507.
15 A    Yes
16 Q    .there were two interviews for the position.
17 A    Yes
18 Q    .three qualified applicants, right and two
19 interviews?
20 A    Yes
21 Q    Actually two qualified applicants and two
22 interviews?
23 A    Two interviews and two qualified applicants, one
24 internal and one external.
25 Q    OK, so that is, the January 17, 2001 recommended

PAGE 80

1  personnel action is incorrect insofar as it lists only
2  two qualified applicants, correct because the Promotion
3  Application Log reflects three qualified applicants?
4  A    No because like I said the DED or Department Head
5  can make a decision not to qualify someone on the basis
6  of they don't feel they're, they should be moved
7  forward for the interview.
8  Q    OK, so a decision could've been made there to, to
9  take the list of three qualified applicants and reduce
10 it to two?
11 A    Well and also, well go ahead.
12 Q    And then, and then it appears that the two
13 applicants that were qualified were interviewed,
14 correct?
15 A    Let me look again; one external, one internal,
16 yes.  That's what it says, one external and one
17 internal.
18 Q    And Todd, Todd Lease, is it Leese or Lice?
19 A    I don't know, L-E-I-S-S.
20 Q    L-E-I-S-S, he was actually recommended for the
21 position, correct?
22 A    Correct
23 Q    And did he, did he take the position?
24 A    Again, my letter would indicate that.
25 Q    OK and he was, he was an internally, an internal

SHEET 21    PAGE 81

1 qualified applicant, correct?
2 A    Well according to this Application Log he was a
3 radio operator in the Control Center.
4 Q    Right, so that would be an in.
5 A    He's an internal candidate.
6 Q    OK
7 A Richard Fleck, who was also qualified, was the
8 external candidate.
9 Q    And if Mr. Williams had been interviewed he
10 would've been, would've been as an internal, correct?
11 A    Well he is already designated as an internal,
12 without being interviewed.
13 Q    Well then the next page 0507 just reflects one
14 internal applicant interviewed?
15 A    Interviewed?
16 Q    Yes
17 A    But, number of applicants is two internal, three
18 external.
19 Q    So somewhere.
20 A    He's included in the internal applicant pool.
21 Q    .but when it left your office, when it left your
22 office Harry Williams was qualified, correct?
23 A    When it left my office, Harry Williams was
24 considered qualified.
25 Q    OK and by the time the recommendation came around.

PAGE 82

1 A    Right
2 Q    .Harry Williams was not qualified?
3 A    As reflected on the personnel actions, recommended
4 personnel action form.
5 Q    OK and who's Joe Grisfoli?
6 A    He's our safety, Manager of Safety.
7 Q    And then who's Dan, Dan Bretzman?
8 A    He is the Operations Center, Center Manager.
9 Q    And when was Dan Bretzman hired?
10 A    I guess maybe early, in 2000 I believe, sometime.
11 Q    And wasn't, wasn't he the one hired as a result,
12 did he get hired as a Duty, Communications Center Duty
13 Officer and promoted to Operations Center Manager in
14 the same year?
15 A    I believe so.
16 Q    OK and who was the Director of the Communications,
17 the, the Safety Department in January 2001?
18 A    Well, Joe Grisgoli was Safety Manager I believe
19 then.
20 Q    Ok Mr. McCool, when did Mr. McCool leave?
21 A    I, I can't recall at this moment.
22 Q    Now the signature page of the Recommended
23 Personnel Action.
24 A    Yes
25 Q    .that should be the last page of the packet, 0509.

PAGE 83

1 A    Yes
2 Q    .well DED of Customer Service under signature
3 title, what's, what is that?
4 A    Well, it is, his name is Greg Richards and he's
5 the DED of Customer Service.
6 Q    But why, why wasn't there another person who
7 signed this?
8 A    You'd have to ask him, I mean he has the ultimate
9 say, so he's the DED he can be the only signature on
10 that if he wants to be.  And also he was fairly new at
11 the time so perhaps, I don't know, I can't answer that,
12 I mean, you have to ask him.  I'm speculating.
13 Q    OK.  Do you know why Mr. McCool left the Turnpike?
14 A    Do I know why he left?  No
15 Q    Have you had any discussions with anybody about
16 the circumstances under which left the Turnpike
17 Commission?
18 A    Any discussions such as, I mean, could you be more
19 specific?
20 Q    Well, I, I can't, you know cause I wanna know
21 everything you know about the reasons Joe McCool left
22 the Turnpike based upon any discussions.
23 A    I, I can't.
24 Q    .with anybody other your Counsel.
25 A    I, I can't recall at this time.

PAGE 84

1 Q    You're the Director of Human Resources?
2 A    Yes
3 Q    You have no recollection of why Joe McCool left
4 the Turnpike?
5 A    He got another job maybe, I don't know.
6 Q    OK.  That's all I have.
7       MR. WEINBERG:  How many employees does the
8 Turnpike have, Joanne?
9       MS. DAVIS:  In excess of 2400.
10 Q    And in any one-year how many employees leave the
11 Turnpike either through termination or quitting?  Do
12 you know?
13 A    Oh my, I don't know.
14 Q    100, 200?
15 A    At least, at least
16 Q    With respect to Policy Letter 65.
17 A    Yes
18 Q    .it states; this is Exhibit 3, Exhibit 2, it
19 states under procedures E4; HR will review all the
20 applicants to determine which applicants meet the
21 minimum educational experience in training requirements
22 for the position.
23 A    Yes
24 Q    Do you see that sentence?
25 A    Yes

SHEET 22   PAGE 85

1  Q    When Mr. Williams was qualified for the position
2  for Duty Officer, is this the paragraph that would've
3  been applicable?  Is this the sentence that would've
4  been applicable, minimum?
5  A    Minimum education experience and training
6  requirements for this position, correct.
7  Q    Correct.  Are there other factors that go into
8  that in getting the position, beyond that, beyond the
9  minimum?
10  A    This, this particular position?  I mean there,
11  there can be; tests that are required to take in
12  certain positions like Supplemental Toll Collectors, I
13  mean they could be minimum and they have to go through
14  training or testing before they can be actually put on
15  to the. I mean hired at the Commission.
16  Q    Thank you.
17        MR. OSTROWSKI:  Let me just follow up.  That
18  reminded me of one thing I neglected to ask you on,
19  with respect to Exhibit 2.  The last item, item 13.
20        MS. DAVIS:  Yes
21  Q    .indicates that the Director of Human Resources
22  will develop standardized procedures to implement this
23  policy.  And this certainly came out during tenure,
24  correct?
25  A    Yes

PAGE 86

1  Q    What, what standardized procedures to implement
2  this policy have you developed?
3  A    The procedures for Salary and Administration.
4  Q    What does that mean?
5  A    Well I have guidelines that were developed for
6  other salary, the   Administration Committee.
7  Q    Did, are the, the guidelines specifically address
8  policy and procedure for promoting employees?
9  A    Well it's in conjunction with Policy Letter 65 but
10  I have guidelines that were developed for Policy Letter
11  65.
12  Q    OK what, how does, does an employee have the
13  ability to challenge the qualifications of the
14  interviewers?
15  A    Say that again, does the.
16  Q    If, if, if an.
17        TONY MARCECA:  Can you restate that and I'll
18  flip the tape sir?
19        MR. OSTROWSKI:  Sure.  If, if an applicant or
20  an interviewee comes into an interview.
21        MS. DAVIS:  Yes
22  Q    .and sees a panel of people who he or she thinks
23  have no business being on such a panel, does that
24  person have an ability to question the qualifications
25  of, of the panel?

PAGE 87

1  A    The qualifications of the panel?
2  Q    Yes, or yes the qualifications or ability to serve
3  on the panel.
4  A    It has never been done.
5  Q    OK and back to the policy, did, what did you, the
6  salary, what was it that you accomplished; the policy
7  that you implemented to or you developed to implement
8  Policy Letter 65?
9  A    The, the guidelines for the salary and
10  administration program; how we set salaries and things
11  like, and things like that, the compensation procedure,
12  internal compensation procedure?
13  Q    OK does that, does that relate specifically to
14  promotions or is that just a general salary procedure?
15  A    Well it relates to promotions, I mean how we
16  develop them, salaries.
17  Q    I'm sorry.
18  A    .salary, just procedures how we have guidelines to
19  develop salaries.  We just.
20  Q    OK are there any additional guidelines that
21  address things like interviewing candidates for
22  promotion, conducting this.
23  A    We have a training class that all Supervisors,
24  Department Heads, Directors, DED's go to before they
25  can be on the panel to interview candidates.

PAGE 88

1  Q    Is there written documentation that governs that
2  training?
3  A    There's a procedure manual or there's a manual or
4  handouts that are given during the training.
5  Q    If you have those, if you can also get those to
6  Mr. Weinberg, I'd appreciate that.
7  A    It's very general, that interview.
8  Q    Does it talk about the the, the ranking, or the you
9  know the form, the recommendation forms and things of
10  that nature?
11  A    I believe so.
12  Q    OK
13  A    Yes, but general.
14  Q    OK anything else in writing that governs the
15  promotion process?
16  A    No
17  Q    And were you aware at any point of there being a
18  typing test for the position of Communications Center
19  Duty Officer?
20  A    Yes
21  Q    OK, when was that implemented?
22  A    I seem to recall that it was after Dan Bretzman
23  became the Manager of that Department.
24  Q    Do you have any.
25  A    I don't know the timeframe.

SHEET 23   PAGE 89

1  Q   .were you at all involved in, in discussions
2  concerning that matter?
3  A   If, I believe that it's part in parcel of the job
4  requirements on the vacancy notice that they have to
5  type 35 or so or 40 words a minute.
6  Q   OK and how, how is that, that to be demonstrated
7  by the applicant?
8  A   Well an applicant will have to take a test.
9  Q   OK and would you expect that if one applicant had
10 to take a test, all applicants had to take the test?
11 A   Well no it depends on an applicant had just taken
12 a test for a different position we could use that
13 testing.  I don't do the testing.  Someone in training
14 does the testing.
15 Q   OK.  Is that testing done before or after the
16 Promotion Application Log is prepared?
17 A   After, after it leaves my office.  I don't do the
18 testing for it.  A Department Head would request the
19 testing to be done.
20 Q   So if someone's name appeared on a Promotion
21 Application Log.
22 A   Right
23 Q   .and that person later was not recognized as an
24 internally qualified applicant.
25 A   Yes

PAGE 90

1  Q   .one of the reasons for disqualification could be
2  the taking of the typing test and not passing it,
3  correct?
4  A   That's correct because I look at the job
5  descriptions has the minimum education, whatever, so I
6  would say that person's qualified.  Now the vacancy
7  notice has 35 words a minute and that was posted, that
8  would be up to the Department Head to test for, to, to,
9  to ask for a typing test.
10 Q   OK and would you expect if one person is subjected
11 to that requirement of 35 words a minute that each of
12 the applicants should also be subjected to that
13 requirement?
14 A   Had they not previously taken the test?
15 Q   Right
16 A   Or could demonstrate that they have a typing test
17 that exceeds 35 words a minute.
18 Q   Did you have any discussions about the taking of
19 the typing test specifically with reference to Harry
20 William's selection to the position of.
21 A   No
22 Q   .Duty Officer?  No.  Do you know whether, whether
23 Todd Liese took a typing test?
24 A   Do I know?  No, I, I don't know.  But he would've
25 had to if he, or had had a previous test on file

PAGE 91

1  because he was selected for the position.
2  Q   OK, that's all the questions I have.
3  A   OK
4  Q   Thank you.
5  A   Yes
6       MR. WEINBERG:  No questions.
7       TONY MARCECA:  Is that it?
8       MR. OSTROWSKI:  Yes
9       TONY MARCECA:  It is July 12, 2002 the time
10 is 4:15 p.m. this deposition is now concluded.

IN THE COURT OF COMMON PLEAS
OF DAUPHIN COUNTY, PENNSYLVANIA

HARRY E. WILLIAMS, JR.        )
                              )
              Plaintiff       )
                              )
          vs.                 )        NO. 1:CV-01-0877
                              )
PENNSYLVANIA TURNPIKE         )
COMMISSION,                   )
                              )
              Defendant       )

ORIGINAL

DEPOSITIONS OF:        GREGORY RICHARDS

DATE:                  JULY 18, 2002

APPEARANCES:

            Andrew Ostrowksi Esquire
            Bailey Stretton & Ostrowski
            4311 N. 6th Street
            Harrisburg, Pa  17110

            Marvin Weinberg
            2000 Market Street
            Tenth Floor
            Philadelphia, PA 19102

            Heather Sharp
            Counsel for Turnpike Commission

SHEET 1   PAGE 1

PAGE 1

1    VIDEO REPORTER: ● Please be
2 advised that video and audio are in
3 operation.  Today's date is July
4 18th. The time now is 1:25 p.m.  My
5 name is Albert Rodriquez.  My
6 address is 4146 Spruce Park,
7 Lebanon, Pennsylvania 17046.  I
8 have been hired by P.R. Video to do
9 this deposition for the Plaintiff.
10 This case in the United States
11 Middle District for the District of
12 Pennsylvania.  It is docketed at
13 number 1 V-01-0877.  The caption is
14 Harry E. Williams versus the
15 Pennsylvania Turnpike Commission.
16 The deponee is Gregory Richards.
17 Mr. Richards, would you please
18 raise your right hand?  Do you
19 understand that this is legal
20 proceeding and do you swear to
21 truthfully answer the questions
22 asked of you?
23        MR. RICHARDS:  I do.
24        VIDEO REPORTER:      Would
25 counsel please identify themselves

PAGE 2

1 and provide their address and phone
2 number for the record.
3 OSTROWSKI: Andrew Ostrowski, 4311
4 North Sixth Street, Harrisburg,
5 Pennsylvania 17110.  Counsel for
6 Plaintiff.
7 ATTORNEY WEINBERG:  Counsel for
8 Turnpike, Marvin Weinberg, 2000
9 Market Street, Tenth Floor,
10 Philadelphia, Pennsylvania 19103.
11 ATTORNEY SHARP:      Heather Sharp,
12 counsel for the Pennsylvania
13 Turnpike Commission, P.O. Box
14 67976, Harrisburg, Pennsylvania
15 17106.
16 ATTORNEY WEINBERG:  The usual
17 stipulations.
18 CROSS EXAMINATION OF ATTORNEY
19 OSTROWSKI:
20        Q:   Mr. Richards, My
21 name is Andy Ostrowski, I am
22 counsel for Harry Williams, who has
23 a lawsuit against the Pennsylvania
24 Turnpike Commission arising out of
25 some employment related matters.

PAGE 3

1 Do you understa●that you are here
2 today to give a deposition in
3 connection with that matter?
4        A:   I do.
5        Q:   Are you a racist?
6        A:   I don't believe so.
7        Q:   Do you dislike
8 blacks?
9        A:   I don't think about
10 it.
11        Q:   Who is your
12 immediate supervisor?
13        A:   Deborah Averly.
14        Q:   What is her
15 position?
16        A:   She is the Associate
17 Executive Director of the Turnpike.
18        Q:   Is she a racist?
19        A:   I don't believe so.
20        Q:   Is John Durman a
21 racist?
22        A:   I don't believe so.
23        Q:   Did you ever hear
24 John Durman say nigger?
25        A:   No I haven't.

PAGE 4

1        Q:   Do you ever use that
2 word?
3        A:   No I don't.
4        Q:   How long have you
5 been with the Turnpike Commission.
6        A:   Since September of
7 1999.
8        Q:   Okay, prior to that
9 where did you work?
10        A:   I worked a year for
11 myself as a consultant.
12        Q:   A consultant for?
13        A:   I consulted to
14 various companies on selling
15 techniques, it was expertise.
16        Q:   Prior to that what
17 was your employment?
18        A:   I was with AMP,
19 Inc., a company in Harrisburg.
20        Q:   How long were you
21 with AMP?
22        A:   Oh, on and off for
23 27 years.
24        Q:   Why did you leave
25 AMP?

SHEET 2  PAGE 5

1          A:    I voluntarily early
2 retired.
3          Q:    Around the time when
4 they were being sold to TYCO?
5          A:    Right before.
6          Q:    And why did you get
7 out of the consulting?
8          A:    Because I
9 interviewed for this job and I was
10 found to be the best candidate and
11 I accepted it.
12          Q:    And what is your
13 current position?
14          A:    I am the Deputy
15 Executive Director of Customer
16 Service.
17          Q:    And has that been
18 the same title since you have been
19 with the Turnpike Commission?
20          A:    It has.
21          Q:    Deputy Executive
22 Director for Customer Service?
23          A:    Yes.
24          Q:    How is the Customer
25 Service Department set up?  Meaning

PAGE 6

1 who are your immediate
2 subordinates?  By position?
3          A:    I have seven direct
4 reports, ah, six direct reports and
5 one indirect. The direct reports
6 are the Director of Customer
7 Satisfaction and Public Relations.
8 That's one person. The Director of
9 Incident Management and Operations.
10 That's another. Director of Fare
11 Collection.  Director of Property
12 Management.  Director of Electronic
13 Toll Collection and my Secretary.
14 They are my direct reports. The
15 indirect is the Commander of Troop
16 T Pennsylvania State Police, who
17 reports through me, but not to me.
18          Q:    What was your first
19 effective day of employment?
20          A:    I couldn't swear; I
21 think it was like September 5th.
22          Q:    Maybe I shouldn't
23 say your first effective day.
24          A:    It was the first
25 week of September of 1999.

PAGE 7

1          Q:    Was Joe McCool
2 employed with the Pennsylvania
3 Turnpike Commission when you
4 started?
5          A:    He was.
6          Q:    And I had seen a
7 note here that referred to him as
8 Director of Safety and Operations?
9          A:    He was.
10          Q:    Is that the same as
11 Incidents in Operations?
12          A:    It has been changed
13 to reflect Incidents and
14 Operations.
15          Q:    When did that change
16 occur?
17          A:    March of 2001, I
18 believe it was effective.
19          Q:    Okay and at that
20 point he was gone from the
21 Pennsylvania Turnpike Commission?
22          A:    He was gone, yes.
23          Q:    How did the change
24 affect the responsibilities of that
25 position?

PAGE 8

1          A:    When the Director of
2 Safety and Operations, he was
3 Director of all safety customers,
4 employees buildings in the present.
5 And he also had incidents and
6 operations in the new set up of the
7 safety of the building and the
8 employees in it is under Risk
9 Management and the safety of the
10 roads and the people on it are
11 still under that position, so we
12 felt that it wasn't total safety.
13 It was more incident and
14 operations.
15          Q:    Were you aware of
16 the lawsuit Harry Williams had
17 brought against the Turnpike
18 Commission prior to Mr. Weinberg or
19 Ms. Sharp contacting you and
20 telling you I wanted to take your
21 deposition?
22          A:    No. No I was not.
23          Q:    At any point up
24 until today, have you been made
25 aware of a lawsuit that a Terry

79

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 3  PAGE 9

1 Edwards. She was before you were
2 here as brought against the
3 Pennsylvania Turnpike Commission?
4        A:   I am aware of it.
5        Q:   Okay, how did you
6 become aware of that?
7        A:   There was, I believe
8 an EEOC Complaint logged and
9 counsel at the Turnpike didn't know
10 whether I would be deposed. And so
11 they made me aware of it.  And then
12 when they realized I wasn't here
13 when she was here, they decided not
14 to depose me.
15        Q:   What are your
16 responsibilities as it relates to
17 personnel decisions in your
18 deputate?
19        A:   Well, if it was
20 direct report to me.  The way we go
21 about hiring management people is
22 we either advertise internally or
23 we advertise internally and
24 externally.  There is a process to
25 do that.  When that process is

PAGE 10

1 done.  Human Resources sends me a
2 list of those candidates that
3 applied and whether they were
4 deemed qualified or unqualified.
5 Those that are qualified then get
6 interviewed.  And the interviewing
7 panel is normally three people.
8 Since I have been here, it's always
9 been three people and they bring
10 forth one, two or three candidates.
11 That is their choice. The reason
12 there is a choice given is if they
13 bring forth three and for whatever
14 reason the first decides not to,
15 then you have the fall back to the
16 second.  If you only bring forth
17 one and that person decides not to,
18 you have to start the process from
19 scratch.
20        Q:   Okay you said they
21 can bring forth either one, two or
22 three?
23        A:   They can, yes.
24        Q:   Now, under what
25 circumstances would it be prudent

PAGE 11

1 to bring forth one?
2        A:   If they interviewed
3 the candidates that were qualified
4 and felt that one person just
5 absolutely excelled over everybody
6 else. And that became the
7 benchmark.  They would be willing
8 to go again.
9        Q:   What about listing
10 four?
11        A:   I don't think there
12 is any.  I can't swear to this.  I
13 don't know that there is any rule
14 against it; it's just that we
15 normally look at three.
16        Q:   Have you ever seen
17 four?
18        A:   I have not.
19        Q:   The listing of one,
20 two or three.  Is that for listings
21 where there is one position
22 available?
23        A:   Yes.
24        Q:   What if there were
25 two positions available?

PAGE 12

1        A:   We have two ways of
2 doing it. We can do separate
3 processes or we could interview a
4 series of candidates, provided we
5 posted both jobs identically.  We
6 said, you know we are posting both
7 internally and if it is
8 internal/external, we advertise
9 both and then we interview the
10 people and they know they are
11 interviewing for two possible
12 slots.  And then we bring forth
13 either two or six candidates.
14        Q:   Now with respect to
15 the, and I understand it was all
16 speculative.  I don't think you
17 were referring to anything
18 specific, but when.  If the
19 promotion committee or the
20 recommendation committee, is that
21 what is called?  If they bring
22 forth only one candidate.  Were you
23 saying that suggests that committee
24 wanted to influence who got the
25 position?

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 4  PAGE 13

1    A:    Not.  I think that
2  is a poor choice of words.  I think
3  that in their interviewing process,
4  they have found that this
5  particular candidate is a ten on a
6  scale of one to ten and all others
7  are maybe four. So, they make a
8  decision based on their experience
9  that if they cannot have that
10  candidate, they will go out and
11  advertise again so that they can
12  get more candidates to interview.
13        Q:    All candidates who
14  are interviewed are qualified for
15  the position.  Is that correct?
16        A:    All qualified
17  candidates are interviewed.
18        Q:    And your estimation
19  is it proper or fair to interview
20  all qualified candidates and if the
21  panel only liked one of them and
22  they just put forth one.  If that
23  person got selected then nobody
24  else gets the job?
25        A:    Your asking me if I

PAGE 14

1  think that is fair?
2        Q:    Yeah?
3        A:    If I am on the
4  interviewing panel then my judgment
5  would be on that case. If I found
6  it to be the same as what I
7  described earlier and one person
8  clearly stood out, I would suggest
9  we bring forth one.  But, if the
10  other people suggested that we
11  bring forth three, then majority
12  would rule.
13        Q:    So, under that
14  system if the panel didn't have a
15  preference for a candidate. Say
16  five people are interviewed and all
17  five come across pretty even.  The
18  panel can pretty much exclude the
19  two that it doesn't want then, by
20  selecting the other three.  Is that
21  correct?
22        A:    Again, I think the
23  word "exclude" is not a good word.
24  I have seen.  I have been involved
25  in panels where we will discuss at

PAGE 15

1  great lengths the pros and cons of
2  what we are looking for.  And
3  normally what you do, what I have
4  done, is to; you make your decision
5  as you go along.  If you interview
6  one and then you interview the
7  second, you compare those two and
8  come out of it with one.  Then you
9  interview a third. You compare
10  those two and come out with one or
11  two.  So, it's a process of
12  elimination based on the
13  requirements of the job.
14        Q:    How many times have
15  you been on a panel for selection?
16        A:    At least, ah four.
17  It could be more probably not more
18  than six.
19        Q:    And in any of those
20  instances has it been a situation
21  where you were interviewing for
22  more than one position?
23        A:    Not me. Not me for
24  more than one position, but I have
25  people under me who have

PAGE 16

1  interviewed for more than position,
2  yeah.
3        Q:    I was limiting it to
4  your.
5        A:    But not me.
6        Q:    And in each of those
7  four that you can recall, how many
8  candidates did you recommend?
9        A:    I would say probably
10  equally split.  Maybe if six is the
11  number that I did, I probably
12  brought forth four candidates three
13  times, four times, brought forth
14  one candidate twice.  I have come
15  with both.
16        Q:    In those instances
17  well, you said probably brought
18  forth one candidate twice.  Can
19  you.
20        A:    I can tell exactly
21  when I did.  I brought forth one
22  candidate with my secretary.
23  Because I interviewed. We
24  interviewed six people and clearly
25  she stood out among the others that

81

SHEET 5  PAGE 17

1 were interviewed, so that's why I
2 brought forth.  And I did that
3 because if she had said no, then I
4 would have gone outside.   I kept it
5 inside to promote from within.
6            Q:   And that was
7 somewhat a different situation
8 because she works for you
9 exclusively. Correct?
10           A:   She does. But, the
11 panel was a panel of my peers. And
12 had they not agreed with me, I
13 would have ended up with someone
14 else.
15           Q:   Other than that one
16 instance, can you recall any other
17 times when you recommended just
18 one?  A panel that you were on that
19 recommended just one?
20           A:   I can't.
21           Q:   This is a document
22 marked as Exhibit 4. We had
23 previously marked three other
24 Exhibits.  Go ahead and take as
25 much time as you want to

PAGE 18

1 familiarize yourself with what that
2 is and tell me when you are set.
3 First of all, on the third page of
4 that document, is that a copy of
5 your signature?
6            A:   Yes it is.
7            Q:   And do you recognize
8 the signature above yours as being
9 that of Joseph McCool?
10           A:   Yes I do.
11           Q:   And this would have
12 been within the first couple weeks
13 of your service.  Correct?
14           A:   That's correct.
15           Q:   As of September 21st
16 1999, what involvement had you had
17 with this promotion process?
18           A:   This first sheet
19 would have come to me.  And because
20 I was new, I would have called
21 McCool in and I would have asked
22 him about the candidates, because
23 at the time I would have felt that
24 he was more familiar than myself.
25 And he would have told me his

PAGE 19

1 feelings on the candidates as to
2 why they were or were not
3 qualified.  And then the panel
4 would have interviewed.  And if the
5 panel would have brought forth
6 their selections and then I would
7 have asked McCool, tell me who your
8 preferences are, one, two, three.
9 So, that when I went before what
10 was then called Salary
11 Administration, I would be asked to
12 present this to them.  And they
13 would say who are your candidates
14 and I would tell them. And who are
15 your choices.
16           Q:   How is the panel
17 established?  Organized?
18           A:    This panel I can't
19 speak to because it so quick after
20 I came here.  But, normally what
21 would occur is you know the
22 position.  If the position within
23 my responsibility, I would make it
24 my business to try to find out what
25 the person is supposed to doing,

PAGE 20

1 that the job is about.  And then
2 the supervisor of that area will
3 recommend his panel and if I think
4 the panel is fair and impartial, I
5 will agree to it. And if I think it
6 also has people on it that are
7 knowledgeable, I will agree to it.
8 If I don't, I will suggest that it
9 be changed.
10           Q:   And when you refer
11 to the supervisor of the position
12 that is to be filled.  Is that the
13 supervisor at the next level below
14 you?
15           A:    It would have been
16 McCool. See at this point in time,
17 I think the Manager of Operations
18 probably would have been Sullivan.
19           Q:   Yes, from what I can
20 see.
21           A:    But, I would have
22 interfaced with McCool.
23           Q:   Have you in any
24 promotion or selection processes
25 that have occurred in your

82

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 6 PAGE 21

1 deputate, have you ever had
2 occasion to deal with the next
3 lower level of staff management?
4           A:   Yeah.  Yeah I have.
5           Q:   In what instances?
6           A:   Well, I think when
7 Sullivan resigned; I think it was
8 two months of after; he retired.
9           Q:   Right.
10          A:   I was within two
11 months after I came here. And
12 McCool resigned within May of the
13 following year, I think it was. And
14 so for a while I was the acting
15 Director of Operations and Incident
16 Management, so I was dealing with
17 at that time, the acting manager,
18 which was Dave Dombrowski, so I
19 dealt with the lower level.
20          Q:   Now was there ever a
21 time when you bypassed the
22 intermediate level and went to the
23 next level?
24          A:   I don't believe so,
25 no.

PAGE 22

1           Q:   I don't know if you
2 recall, but Diane Jordan was
3 selected in connection with this
4 process.  Is that correct?
5           A:   That's what this
6 would indicate, yeah.
7           Q:   And that one, two
8 and three next to the candidates
9 names.  Is that your handwriting?
10          A:   No it is not.
11          Q:   Do you know whose
12 that is?
13          A:   I do not.  It might
14 have been my secretary at the time.
15 Jane Kelley, it might be hers, but
16 it's not mine.
17          Q:   And does that one,
18 two and three, that does reflect a
19 relative ranking of candidates?
20          A:   It would in this
21 case, yes.  And it would have been
22 on the copy that I took into;
23 normally we do not rank them when
24 we go before Salary Administration,
25 but I might have had a copy of this

PAGE 23

1 with me as notes.  And that would
2 be for my own notes.  If someone
3 would say how were they ranked, I
4 know.
5           Q:   Is that a question
6 that is typically asked.  How were
7 they ranked?
8           A:   Yeah.  When you
9 bring forth more than one
10 candidate, you have to tell who
11 your first choice is.
12          Q:   If you would refer
13 to the second page.  That top box
14 it gives you some statistics.
15 Three candidates were interviewed
16 and three were recommended.  Is
17 there any correlation between the
18 number of applicants interviewed
19 and the number of applicants
20 recommended?
21          A:   In this case it
22 would look as if there is, but
23 there really isn't.  There are
24 times when the first line is
25 critical because that gives you

PAGE 24

1 your total number and tells which
2 were internal and which were
3 external.  And then the next line
4 tells you who were qualified
5 internally.  And who were qualified
6 externally.  And sometimes you see
7 where there even though they apply,
8 they are eliminated because they
9 are not qualified.  And at this
10 point in time, the applicants
11 interviewed, it was the panel's
12 choice. The Director at that time
13 was McCool. It was his choice to
14 interview three of them.  He says
15 one applicant did not respond to
16 attempts to schedule an interview,
17 so he only interviewed three. He
18 tried for four.  And he did not
19 interview the internal one.  It
20 doesn't give me any reason why he
21 didn't interview the internal one.
22          Q:   It was she wasn't
23 qualified.
24          A:   Does it say she
25 wasn't?

83

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 7 PAGE 25

1    Q: On the first page it
2 does.
3        A:    Okay, it says she
4 wasn't qualified?  Oh okay, yeah.
5 Okay not qualified.  I see, yeah.
6        Q:    Was the.
7        A:    Your question to me
8 is, sometimes there are seven
9 interviewed, but only three brought
10 fourth.  So, you ask me if there is
11 a correlation.
12        Q:    I understand.  Was
13 there any discussion during this
14 particular promotion process of the
15 desirability of filling the
16 position with a female?  Did you
17 know that Harry Williams.
18        A:    I did not know.
19 There was no desire for it to be a
20 female.
21        Q:    Did you know that
22 Harry Williams submitted or
23 attempted to submit an application
24 or a response to this posting?
25        A:    I would not have

PAGE 26

1 known that.  This is the sheet I
2 would have received.
3        Q:    You're referring to
4 the top sheet?
5        A:    Yeah, his name is
6 not on it.
7        Q:    So, my question to
8 you is was that the first time you
9 ever heard that?
10        A:    Yes.
11        Q:    This will be marked
12 as Exhibit 5.  And again, go ahead
13 and review that.  Okay on the third
14 page of that document, is that your
15 signature? A copy of your
16 signature?
17        A:    Yes it is.
18        Q:    From the time of
19 Diane Jordan's selection until the
20 12/1/99 posting date, which is the
21 date referenced on the promotion
22 application logs. Were there any
23 vacancies created in the Duty
24 Officer position?
25        A:    I don't know the

PAGE 27

1 answer to that.
2        Q:    Joe Sullivan left at
3 some point during that period of
4 time, didn't he?
5        A:    Well he left in
6 October of 1999.  But, as I said,
7 we put Dave Dombrowski as the
8 acting manager and he retained.  He
9 was the Duty Officer and the acting
10 Manager.
11        Q:    And who.  I'm sorry
12 did you have some more to say?
13        A:    No, you asked me a
14 question, I don't know the exact
15 answer. There were, we had quite a
16 few openings for both radio
17 operators and duty officers.  One
18 of the first things that I was hit
19 with when I came here was trying to
20 make sure that we had the proper
21 staff.  The proper count. We were
22 down on it.
23        Q:    When you came here,
24 how many duty officers positions,
25 not positions, but how many duty

PAGE 28

1 officers were actually employed?
2        A:    Jordan, Dombrowski,
3 Roush and Wickert and Rudy.  Five.
4        Q:    And Diane Jordan,
5 six?
6        A:    Jordan six.  Yes.
7        Q:    And when Dombrowski
8 was appointed acting Operations
9 Center Manager, did he retain his
10 duty officer position.  Did he
11 continue to hold that position as a
12 matter of personnel record?
13        A:    For a while, but
14 then he was also transferring into
15 another area of that department.
16 He was going to take over the
17 coordinator of our towing and
18 emergency response vehicles.  He
19 was going coordinate that, so he
20 was going to relieve the Duty
21 Officer position. So it created a
22 vacancy in the Duty Officer and
23 then he held two halves of that
24 coordinator and the acting manager
25 for the better part of a year.

84

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 8  PAGE 29

1      Q: Well is it fair to
2 conclude then that this promotion
3 reflected filling Dave Dombrowski's
4 position or was this a separate.
5      A: I don't know that
6 it's fair to say that. I would
7 have to go back and look at the
8 exact records at the time, but you
9 know, we were low on Duty Officers
10 and we were interviewing for them.
11      Q: You had six before
12 Joe Sullivan retired. I think we
13 just went them?
14      A: Did I have six or
15 did I just save five at first?
16      Q: Yeah, but then you
17 hired Diane Jordan, which made six.
18      A: But, I lost
19 Dombrowski, which brought me back
20 to five.
21      Q: I'm saying before
22 Joe Sullivan left, you had six?
23      A: I would have had
24 Jordan, Roush, Jumper, Wickert and
25 Rudy. That's five.

PAGE 30

1      Q: And then.
2      A: Dombrowski gone and
3 then Jordan in would be the sixth.
4 No?
5      Q: You counted Jordan
6 twice I think?
7      A: Did I?
8      Q: Maybe, no I might
9 have been mistaken.
10      A: The record will
11 speak for itself.
12      Q: Yeah. Well let me
13 ask it this way. After this
14 position was filled, how many Duty
15 Officers were there?
16      A: After this position
17 was filled we would have had
18 Jordan, Roush, Jumper, Wickert and
19 Rudy. Now we probably were still
20 looking for more, because
21 Dombrowski was going to vacate.
22      Q: Right.
23      A: So, we had five.
24      Q: How many Duty
25 Officers are there now?

PAGE 31

1      A: I think there are
2 six, if I can count them in mind.
3 There is Jordan, Rudy, Roush,
4 Jumper, Wickert and Leiss. There
5 are six.
6      Q: What's the
7 complement? Is it six?
8      A: For Duty Officers,
9 it is six, yes.
10      Q: Okay that's probably
11 the first question I should have
12 asked. Okay and the first page of
13 Exhibit 5. That is a copy of what
14 you would have received from
15 personnel, correct?
16      A: This is what I
17 received from H.R., yeah, that's
18 correct.
19      Q: And without
20 reference to that document, from
21 that point, what is the process?
22      A: I look at who
23 applied. Who has applied? I look
24 at who is qualified and who is not
25 and if something would jump out at

PAGE 32

1 me. Suppose there was a person in
2 there that I had been associated
3 with in the Turnpike and they were
4 considered not qualified or they
5 were considered qualified. And in
6 my own mind I would question either
7 one. I would pick up the phone and
8 call H.R. and say, you sent me
9 this. You qualify it or you did
10 not qualify this person. Can you
11 tell me why?
12      Q: Do you know if he
13 did that in connection with this
14 one?
15      A: On this one. No, I
16 did not because I would rely on
17 McCool. I was still fairly new at
18 this game. I still would have
19 relied on McCool.
20      Q: So, you had two
21 qualified applicants?
22      A: Well, it says here I
23 had Davis and Havrilla. And on the
24 second page we have added Faryniek
25 and Dietz. And then my note



VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 9  PAGE 33

1 explains to H.R. why.
2        Q:   So what happened?
3 Was it Faryniek, F.a.r.y.n.i.e.k.
4 and Dietz, D.e.i.t.z. that were
5 being added?
6        A:    Well, I am referring
7 to the note that is on the back end
8 of this, where they had been
9 interviewed before and it says.  I
10 said to the Director of H.R.  This
11 is my handwriting.  It's A-okay to
12 go ahead with two, meaning two
13 positions per Joe McCool from the
14 last go around on Duty Officers.
15 Cindy Dietz and Dan Bretzman are
16 applicable to this posting.  To
17 conserve time, let's have the same
18 interview team interview the two
19 and then choose from the four.
20        Q:   And is this all your
21 handwriting on the last page?
22        A:   No.  My handwriting
23 is the one that is straight up and
24 down; like a draftsman.  And then
25 my signature.  The lines on the

PAGE 34

1 left are not mine.  I don't whose
2 they are?  They must be from H.R.
3        Q:   And at the bottom
4 where it says check file regarding
5 the above issue.  Do you recognize
6 the handwriting there?
7        A:    I don't know whose
8 handwriting it is?
9        Q:   It appears to me
10 that you are responding to Joanne
11 Davis.  She was an inquiry?
12        ATTORNEY WEINBERG:
13 Object to the form.
14        Q:   Let me just get
15 clear here.  Just read all the
16 words on here that aren't your
17 handwriting.  In the order as you
18 go through it?
19        A:    That is mine?
20        Q:   Yeah?
21        A:    It says okay 1/7/00.
22 It says, that's Joanne Davis'
23 signature, see it?  At the middle
24 of the page?  J.G.D.?
25        Q:   Okay.

PAGE 35

1        A:    And then it says
2 check file regarding the above
3 issue.  I don't want to give
4 conjecture, she probably had a file
5 on the interviews of the two
6 candidates.
7        Q:   Everything then is
8 your handwriting?
9        A:   Yes sir.
10        Q:   Do you know if the
11 scribble over Steve Detweiler, is
12 that your scribble mark?
13        A:    It probably is.  I
14 don't know the answer to that.
15        Q:   Who is Faryniek?
16        A:    I don't know?
17 Probably a candidate that was
18 interviewed prior.
19        Q:   On that second page
20 of the document or is the
21 handwriting on that document yours?
22        A:    No it is not.
23        Q:   Do you recognize
24 that handwriting?
25        A:    No I do not.

PAGE 36

1        Q:   And the only one
2 that has a check next to it as
3 qualified is Faryniek, correct?
4        A:    Yeah, but they are
5 grouped.  See the line beside them?
6 Like a bracket.  Beside Faryniek
7 and Gates there is a bracket so,
8 you say they are the only one that
9 is checked, but it looks like they
10 are bracketed as together.
11        Q:   It appears they are
12 bracketed as external.  Can you
13 read what that says there?
14        A:    No, I can't.  It
15 looks like external, but I couldn't
16 swear to it.
17        Q:   With respect to the
18 first page, do you agree that you
19 had two qualified candidates for
20 one position, correct?
21        A:    This log came to me
22 as you see it here. That's what I
23 read, correct.
24        Q:   And I think you also
25 testified that you didn't have any

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 10   PAGE 37

1 problem with. You explained a
2 hypothetical situation where if you
3 saw and you questioned someone's
4 qualifications. You said you didn't
5 have that concern with this,
6 correct?
7         A:   I would not have
8 that concern, no.
9         Q:   And all four of
10 those candidates were internal
11 candidates, correct?
12         A:   That is correct.
13         Q:   Do you know Mr.
14 Havrilla?
15         A:   I know him. I didn't
16 know him when this done, but I know
17 him now, yeah.
18         Q:   He was hired, what
19 two months before this decision?
20         A:   Yes.
21         Q:   Do you know Joel
22 Davis?
23         A:   He was hired right
24 when I came.
25         Q:   Do you know Joel

PAGE 38

1 Davis?
2         A:   I do not.
3         Q:   Have you ever heard
4 that name before?
5         A:   No.
6         Q:   How did it get back
7 into the process of trying to pick
8 two more people to fill that
9 position?
10         A:   If I were to tell
11 you what I think it's purely
12 conjecture. I don't know.
13         Q:   Tell me.
14         A:   I don't know. At
15 that point in time, there was a
16 need for Duty Officers and what we
17 had was a series of Duty Officers
18 who were getting absolutely no time
19 off. They couldn't even get a
20 vacation because we were always
21 short one. And so, we were trying
22 to interview as many qualified
23 candidates as we could and the one
24 thing I do remember about Cindy
25 Dietz, whose name is on there. Is

PAGE 39

1 that she had been interviewed
2 before and she was considered a
3 viable candidate, but she did not
4 take the job because she got a
5 better offer at the local OP Center
6 where she worked. And then in the
7 middle of this process, she called
8 McCool and said I am available. I
9 would like to interview for a job.
10 And McCool went to H.R. and said,
11 can I bring forth these candidates
12 and H.R. said if it is alright with
13 Richards, it will be alright with
14 us. They had been interviewed and
15 they had been qualified before.
16 That is the reason for that.
17         Q:   Do you know Joe
18 McCool to be a racist?
19         A:   I don't know that.
20         Q:   Do know that is why
21 he got fired?
22         A:   I don't know that he
23 was fired. He resigned.
24         Q:   He resigned. Did you
25 ever hear him use the word nigger?

PAGE 40

1         A:   No, I did not.
2         Q:   Did you ever know
3 him to use that word?
4         A:   No, I did not.
5         Q:   At any time until
6 today, you never heard anybody say
7 that Joe McCool used that word?
8         A:   When I looked at the
9 EEOC, I certainly saw that it was
10 inferred.
11         Q:   And what's your
12 source of knowledge of the fact
13 that you testified to about Cindy
14 Dietz contacting Joe McCool?
15         A:   Conversations with
16 McCool and conversations with H.R.
17 I did not meet her. But, I saw her
18 resume. I saw her qualifications.
19         Q:   Did you know that
20 Joanne Gitto Davis received a
21 letter, I think it was around
22 November or so of 1999, saying Dear
23 Joanne, someone by the name of Joe
24 contacting me to ask if I was
25 interested in the Duty Officer



## VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 11  PAGE 41

1 position, would you know that?
2         A:    No, I would not know
3 that.
4         Q:    I don't think,
5 either I haven't allowed you or you
6 haven't gotten to the direct answer
7 to the question as to why from
8 after you received page one; why
9 did it need to be opened up to
10 anymore candidates?
11         A:    There are instances
12 where you, in position I go by what
13 H.R. sends to me. You know, they
14 are the people that are the experts
15 on how this is conducted. And if
16 they would send me a list and tell
17 me this is the list of candidates,
18 I look at it and say it's fine.
19 They could come back to me and in a
20 couple of days and say we didn't
21 get a candidate in or we made a
22 mistake and didn't get this
23 candidate in. And here is the new
24 list, will you review it.
25         Q:    Didn't that happen?

PAGE 42

1         A:    Well I've got two
2 lists here. The one references me.
3 The other one does not. The one
4 has my name on it as a cc; the
5 second one does not, so I can't
6 attest to that.
7         Q:    And Joanne Gitto
8 Davis, she testified that when the
9 list came down to her office. The
10 list to work from, it's got the
11 typewritten x's in the boxes as
12 opposed to check marks?
13         A:    That is true.
14         Q:    Did you receive that
15 list with the check marks on it?
16         A:    I have not, no.
17         Q:    If I suggest that
18 Faryniek, James and Cindy are and I
19 really don't know one way or the
20 other, is that Joe McCool's
21 writing?
22         A:    I can't say that. I
23 don't that.
24         Q:    Okay if you would
25 turn to the fourth page of that

PAGE 43

1 document.
2         A:    Alright.
3         Q:    The two persons who
4 were qualified from the first page.
5 Mr. Davis and Mr. Havrilla are
6 listed as recommended, correct?
7         A:    Mr. Davis?
8         Q:    Yeah, Bertzman,
9 Davis, Dietz?
10         A:    Oh okay. Yes, there
11 are four of them.
12         Q:    I'll read to you.
13 Let's look at Mr. Davis and Mr.
14 Havrilla. Mr. Davis is qualified
15 for the position of Duty Officer.
16 Mr. Davis has ten years experience
17 with the Pennsylvania Turnpike
18 Commission, including four years as
19 Radio Operator and one year as a
20 Radio Operator Two (Shift Leader).
21 Martin Havrilla is qualified for
22 the position of Duty Officer. Mr.
23 Havrilla has a military background,
24 but only limited Turnpike
25 Telecommunications experience.

PAGE 44

1         A:    Um hum.
2         Q:    Given those two
3 candidates, whom would you select?
4         A:    Well, I happen to
5 know Marty Havrilla's background
6 and along with this list would be
7 the resumes and the request. If
8 they are an internal candidate,
9 they have to supply their. If it
10 applicable, their performance
11 reviews. They have to supply a
12 written request and they have to
13 supply a resume. So, I would have
14 read the resumes. And not knowing
15 Joel Davis, I can tell you that I
16 have read Marty Havrilla's resume
17 and I have also interviewed Marty
18 Havrilla for other positions. So
19 with what I would have to back it
20 up. I'd probably choose Havrilla.
21 He was a retired Colonel from the
22 Air Force.
23         Q:    What do you know
24 about Joel Davis?
25         A:    I told you I didn't



VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 12    PAGE 45

1 know him. I don't know him. I
2 would have read his resume. And if
3 I was looking for someone. We were
4 always looking for people who could
5 come in at one level, be promoted
6 to another and had great background
7 in dispatch and good credentials in
8 this field or related fields. And
9 the resumes would have been
10 attached to this. It would allow
11 me to make a very easy choice.
12          Q:   So in any event, in
13 your mind, Mr. Havrilla, based on
14 what you know about him as
15 perfectly suited. Or not perfectly
16 suited, but was an acceptable and
17 qualified candidate for the Duty
18 Officer position?
19          A:   Well, I was not the
20 panel that interviewed these
21 people.
22          Q:   Well, I know, I'm
23 asking you.
24          A:   But, in my mind
25 based on that, he was one of four

PAGE 46

1 that was brought forth and he would
2 be acceptable. I happen to know
3 that he did not get it.
4          Q:   But, if somebody
5 came to you and said, look we are
6 going to hire Martin Havrilla for
7 this position, you would not have
8 said, oh no way; you can't do that,
9 that's a mistake.
10          A:   Based on my reading
11 of his resume, I would have said,
12 he is certainly qualified for the
13 position.
14          Q:   And if the only
15 thing you ever knew about these two
16 gentlemen is what's written on that
17 page, so you have to kind of
18 exclude your knowledge of Mr.
19 Havrilla. I mean who looks like
20 more qualified or the better suited
21 candidate?
22          A:   Well, I know where
23 you are leading me, but I'm going
24 to lead you right back. Our
25 statements in our job description

PAGE 47

1 have or equal.
2          Q:   Have what?
3          A:   Or equal. They have
4 the experience or equal.
5          Q:   Oh, no. I'm not
6 leading you there. Your talking
7 about a college degree?
8          A:   No, I'm talking
9 about that all. I mean if I read
10 Joel Davis, I'm reading that he is
11 applying for Duty Officer; he's
12 been a Radio Operator. He's got
13 experience and he is shift leader.
14          Q:   Right?
15          A:   He's an internal
16 candidate. That would tell me he
17 is familiar. It doesn't tell me
18 that is going to make a great Duty
19 Officer. It tells me that he was
20 hired and he was an acceptable
21 Radio Operator. He is being brought
22 forth by a committee based on his
23 interview, based on what they know
24 about him as an okay candidate for
25 this. So is Havrilla. So I am

PAGE 48

1 really relying on the committee and
2 saying that they were both brought
3 forth. Now I will then ask the
4 committee, give me your top. I
5 need to prioritize this.
6          Q:   Okay, well suppose
7 then you didn't get to that point
8 with the committee. Someone said
9 to you, you got two candidates,
10 Joel Davis and Martin Havrilla.
11 Read what's here and make a
12 decision.
13          Q:   I'll ask a different
14 question.
15          A:   Alright.
16          Q:   Do you have any
17 reason? You being the reasonable
18 man and competent supervisor that
19 you are; would have any reason to
20 disagree with the statement that if
21 you were reviewing the statement
22 next to Joel Davis and the
23 statement next to Martin Havrilla
24 had them make this decision with
25 nothing other than what is written

89

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 13  PAGE 49

1 there in black and white, you would
2 have selected Joel Davis?
3          ATTORNEY WEINBERG:   I
4 have a continuing objection.  This
5 is absurd.  The witness has just
6 spent ten minute telling you.
7          Q:   Well, I'll tell you
8 what is absurd, is the point I'm
9 trying to make.
10         ATTORNEY WEINBERG:   Ten
11 minutes telling you that based on a
12 few sentences on one piece of
13 paper.  He can't answer that kind
14 of question. There are too many
15 other facts to look at.
16         Q:   Fair enough.  You
17 never met Joel Davis?
18         **A:   No.  I don't**
19 **remember Joel Davis and I looked at**
20 **the thing you gave you earlier and**
21 **it appeared that he left the**
22 **Turnpike in December of 1999. So,**
23 **there is every reason to support**
24 **that I would not have known him,**
25 **because I started working here**

PAGE 50

1 **September 5th and by September 18th**
2 **we relocated to Carlisle. And the**
3 **Operations Center stayed here in a**
4 **trailer and I only got back in**
5 **forth a little bit between the two.**
6 **So, he probably was gone by then.**
7          Q:   Is there any reason
8 that whoever was conducting this
9 process did not find either Joel
10 Davis or Martin Havrilla as
11 acceptable candidates?
12         **A:   No, there is no**
13 **reason that I know of.**
14         Q:   Now if I point out
15 the fact that Joel Davis is a black
16 man, is there any reason in your
17 mind to determine whether anybody
18 thought Joel Davis or Martin
19 Havrilla was not qualified?
20         **A:   No.  I would not**
21 **have known that Joel Davis was a**
22 **black man.  That would not have**
23 **made any difference.**
24         Q:   Shouldn't have made
25 a difference, right?

PAGE 51

1          **A:   It wouldn't have**
2 **made any difference to me.**
3          Q:   And it shouldn't for
4 whoever made this decision?
5          **A:   That is correct.**
6          Q:   Now has it ever been
7 discussed in your presence or
8 suggested to you that whoever
9 conducted this process knew that
10 they were going to be faced with
11 choosing between the black man,
12 Joel Davis and Martin Havrilla, who
13 has only been at the Turnpike for
14 three months, knew that being the
15 black hating person that he or she
16 is, he would have to hire a black
17 man in a management position and
18 didn't want that; and therefore,
19 went out crafted positions and got
20 new candidates.
21          ATTORNEY WEINBERG:
22 Objection.
23          Q:   Has that ever been?
24          ATTORNEY WEINBERG:
25 That's not even a question.

PAGE 52

1          ATTORNEY OSTROWSKI: Yes
2 it is.
3          ATTORNEY WEINBERG:   That
4 is the most compounded question.
5          ATTORNEY OSTROWSKI: No.
6 It is a very simply question.
7          ATTORNEY SHARP:      Whoa,
8 one at a time now.
9 Series of questions.
10         ATTORNEY SHARP:      Okay,
11 we are done.
12         ATTORNEY WEINBERG:   I'm
13 objecting as to the form of the
14 question.  Mr. Richards, did you
15 understand this question?
16         **A:   I would ask you to**
17 **repeat the question.**
18         Q:   My question is.  The
19 question really is at the beginning
20 here. Did anybody ever suggest to
21 you or discuss in front of you the
22 fact that. That's the question and
23 here is the proposition. Whoever
24 was making this decision had to
25 choose between; knew, saw that they

90

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 14   PAGE 53

1 were going to have to choose
2 between Martin Havrilla and Joel
3 Davis.  Martin Havrilla had only
4 been at the Turnpike Commission for
5 three months.  Joel Davis is a
6 black man. This person didn't like
7 blacks and therefore, went out and
8 tried to contact Cindy Dietz,
9 Faryniek and others to have more
10 candidates to choose from to
11 legitimize it?
12          A:    I don't know that to
13 be true.
14          Q:    Do you have any
15 reason to dispute my hypothecation
16 as affect?
17          A:    To dispute it?
18          Q:    Yes.
19          A:    My only dispute
20 would be that the panel; I have
21 never heard McCool act racist.  I
22 have never heard Capone act racist
23 and I have never heard Genevieve
24 act racist. So, no.  Do I have any
25 reason to believe?  I would trust

PAGE 54

1 the panel. And I don't know that; I
2 have never seen them to be racist.
3          Q:    On the first page of
4 that document.  That appears to be
5 a copy of post-it-note.  Is that
6 your handwriting on that?
7          A:    No it is not.
8          Q:    Can you offer any?
9 Your G.R. Richards?
10          A:    I am.  It says
11 external candidate. (Operations
12 Center) date 3/8/00.  That might
13 be; that is H.R. is my suspicion,
14 but I don't know.
15          Q:    Do you know why or
16 do you recall anything that was
17 going on with respect to this
18 promotion in early March of 2000?
19          A:    I think I have
20 already told you that there was a
21 need for duty officers. There was a
22 need for radio operators and at the
23 time we were interviewing everybody
24 that we could to get qualified
25 people.  And there was also a

PAGE 55

1 revolving door on some of the duty
2 officers and we were trying to get
3 the complement up to what it was
4 supposed to be.
5          Q:    As of March 8, 2000,
6 had the applicant; successful
7 applicant taken that duty officer
8 position or assumed, or actually
9 fill that duty officer position?
10          A:    Well this was
11 brought forth on 1/26 and the two
12 people that were hired out this for
13 duty officers. There would have
14 only been one.  Marty Havrilla was
15 never a duty officer.  Bretzman
16 would have been hired. Dietz, as I
17 told you, turned down the job and I
18 never met Joel Davis.  So, Bretzman
19 would have got the job so, if we
20 accepted this on 1/26, it would
21 have been approved at the next
22 Commission meeting, which would
23 have been the first Tuesday in
24 February and then the person would
25 have started the following pay

PAGE 56

1 period, which would have been a
2 Friday. So, the answer to your
3 question is, Bretzman would have
4 started by this date.  By 3/8.
5          Q:    Is there any reason
6 that you are aware of or recall
7 that Mr. Bretzman would not have or
8 did not fill that position that
9 second week of February?
10          A:    It's in the record.
11 If the process followed through the
12 way I described it, Mr. Bretzman
13 would have been brought onto the
14 Turnpike in February.
15          Q:    You don't have a
16 recollection of there being any.
17          A:    No, but it's in the
18 record; I mean H.R. records would
19 show it.
20          Q:    Okay this is marked
21 Exhibit 7.  The fifth page of this
22 document.  Is that a copy of your
23 signature?
24          A:    It is.
25          Q:    And above that, is

91

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 15   PAGE 57

1 that your handwriting?  DED of
2 Customer Service?
3        A:    Yes it is.
4        Q:    Why did you write
5 that in there?
6        A:    Because it was given
7 to me to sign.  It was computer
8 generated and it didn't have my
9 title in it.  So, I put the title
10 in and signed it.
11        Q:    But, why was there;
12 I mean on the other.
13        A:    It was probably
14 typed in.
15        Q:    But on the other
16 documents at that level on the
17 recommended personnel action, we
18 had Joe McCool signing.
19        A:    Joe McCool was gone.
20        Q:    Okay.
21        A:    It's 1/17/01.  He
22 left in May of 1999.  I was still
23 the acting director.
24        Q:    Why. This is 2001?
25 How long were you acting director?

PAGE 58

1        A:    I hired.  Joe McCool
2 left in May of 2000, and I believe
3 we hired Alan Baldwin in March or
4 April of 2001.
5        Q:    Well why.
6        A:    So I was acting for
7 ten months.
8        Q:    Why didn't you have
9 the Operations Center Manager
10 assume that role?  Deal with the
11 Operations Center Manager in this
12 process?
13        A:    At this point in
14 time I don't know whether Bretzman
15 had; I don't know whether Bretzman
16 was yet appointed as manager, but
17 ah.
18        Q:    Well on the previous
19 page.
20        A:    What's it say?
21        Q:    Or it's the third
22 page of the document.  It says um.
23        A:    That he had already
24 been appointed.
25        Q:    Would he had the

PAGE 59

1 person with whom you would have
2 dealt with?
3        A:    My secretary just
4 took the form off the computer and
5 you know, I'm allowed to sign it.
6 Bretzman's signature in itself
7 won't make it happen.  My signature
8 will make it happen.  I was asked
9 to sign it, so I signed it.
10        Q:    Well, I'm not asking
11 why you signed it because you
12 signed the other ones.  I'm asking
13 why you wrote DED of Customer
14 Service?
15        A:    Well, it doesn't
16 have title there?  Signature/title?
17        Q:    Yeah and what.
18        A:    I probably read just
19 what I just did now; I didn't read
20 signature, I read title.
21        Q:    Well, what about
22 below your signature?  DED
23 signature? Right?
24        A:    I read.  I did what
25 I just did right now.  When you

PAGE 60

1 asked why I wrote the title, I
2 looked at it and I read title.  I
3 didn't read signature title.
4        Q:    Well look at number
5 5 and number 4 and above the DED
6 signature line is Joe McCool?
7        A:    He's gone.
8        Q:    Didn't you know that
9 someone else was supposed to sign
10 that?
11        A:    I can't answer that.
12 I signed it.  And I wrote in my
13 title.
14        Q:    Okay.  Why in this
15 instance, was there a panel of only
16 two persons? - and Dan Gretzman?
17        A:    I can only; it would
18 be conjecture for me to answer you.
19 There was no written rule that we
20 had to have three.  We could have
21 two.  And we chose to have two at
22 this point in time. There is no
23 specific reason.
24        Q:    You don't recall
25 there being any discussion about

92

VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 16    PAGE 61

1 that?
2           A:   No.  And it might
3 have been that you know, we wanted
4 to have; we might have wanted to
5 have a third and that third person
6 wasn't available.  They could have
7 been on vacation and so to move the
8 process along, we went with two.
9           Q:   Was Bill Capone an
10 employee at the time?
11          A:   Oh yeah.
12          Q:   What was his
13 position at the time?
14          A:   At the time of this,
15 he would have been the Director of
16 Marketing.
17          Q:   If you look at the
18 second page of this, which is what
19 I believe would be the promotion
20 application log as received by you,
21 correct?
22          A:   This is normally
23 what I would receive, yes.
24          Q:   It reflects two
25 qualified internal candidates,

PAGE 62

1 correct?
2           A:   Yes.
3           Q:   Harry Williams and
4 Todd Leiss?
5           A:   Um hum.
6           Q:   And if you turn to
7 the next page in the top box, fist
8 line, first box.  The total number
9 of applicants internal two?
10          A:   Right.
11          Q:   And it says
12 applicants not qualified, one
13 applicants qualified one?
14          A:   Um hum.
15          Q:   Can you explain how
16 when you have two.  How you square
17 the second page and third page of
18 that?
19          A:   WE had started to
20 raise the bar for duty officers
21 with not only ABCO training, but
22 also ability to interface with the
23 computer.  Ability to type for the
24 purpose of getting the reports
25 accurate and quick.  Because that

PAGE 63

1 is essential.  And on paper the
2 first sheet would indicate the
3 qualifications on paper.  The
4 second sheet would indicate that
5 for whatever reason, one person
6 didn't make it though the testing.
7           Q:   And in that case
8 that would be Harry Williams,
9 right?
10          A:   And I would have
11 called on that.  And I did.
12          Q:   And what was the
13 reason?
14          A:   I saw that and the
15 thing that alerted me was he was.
16          Q:   Who did you call?
17          A:   I called Bretzman.
18 I called Bretzman because I saw
19 from H.R. that there were three
20 qualified and I saw that he only
21 brought forth one, and I said what
22 happened to the two qualified and
23 he told me that one of the
24 candidates did not pass the typing.
25          Q:   And um, strike that.

PAGE 64

1 And at this time, as of January 17,
2 2001, you were aware of Harry
3 Williams EEOC Complaint?
4           A:   I can't swear to the
5 crossing of dates.  I would have to
6 ask counsel for that.  I know that
7 our counsel gave that to me, but I
8 don't know the dates.  I can't
9 answer that.
10          ATTORNEY WEINBERG:  I'm
11 going to object because I believe
12 the witness said he was aware of an
13 Edwards Complaint, not a Harry
14 Williams Complaints.
15          Q:   Well, he did, but I
16 was asking were you also at some
17 point before today.  If not of this
18 specific Federal lawsuit of an EEOC
19 Complaint also filed by Harry
20 Williams?
21          A:   I have never seen
22 it, I heard about it.
23          Q:   Let me ask you, did
24 you write DED of Customer Service
25 on that line because you knew if

93

## VIDEO DEPOSITION OF GREGROY RICHARDS

SHEET 17  PAGE 65

1 Dan Bretzman signed it, it would
2 give Harry Williams ammunition to.
3        A:    No. No.  I'm just
4 telling you right here.  I must
5 have made the same mistake then
6 that I made just now.  You asked you
7 why it was there and I looked at
8 that and saw title.  I didn't see
9 signature.  And title to me was DED
10 of Customer Service and DED's
11 signature was Gregory R. Richards.
12 And what I knew was when I went
13 before the Salary Administration
14 Committee, they want me signature
15 on there.  As having okayed the
16 process.
17        Q:    And this issue of
18 the type in. What do you mean?
19        A:    Well, a lot of these
20 forms are on computer now.  And if
21 I'm doing, if my secretary is.
22        Q:    You're responding to
23 the wrong question.  The reason
24 that Harry wasn't; you said you had
25 talked to.

PAGE 66

1        A:    Oh the part of the
2 qualifications for duty officers
3 when we brought Mr. Gretzman on we
4 asked him to start to raise the bar
5 for the qualifications because the
6 qualifications for a duty officer;
7 I mean it's not just bing bing and
8 your in.  It takes a certain type
9 of person with certain skills.  And
10 not only did we have the ABCO
11 training, but we also now began to
12 want some computer skills, some
13 typing skills for the purpose of
14 making sure the logs were done on
15 time and accurate.
16        Q:    Does the Turnpike
17 use voice recognition software?
18        A:    No.
19        Q:    Do you know if the
20 vacancy notice; and the only one I
21 have may not have been in affect at
22 that time.  If the vacancy notice
23 said anything about a typing
24 requirement?
25        A:    I don't know that.

PAGE 67

1        Q:    Do you know anyone
2 else who ever took a typing test
3 for a duty officer position?
4        A:    Todd Leiss.
5        Q:    And you said that, I
6 forget what I was going to ask.
7 Okay I have not further questions.
8        ATTORNEY WEINBERG:   I
9 just have a note.  Plaintiff's 7
10 should not be 6.  Is there a 6?
11        ATTORNEY OSTROWSKI: I think
12 so.  We have four, five, six, I'm
13 sorry, your right.
14        ATTORNEY WEINBERG:   And I
15 have no questions.
16        ATTORNEY OSTROWSKI: Thank you
17 Mr. Richards.
18        VIDEO REPORTER:       The
19 time is 2:39 p.m.  The deposition
20 of Gregory Richards is completed.
21 Video and audio will be suspended.

G4

DEPOSITION OF GREGORY RICHARDS

**1**

**1/17/01** [1] 57:21
**1/26** [2] 55:11,20
**1/7/00** [1] 34:21
**1:25** [1] 1:4
**12/1/99** [1] 26:20
**12v-01-0877** [1] 1:13
**17** [1] 64:1
**17046** [1] 1:7
**17106** [1] 2:15
**17110** [1] 2:5
**18th** [2] 1:4 50:1
**19103** [1] 2:10
**1999** [7] 4:7 6:25 18:16 27:6 40:22 49:22 57:22

**2**

**2:39** [1] 67:19
**2000** [4] 2:8 54:18 55:5 58:2
**2001** [4] 7:17 57:24 58:4 64:2
**21st** [1] 18:15
**27** [1] 4:23

**3**

**3/8** [1] 56:4
**3/8/00** [1] 54:12

**4**

**4** [2] 17:22 60:5
**4146** [1] 1:6
**4311** [1] 2:3

**5**

**5** [3] 26:12 31:13 60:5
**5th** [2] 6:21 50:1

**6**

**6** [2] 67:10,10
**67976** [1] 2:14

**7**

**7** [2] 56:21 67:9

**8**

**8** [1] 55:5

**A**

**a-okay** [1] 33:11
**abco** [2] 62:21 66:10
**ability** [2] 62:22,23
**above** [5] 18:8 34:5 35:2 56:25 60:5
**absolutely** [2] 11:5 38:18
**absurd** [2] 49:5,8
**acceptable** [4] 45:16 46:2 47:20 50:11
**accepted** [2] 5:11 55:20

**accurate** [2] 62:5 66:15
**across** [1] 14:17
**act** [3] 53:21,22,24
**acting** [9] 21:14,17 27:8,9 28:8,24 57:23,25 58:6
**action** [1] 57:17
**actually** [2] 28:1 55:8
**added** [2] 32:24 33:5
**address** [2] 1:6 2:1
**administration** [3] 19:11 22:24 65:13
**advertise** [4] 9:22,23 12:8 13:11
**advised** [1] 1:2
**affect** [3] 7:24 53:16 66:21
**agree** [3] 20:5,7 36:18
**agreed** [1] 17:12
**ah** [3] 6:4 15:16 58:17
**ahead** [3] 17:24 26:12 33:12
**air** [1] 44:22
**alan** [1] 58:3
**albert** [1] 1:5
**alerted** [1] 63:15
**allow** [1] 45:10
**allowed** [2] 41:5 59:5
**already** [2] 54:20 58:23
**alright** [4] 39:12,13 43:2 48:15
**ammunition** [1] 65:2
**among** [1] 16:25
**amp** [3] 4:18,21,25
**andrew** [1] 2:3
**andy** [1] 2:21
**another** [3] 6:10 28:15 45:6
**answer** [10] 1:21 27:1,15 35:14 41:6 49:13 56:2 60:11,18 64:9
**anybody** [3] 40:6 50:17 52:20
**appeared** [1] 49:21
**appears** [3] 34:9 36:11 54:4
**applicable** [2] 33:16 44:10
**applicant** [3] 24:15 56:6,7
**applicants** [7] 23:18,19 24:10 32:21 62:9,12,13
**application** [3] 25:23 26:22 61:20
**applied** [3] 10:3 31:23,23
**apply** [1] 24:7
**applying** [1] 47:11
**appointed** [3] 28:8 58:16,24
**approved** [1] 55:21
**april** [1] 58:4
**area** [2] 20:2 28:15
**aren't** [1] 34:16
**arising** [1] 2:24
**around** [3] 5:3 33:14 40:21
**associate** [1] 3:16

by ETS Inc.

DEPOSITION OF GREGORY RICHARDS

**associated** [1] 32:2
**assume** [1] 58:10
**assumed** [1] 55:8
**attached** [1] 45:10
**attempted** [1] 25:23
**attempts** [1] 24:16
**attest** [1] 42:6
**attorney** [20] 2:7,11,16,18 34:12 49:3,10 51:21,24 52:1,3,5,7,10,12 64:10 67:8,11,14,16
**audio** [2] 1:2 67:21
**available** [4] 11:22,25 39:8 61:6
**averly** [1] 3:13
**aware** [8] 8:15,25 9:4,6,11 56:6 64:2,12

### B

**back** [9] 10:15 29:7,19 33:7 38:6 41:19 44:19 46:24 50:4
**background** [3] 43:23 44:5 45:6
**baldwin** [1] 58:3
**bar** [2] 62:20 66:4
**based** [8] 13:8 15:12 45:13,25 46:10 47:22,23 49:11
**became** [1] 11:6
**become** [1] 9:6
**began** [1] 66:11
**beginning** [1] 52:19
**believe** [10] 3:6,19,22 7:18 9:7 21:24 53:25 58:2 61:19 64:11
**below** [2] 20:13 59:22
**benchmark** [1] 11:7
**bertzman** [1] 43:8
**beside** [2] 36:5,6
**best** [1] 5:10
**better** [3] 28:25 39:5 46:20
**between** [5] 23:17 50:5 51:11 52:25 53:2
**bill** [1] 61:9
**bing** [2] 66:7,7
**bit** [1] 50:5
**black** [7] 49:1 50:15,22 51:11,15,16 53:6
**blacks** [2] 3:8 53:7
**both** [6] 12:5,6,9 16:15 27:16 48:2
**bottom** [1] 34:3
**box** [4] 2:13 23:13 62:7,8
**boxes** [1] 42:11
**bracket** [2] 36:6,7
**bracketed** [2] 36:10,12
**bretzman** [11] 33:15 55:15,18 56:3,7,12 58:14,15 63:17,18 65:1
**bretzman's** [1] 59:6
**bring** [11] 10:9,13,16,21 11:1 12:12,21 14:9,11 23:9 39:11
**brought** [17] 8:17 9:2 16:12,13,17,21 17:2 19:5 25:9 29:19 46:1 47: 21 48:2 55:11 56:13 63:21 66:3
**building** [1] 8:7

**buildings** [1] 8:5
**business** [1] 19:24
**bypassed** [1] 21:21

### C

**call** [2] 32:8 63:16
**called** [7] 12:21 18:20 19:10 39:7 63:11,17,18
**came** [8] 19:20 21:11 27:19,23 36:21 37:24 42:9 46:5
**candidate** [19] 5:10 12:22 13:5,10 14:15 16:14,18,22 23:10 35:17 39:3 41:21,23 44:8 45:17 46:21 47:16,24 54:11
**candidates** [32] 10:2,10 11:3 12:4,13 13:12,13,17,20 16:8,12 18:22 19:1,13 22:8,19 23:15 35:6 36:19 37:10,11 38:23 39:11 41:10,17 44:3 48:9 50:11 51:20 53:10 61:25 63:24
**cannot** [1] 13:9
**capone** [2] 53:22 61:9
**caption** [1] 1:13
**carlisle** [1] 50:2
**case** [5] 1:10 14:5 22:21 23:21 63:7
**cc** [1] 42:4
**center** [6] 28:9 39:5 50:3 54:12 58:9,11
**certain** [2] 66:8,9
**certainly** [2] 40:9 46:12
**change** [2] 7:15,23
**changed** [2] 7:12 20:9
**check** [5] 34:4 35:2 36:2 42:12,15
**checked** [1] 36:9
**choice** [7] 10:11,12 13:2 23:11 24:12,13 45:11
**choices** [1] 19:15
**choose** [5] 33:19 44:20 52:25 53:1,10
**choosing** [1] 51:11
**chose** [1] 60:21
**cindy** [5] 33:15 38:24 40:13 42:18 53:8
**circumstances** [1] 10:25
**clear** [1] 34:15
**clearly** [2] 14:8 16:24
**collection** [2] 6:11,13
**college** [1] 47:7
**colonel** [1] 44:21
**come** [7] 14:17 15:8,10 16:14 18:19 41:19 45:5
**commander** [1] 6:15
**commission** [12] 1:15 2:13,24 4:5 5:19 7:3,21 8:18 9:3 43:18 53:4 55:22
**committee** [8] 12:19,20,23 47:22 48:1,4,8 65:14
**companies** [1] 4:14
**company** [1] 4:19
**compare** [2] 16:7,9
**competent** [1] 48:18
**complaint** [4] 9:8 64:3,13,19
**complaints** [1] 64:14

96

**complement** [2] 31:7 55:3
**completed** [1] 67:20
**compounded** [1] 52:4
**computer** [5] 57:7 59:4 62:23 65:20 66:12
**concern** [2] 37:5,8
**conclude** [1] 29:2
**conducted** [2] 41:15 51:9
**conducting** [1] 50:8
**conjecture** [3] 35:4 38:12 60:18
**connection** [3] 3:3 22:3 32:13
**cons** [1] 15:1
**conserve** [1] 33:17
**considered** [3] 32:4,5 39:2
**consultant** [2] 4:11,12
**consulted** [1] 4:13
**consulting** [1] 5:7
**contact** [1] 53:8
**contacting** [3] 8:19 40:14,24
**continue** [1] 28:11
**continuing** [1] 49:4
**conversations** [2] 40:15,16
**coordinate** [1] 28:19
**coordinator** [2] 28:17,24
**copy** [7] 18:4 22:22,25 26:15 31:13 54:5 56:22
**correct** [18] 13:15 14:21 17:9 18:13,14 22:4 31:15,18 36:3,20,23 37: 6,11,12 43:6 51:5 61:21 62:1
**correlation** [2] 23:17 25:11
**couldn't** [3] 6:20 36:15 38:19
**counsel** [8] 1:25 2:5,7,12,22 9:9 64:6,7
**count** [2] 27:21 31:2
**counted** [1] 30:5
**couple** [2] 18:12 41:20
**crafted** [1] 51:19
**created** [2] 26:23 28:21
**credentials** [1] 45:7
**critical** [1] 23:25
**cross** [1] 2:18
**crossing** [1] 64:5
**current** [1] 5:13
**customer** [8] 5:15,22,24 6:6 57:2 59:13 64:24 65:10
**customers** [1] 8:3

**D**

**d.e.i.t.z** [1] 33:4
**dan** [3] 33:15 60:16 65:1
**date** [5] 1:3 26:20,21 54:12 56:4
**dates** [2] 64:5,8
**dave** [3] 21:18 27:7 29:3
**davis** [28] 32:23 34:11 37:22 38:1 40:20 42:8 43:5,7,9,13,14,16 44:15,

24 47:10 48:10,22 49:17,19 50:10,15,18,21 51:12 53:3,5 55:18
**davis'** [1] 34:22
**day** [2] 6:19,23
**days** [1] 41:20
**deal** [2] 21:2 58:10
**dealing** [1] 21:16
**dealt** [2] 21:19 59:2
**dear** [1] 40:22
**deborah** [1] 3:13
**december** [1] 49:22
**decided** [1] 9:13
**decides** [2] 10:14,17
**decision** [7] 13:8 15:4 37:19 48:12,24 51:4 52:24
**decisions** [1] 9:17
**ded** [6] 57:1 59:13,22 60:5 64:24 65:9
**ded's** [1] 65:10
**deemed** [1] 10:4
**degree** [1] 47:7
**department** [2] 5:25 28:15
**deponee** [1] 1:16
**depose** [1] 9:14
**deposed** [1] 9:10
**deposition** [4] 1:9 3:2 8:21 67:19
**deputate** [2] 9:18 21:1
**deputy** [2] 5:14,21
**described** [2] 14:7 56:12
**description** [1] 46:25
**desirability** [1] 25:15
**desire** [1] 25:19
**determine** [1] 50:17
**detweiler** [1] 35:11
**diane** [4] 22:2 26:19 28:4 29:17
**dietz** [8] 32:25 33:4,15 38:25 40:14 43:9 53:8 55:16
**difference** [3] 50:23,25 51:2
**different** [2] 17:7 48:13
**direct** [6] 6:3,4,5,14 9:20 41:6
**director** [17] 3:17 5:15,22 6:6,8,10,11,12 7:8 8:1,3 21:15 24:12 33: 10 57:23,25 61:15
**disagree** [1] 48:20
**discuss** [2] 14:25 52:21
**discussed** [1] 51:7
**discussion** [2] 25:13 60:25
**dislike** [1] 3:7
**dispatch** [1] 45:7
**dispute** [3] 53:15,17,19
**district** [2] 1:11,11
**docketed** [1] 1:12
**document** [10] 17:21 18:4 26:14 31:20 35:20,21 43:1 54:4 56:22 58: 22

by ETS Inc.

97

DEPOSITION OF GREGORY RICHARDS

**documents** [1] 57:16
**doing** [3] 12:2 19:25 65:21
**dombrowski** [7] 21:18 27:7 28:2,7 29:19 30:2,21
**dombrowski's** [1] 29:3
**done** [5] 10:1 15:4 37:16 52:11 66:14
**door** [1] 55:1
**down** [4] 27:22 33:24 42:9 55:17
**draftsman** [1] 33:24
**during** [2] 25:13 27:3
**durman** [2] 3:20,24
**duty** [31] 26:23 27:9,17,24,25 28:10,20,22 29:9 30:14,24 31:8 33:14 38:16,17 40:25 43:15,22 45:17 47:11,18 54:21 55:1,7,9,13,15 62:20 66:2,6 67:3

### E

**each** [1] 16:6
**earlier** [2] 14:7 49:20
**early** [2] 5:1 54:18
**easy** [1] 45:11
**edwards** [2] 9:1 64:13
**eeoc** [4] 9:8 40:9 64:3,18
**effective** [3] 6:19,23 7:18
**either** [6] 9:22 10:21 12:13 32:6 41:5 50:9
**electronic** [1] 6:12
**eliminated** [1] 24:8
**elimination** [1] 15:12
**emergency** [1] 28:18
**employed** [2] 7:2 28:1
**employee** [1] 61:10
**employees** [2] 8:4,8
**employment** [3] 2:25 4:17 6:19
**end** [1] 33:7
**ended** [1] 17:13
**enough** [1] 49:16
**equal** [3] 47:1,3,4
**equally** [1] 16:10
**essential** [1] 63:1
**established** [1] 19:17
**estimation** [1] 13:18
**even** [4] 14:17 24:7 38:19 51:25
**event** [1] 45:12
**everybody** [2] 11:5 54:23
**everything** [1] 35:7
**exact** [2] 27:14 29:8
**exactly** [1] 16:20
**examination** [1] 2:18
**excelled** [1] 11:5
**exclude** [3] 14:18,23 46:18
**exclusively** [1] 17:9

**executive** [3] 5:1 5:15,21
**exhibit** [4] 17:22 26:12 31:1 56:21
**exhibits** [1] 17:24
**experience** [5] 13:8 43:16,25 47:4,13
**expertise** [1] 4:15
**experts** [1] 41:14
**explain** [1] 62:15
**explained** [1] 37:1
**explains** [1] 33:1
**external** [4] 24:3 36:12,15 54:11
**externally** [2] 9:24 24:6

### F

**f.a.r.y.n.i.e.k** [1] 33:3
**faced** [1] 51:10
**fact** [3] 40:12 50:15 52:22
**facts** [1] 49:15
**fair** [6] 13:19 14:1 20:4 29:1,6 49:16
**fairly** [1] 32:17
**fall** [1] 10:15
**familiar** [2] 18:24 47:17
**familiarize** [1] 18:1
**fare** [1] 16:10
**faryniek** [7] 32:24 33:3 35:15 36:3,6 42:18 53:9
**february** [3] 55:24 56:9,14
**federal** [1] 64:18
**feelings** [1] 19:1
**felt** [3] 8:12 11:4 18:23
**female** [2] 25:16,20
**few** [2] 27:16 49:12
**field** [1] 45:8
**fields** [1] 45:8
**fifth** [1] 56:21
**file** [3] 34:4 35:2,4
**filed** [1] 64:19
**fill** [3] 38:8 55:9 56:8
**filled** [3] 20:12 30:14,17
**filling** [2] 25:15 29:3
**find** [2] 19:24 50:9
**fine** [1] 41:18
**fired** [2] 39:21,23
**first** [21] 6:18,23,24 10:14 18:3,12,18 23:11,24 25:1 26:8 27:18 29:15 31:11,12 36:18 43:4 54:3 55:23 62:8 63:2
**fist** [1] 62:7
**five** [8] 14:16,17 28:3 29:15,20,25 30:23 67:12
**floor** [1] 2:9
**followed** [1] 56:11
**following** [2] 21:13 55:25
**force** [1] 44:22

by ETS Inc.

documents - force

98

**forget** [1] 67:6
**form** [3] 34:13 52:13 59:4
**forms** [1] 65:20
**orth** [24] 10:10,13,16,21 11:1 12:12,22 13:22 14:9,11 16:12,13,18,21 17:2 19:5 23:9 39:11 46:1 47:22 48:3 50:5 55:11 63:21
**found** [3] 5:10 13:4 14:5
**four** [14] 11:10,17 13:7 15:16 16:7,12,13 24:18 33:19 37:9 43:11,18 45:25 67:12
**fourth** [2] 25:10 42:25
**friday** [1] 56:2
**front** [1] 52:21
**further** [1] 67:7

## G

**g.r** [1] 54:9
**game** [1] 32:18
**gates** [1] 36:7
**gave** [2] 49:20 64:7
**generated** [1] 57:8
**genevieve** [1] 53:23
**gentlemen** [1] 46:16
**gets** [1] 13:24
**getting** [2] 38:18 62:24
**gitto** [2] 40:20 42:7
**give** [5] 3:2 24:20 35:3 48:4 65:2
**given** [3] 10:12 44:2 57:6
**gives** [2] 23:14,25
**got** [11] 12:24 13:23 39:4,21 42:1,10 47:12 48:9 50:4 51:19 55:19
**gotten** [1] 41:6
**great** [3] 15:1 45:6 47:18
**gregory** [3] 1:16 65:11 67:20
**gretzman** [2] 60:16 66:3
**grouped** [1] 36:5

## H

**h.r** [12] 31:17 32:8 33:1,10 34:2 39:10,12 40:16 41:13 54:13 56:18 63:19
**halves** [1] 28:23
**hand** [1] 1:18
**handwriting** [12] 22:9 33:11,21,22 34:6,8,17 35:8,21,24 54:6 57:1
**happen** [5] 41:25 44:4 46:2 59:7,8
**happened** [2] 33:2 63:22
**harrisburg** [3] 2:4,14 4:19
**harry** [12] 1:14 2:22 8:16 25:17,22 62:3 63:8 64:2,13,19 65:2,24
**hating** [1] 51:15
**havrilla** [20] 32:23 37:14 43:5,14,21,23 44:18,20 45:13 46:6,19 47:25 48:10,23 50:10,19 51:12 52:3 53:2,3 55:14
**havrilla's** [2] 44:5,16
**hear** [2] 3:23 39:25
**heard** [7] 26:9 38:3 40:6 53:21,22,23 64:22

**heather** [1] 2:1
**held** [1] 28:23
**hire** [2] 46:6 51:16
**hired** [9] 1:8 29:17 37:18,23 47:20 55:12,16 58:1,3
**hiring** [1] 9:21
**hit** [1] 27:18
**hold** [1] 28:11
**hum** [3] 44:1 62:5,14
**human** [1] 10:1
**hypothecation** [1] 53:15
**hypothetical** [1] 37:2

## I

**identically** [1] 12:5
**identify** [1] 1:25
**immediate** [2] 3:12 6:1
**impartial** [1] 20:4
**inc** [1] 4:19
**incident** [3] 6:9 8:13 21:15
**incidents** [3] 7:11,13 8:5
**including** [1] 43:18
**indicate** [3] 22:6 63:2,4
**indirect** [2] 6:5,15
**inferred** [1] 40:10
**influence** [1] 12:24
**inquiry** [1] 34:11
**inside** [1] 17:5
**instance** [2] 17:16 60:15
**instances** [4] 15:20 16:16 21:5 41:11
**interested** [1] 40:25
**interface** [1] 62:22
**interfaced** [1] 20:22
**intermediate** [1] 21:22
**internal** [8] 24:2,19,21 37:10 44:8 47:15 61:25 62:9
**internal/external** [1] 12:8
**internally** [4] 9:22,23 12:7 24:5
**interview** [16] 12:3,9 13:12,19 15:5,6,9 24:14,16,19,21 33:18,18 38:22 39:9 47:23
**interviewed** [22] 5:9 10:6 11:2 13:14,17 14:16 16:1,23,24 17:1 19:4 23:15,18 24:11,17 25:9 33:9 35:18 39:1,14 44:17 45:20
**interviewing** [7] 10:6 12:11 13:3 14:4 15:21 29:10 54:23
**interviews** [1] 35:5
**involved** [1] 14:24
**involvement** [1] 18:16
**isn't** [1] 23:23
**issue** [3] 34:5 35:3 65:17
**itself** [2] 30:11 59:6

## J

**j.g.d** [1] 34:24

by ETS Inc.

## DEPOSITION OF GREGORY RICHARDS

**james** [1] 42:18
**jane** [1] 22:15
**january** [1] 64:1
**joanne** [5] 34:10,22 40:20,23 42:7
**job** [9] 5:9 13:24 15:13 20:1 39:4,9 46:25 55:17,19
**jobs** [1] 12:5
**joe** [14] 7:1 27:2 29:12,22 33:13 39:17 40:7,14,23 42:20 57:18,19 58:1 60:6
**joel** [18] 37:21,25 44:15,24 47:10 48:10,22 49:2,17,19 50:9,15,18,21 51:12 53:2,5 55:18
**john** [2] 3:20,24
**jordan** [10] 22:2 28:2,4,6 29:17,24 30:3,5,18 31:3
**jordan's** [1] 26:19
**joseph** [1] 18:9
**judgment** [1] 14:4
**july** [1] 1:3
**jump** [1] 31:25
**jumper** [3] 29:24 30:18 31:4

### K

**keiley** [1] 22:15
**kept** [1] 17:4
**kind** [2] 46:17 49:13
**knowing** [1] 44:14
**knowledge** [2] 40:12 46:18
**knowledgeable** [1] 20:7
**known** [3] 26:1 49:24 50:21

### L

**last** [2] 33:14,21
**lawsuit** [4] 2:23 8:16,25 64:18
**lead** [1] 46:24
**leader** [2] 43:20 47:13
**leading** [2] 46:23 47:6
**least** [1] 15:16
**leave** [1] 4:24
**lebanon** [1] 1:7
**left** [7] 27:2,5 29:22 34:1 49:21 57:22 58:2
**legal** [1] 1:19
**legitimize** [1] 53:11
**leiss** [3] 31:4 62:4 67:4
**lengths** [1] 15:1
**letter** [1] 40:21
**level** [7] 20:13 21:3,19,22,23 45:5 57:16
**limited** [1] 43:24
**limiting** [1] 16:3
**line** [6] 23:24 24:3 36:5 60:6 62:8 64:25
**lines** [1] 33:25
**list** [8] 10:2 41:16,17,24 42:9,10,15 44:6
**listed** [1] 43:6

**listing** [2] 11:9
**listings** [1] 11:20
**lists** [1] 42:2
**little** [1] 50:5
**local** [1] 39:5
**log** [2] 36:21 61:20
**logged** [1] 9:8
**logs** [2] 26:22 66:14
**long** [3] 4:4,20 57:25
**look** [11] 11:15 23:22 29:7 31:22,23 41:18 43:13 46:5 49:15 60:4 61:17
**looked** [4] 40:8 49:19 60:2 65:7
**looking** [4] 15:2 30:20 45:3,4
**looks** [3] 36:9,15 46:19
**lost** [1] 29:18
**lot** [1] 65:19
**low** [1] 29:9
**lower** [2] 21:3,19

### M

**made** [10] 8:24 9:11 29:17 41:21 50:23,24 51:2,4 65:5,6
**majority** [1] 14:11
**man** [6] 48:18 50:16,22 51:11,17 53:6
**management** [7] 6:9,12 8:9 9:21 21:3,16 51:17
**manager** [9] 20:17 21:17 27:8,10 28:9,24 58:9,11,16
**many** [8] 15:14 16:7 27:24,25 30:14,24 38:22 49:14
**march** [4] 7:17 54:18 55:5 58:3
**mark** [1] 35:12
**marked** [4] 17:22,23 26:11 56:20
**market** [1] 2:9
**marketing** [1] 61:16
**marks** [2] 42:12,15
**martin** [9] 43:21 46:6 48:10,23 50:10,18 51:12 53:2,3
**marty** [4] 44:5,16,17 55:14
**marvin** [1] 2:8
**matter** [2] 3:3 28:12
**matters** [1] 2:25
**mccool** [22] 7:1 18:9,21 19:7 20:16,22 21:12 24:13 32:17,19 33:13 39:8,10,18 40:7,14,16 53:21 57:18,19 58:1 60:6
**mccool's** [1] 42:20
**mean** [8] 46:19 47:9 56:18 57:12 65:18 66:7
**meaning** [2] 5:25 33:12
**meet** [1] 40:17
**meeting** [1] 55:22
**met** [2] 49:17 55:18
**middle** [3] 1:11 34:23 39:7
**might** [7] 22:13,15,25 30:8 54:12 61:2,4
**military** [1] 43:23
**mind** [5] 31:2 32:6 45:13,24 50:17

by ETS Inc.

mine [3] 22:16 34:1,19
minute [1] 49:6
minutes [1] 49:11
mistake [3] 41:22 46:9 65:5
mistaken [1] 30:9
months [6] 21:8,11 37:19 51:14 53:5 58:7
most [1] 52:4
move [1] 61:7
ms [1] 18:19
much [2] 14:18 17:25
must [2] 34:2 65:4
myself [2] 4:11 18:24

## N

name [7] 1:5 2:21 26:5 38:4,25 40:23 42:4
names [1] 22:9
need [5] 38:16 41:9 48:5 54:21,22
never [9] 40:6 49:17 53:21,22,23 54:2 55:15,18 64:21
new [5] 8:6 18:20 32:17 41:23 51:20
next [10] 20:13 21:2,23 22:8 24:3 36:2 48:22,23 55:21 62:7
nigger [2] 3:24 39:25
nobody [1] 13:23
normally [6] 10:7 11:15 15:3 19:20 22:23 61:22
north [1] 2:4
note [4] 7:7 32:25 33:7 67:9
notes [2] 23:1,2
nothing [1] 48:25
notice [2] 66:20,22
november [1] 40:22
number [9] 1:13 2:2 16:11 23:18,19 24:1 60:4,5 62:8

## O

object [2] 34:13 64:11
objecting [1] 52:13
objection [2] 49:4 51:22
occasion [1] 21:2
occur [2] 7:16 19:21
occurred [1] 20:25
october [1] 27:6
offer [2] 39:5 54:8
office [1] 42:9
officer [16] 26:24 27:9 28:10,21,22 40:25 43:15,22 45:18 47:11,19 55:7,9,15 66:6 67:3
officers [15] 27:17,24 28:1 29:9 30:15,25 31:8 33:14 38:16,17 54:21 55:2,13 62:20 66:2
okay [21] 4:8 7:19 9:5 10:20 25:3,4,5 26:13 31:10,12 34:21,25 42:24 43:10 47:24 48:6 52:10 56:20 57:20 60:14 67:7
okayed [1] 65:15
one [61] 6:5,8 10:10,17,21 11:1,4,19,21 12:22 13:6,21,22 14:7,9 15:6,8, 10,22,24 16:14,18,21 17:15,18,19 19:8 22:7,17 23:9 24:15,19,21 27:17

32:7,14,15 33:2,3,18,20 38:21,23 41:8 42:2,3,3,5,19 43:19 45:5,25 49:12 52:8 55:14 62:12,13 63:5,21,23 66:20
ones [1] 59:12
only [20] 10:16 12:22 13:21 24:17 25:9 36:1,8 43:24 46:14 50:4 51:13 53:3,19 55:14 60:15,17 62:21 63:20 66:10,20
op [1] 39:5
opened [1] 41:9
openings [1] 27:16
operation [1] 1:3
operations [14] 6:9 7:8,11,14 8:2,6,14 20:17 21:15 28:8 50:3 54:11 58:9,11
operator [4] 43:19,20 47:12,21
operators [2] 27:17 54:22
opposed [1] 42:12
order [1] 34:17
organized [1] 19:17
ostrowski [8] 2:3,3,19,21 52:1,5 67:11,16
other [13] 14:10,20 17:15,16,23 42:3,20 44:18 48:25 49:15 57:12,15 59:12
others [3] 13:6 16:25 53:9
out [13] 2:24 5:7 13:10 14:8 15:8,10 16:25 19:24 31:25 50:14 51:19 53:7 55:12
outside [1] 17:4
over [3] 11:5 28:16 35:11
own [2] 23:2 32:6

## P

p.m [2] 1:4 67:19
p.o [1] 2:13
p.r [1] 1:8
page [22] 18:3 23:13 25:1 26:14 31:12 32:24 33:21 34:24 35:19 36:18 41:8 42:25 43:4 46:17 54:3 56:21 58:19,22 61:18 62:7,17,17
panel [19] 10:7 13:21 14:4,14,18 15:15 17:11,11,18 19:3,5,16,18 20:3,4 45:20 53:20 54:1 60:15
panel's [1] 24:11
panels [1] 14:25
paper [3] 49:13 63:1,3
park [1] 1:6
part [2] 28:25 66:1
particular [2] 13:5 25:14
pass [1] 63:24
pay [1] 55:25
peers [1] 17:11
pennsylvania [13] 1:7,12,15 2:5,10,12,14,23 6:16 7:2,21 9:3 43:17
people [16] 8:10 9:21 10:7,9 12:10 14:10,16 15:25 16:24 20:6 38:8 41:14 45:4,21 54:25 55:12
per [1] 33:13
perfectly [2] 45:15,15

by ETS Inc.

DEPOSITION OF GREGORY RICHARDS

**performance** [1]44:10
**period** [2]27:3 56:1
**person** [15]6:8 10:17 11:4 13:23 14:7 19:25 32:1,10 51:15 53:6 55: 24 59:1 61:5 63:5 66:9
**personnel** [4]9:17 28:12 31:15 57:17
**persons** [2]43:3 60:16
**philadelphia** [1]2:10
**phone** [2]2:1 32:7
**pick** [2]32:7 38:7
**piece** [1]49:12
**plaintiff** [2]1:9 2:6
**plaintiff's** [1]67:9
**please** [3]1:1,17,25
**point** [13]7:20 8:23 20:16 24:10 27:3 31:21 38:15 48:7 49:8 50:14 58: 13 60:22 64:17
**police** [1]6:16
**poor** [1]13:2
**position** [37]3:15 5:13 6:2 7:25 8:11 11:21 12:25 13:15 15:22,24 16: 1 19:22,22 20:11 25:16 26:24 28:10,11,21 29:4 30:14,16 36:20 38:9 41: 1,12 43:15,22 45:18 46:7,13 51:17 55:8,9 56:8 61:13 67:3
**positions** [6]11:25 27:24,25 33:13 44:18 51:19
**possible** [1]12:11
**post-it-note** [1]54:5
**posted** [1]12:5
**posting** [4]12:6 25:24 26:20 33:16
**preference** [1]14:15
**preferences** [1]19:8
**presence** [1]51:7
**present** [2]8:4 19:12
**pretty** [2]14:17,18
**previous** [1]58:18
**previously** [1]17:23
**prior** [4]4:8,16 8:18 35:18
**prioritize** [1]48:5
**probably** [14]15:17 16:9,11,17 20:18 30:19 31:10 35:4,13,17 44:20 50:6 57:13 59:18
**problem** [1]37:1
**proceeding** [1]1:20
**process** [17]9:24,25 10:18 13:3 15:11 18:17 22:4 25:14 31:21 38:7 39:7 50:9 51:9 56:11 58:12 61:8 65:16
**processes** [2]12:3 20:24
**promote** [1]17:5
**promoted** [1]45:5
**promotion** [8]12:19 18:17 20:24 25:14 26:21 29:2 54:18 61:19
**proper** [3]13:19 27:20,21
**property** [1]6:11
**proposition** [1]52:23
**pros** [1]15:1
**provide** [1]2:1

**provided** [1]12:
**prudent** [1]10:25
**public** [1]6:7
**purely** [1]38:11
**purpose** [2]62:24 66:13
**put** [3]13:22 27:7 57:9

**Q**

**qualifications** [6]37:4 40:18 63:3 66:2,5,6
**qualified** [34]10:4,5 11:3 13:14,16,20 19:3 24:4,5,9,23 25:4,5 31:24 32:4,5,21 36:3,19 38:22 39:15 43:4,14,21 45:17 46:12,20 50:19 54:24 61:25 62:12,13 63:20,22
**qualify** [2]32:9,10
**question** [20]23:5 25:7 26:7 27:14 31:11 32:6 41:7 48:14 49:14 51: 25 52:4,6,14,15,17,18,19,22 56:3 65:23
**questioned** [1]37:3
**questions** [4]1:21 52:9 67:7,15
**quick** [2]19:19 62:25
**quite** [1]27:15

**R**

**racist** [8]3:5,18,21 39:18 53:21,22,24 54:2
**radio** [6]27:16 43:19,20 47:12,21 54:22
**raise** [3]1:18 62:20 66:4
**rank** [1]22:23
**ranked** [2]23:3,7
**ranking** [1]22:19
**read** [15]34:15 36:13,23 43:12 44:14,16 45:2 47:9 48:11 59:18,19,20, 24 60:2,3
**reading** [2]46:10 47:10
**realized** [1]9:12
**really** [4]23:23 42:19 48:1 52:19
**reason** [17]10:11,14 24:20 39:16 48:17,19 49:23 50:7,13,16 53:15, 25 56:5 60:23 63:5,13 65:23
**reasonable** [1]48:17
**recall** [6]16:7 17:16 22:2 54:16 56:6 60:24
**receive** [2]42:14 61:23
**received** [6]26:2 31:14,17 40:20 41:8 61:20
**recognition** [1]66:17
**recognize** [3]18:7 34:5 35:23
**recollection** [1]56:16
**recommend** [2]16:8 20:3
**recommendation** [1]12:20
**recommended** [6]17:17,19 23:16,20 43:6 57:17
**record** [5]2:2 28:12 30:10 56:10,18
**records** [2]29:8 56:18
**refer** [2]20:10 23:12
**reference** [1]31:20
**referenced** [1]26:21
**references** [1]42:2

by ETS Inc.

performance - references

DEPOSITION OF GREGORY RICHARDS

referred [1] 7:7
referring [3] 12:17 26:3 33:6
reflect [2] 7:13 22:18
reflected [1] 29:3
reflects [1] 61:24
regarding [2] 34:4 35:2
related [2] 2:25 45:8
relates [1] 9:16
relations [1] 6:7
relative [1] 22:19
relied [1] 32:19
relieve [1] 28:20
relocated [1] 50:2
rely [1] 32:16
relying [1] 48:1
remember [2] 38:24 49:19
repeat [1] 52:17
report [1] 9:20
reporter [3] 1:1,24 67:18
reports [6] 6:4,4,5,14,17 62:24
request [2] 44:7,12
requirement [1] 66:24
requirements [1] 15:13
resigned [4] 21:7,12 39:23,24
resources [1] 10:1
respect [3] 12:14 36:17 54:17
respond [1] 24:15
responding [2] 34:10 65:22
response [2] 25:24 28:18
responsibilities [2] 7:24 9:16
responsibility [1] 19:23
resume [5] 40:18 44:13,16 45:2 46:11
resumes [3] 44:7,14 45:9
retain [1] 28:9
retained [1] 27:8
retired [4] 5:2 21:8 29:12 44:21
review [2] 26:13 41:24
reviewing [1] 48:21
reviews [1] 44:11
revolving [1] 55:1
richards [10] 1:16,17,23 2:20 39:13 52:14 54:9 65:11 67:17,20
risk [1] 8:8
roads [1] 8:10
rodriquez [1] 11:5
role [1] 58:10
roush [4] 28:3 29:24 30:18 31:3
rudy [4] 28:3 29:25 30:19 31:3
rule [3] 11:13 14:12 60:19

## S

safety [6] 7:8 8:2,3,7,9,12
salary [3] 19:10 22:24 65:13
same [5] 5:18 7:10 14:6 33:17 65:5
satisfaction [1] 6:7
save [1] 29:15
saw [9] 37:3 40:9,17,18 52:25 63:14,18,20 65:8
saying [4] 12:23 29:21 40:22 48:2
says [12] 24:14 25:3 32:22 33:9 34:4,21,22 35:1 36:13 54:10 58:22 62:11
scale [1] 13:6
schedule [1] 24:16
scratch [1] 10:19
scribble [2] 35:11,12
second [10] 10:16 15:7 23:13 32:24 35:19 42:5 56:9 61:18 62:17 63:4
secretary [5] 6:13 16:22 22:14 59:3 65:21
see [8] 20:16,20 24:6 25:5 34:23 36:5,22 65:8
seen [5] 7:6 11:16 14:24 54:2 64:21
select [1] 44:3
selected [3] 13:23 22:3 49:2
selecting [1] 14:20
selection [3] 15:15 20:24 26:19
selections [1] 19:6
selling [1] 4:14
send [1] 41:16
sends [2] 10:1 41:13
sent [1] 32:8
sentences [1] 49:12
separate [2] 12:2 29:4
september [6] 4:6 6:21,25 18:15 50:1,1
series [3] 12:4 38:17 52:9
service [8] 5:16,22,25 18:13 57:2 59:14 64:24 65:10
set [3] 5:25 8:6 18:2
seven [2] 6:3 25:8
sharp [5] 2:11,11 8:19 52:7,10
sheet [5] 18:18 26:1,4 63:2,4
shift [2] 43:20 47:13
short [1] 38:21
shouldn't [3] 6:22 50:24 51:3
show [1] 56:19
sign [4] 57:7 59:5,9 60:9
signature [17] 18:5,8 26:15,16 33:25 34:23 56:23 59:6,7,20,22,23 60:3,6 65:9,11,14
signature/title [1] 59:16
signed [6] 57:10 59:9,11,12 60:12 65:1
signing [1] 57:18
simply [1] 52:6

by ETS Inc.

DEPOSITION OF GREGORY RICHARDS

**since** [3] 4:6 5:18 10:8
**sir** [1] 35:9
**situation** [3] 15:20 17:7 37:2
**six** [16] 6:4 12:13 15:18 16:10,24 28:5,6 29:11,14,17,22 31:2,5,7,9 67:12
**sixth** [2] 2:4 30:3
**skills** [3] 66:9,12,13
**slots** [1] 12:12
**software** [1] 66:17
**sold** [1] 5:4
**somebody** [1] 46:4
**someone** [6] 17:13 23:2 40:23 45:3 48:8 60:9
**someone's** [1] 37:3
**sometimes** [2] 24:6 25:8
**somewhat** [1] 17:7
**sorry** [2] 27:11 67:13
**source** [1] 40:12
**specific** [3] 12:18 60:23 64:18
**speculative** [1] 12:16
**spent** [1] 49:6
**split** [1] 16:10
**spruce** [1] 1:6
**square** [1] 62:16
**staff** [2] 21:3 27:21
**start** [2] 10:18 66:4
**started** [5] 7:4 49:25 55:25 56:4 62:19
**state** [1] 6:16
**statement** [3] 48:20,21,23
**statements** [1] 46:25
**states** [1] 1:10
**statistics** [1] 23:14
**stayed** [1] 50:3
**steve** [1] 35:11
**still** [5] 8:11 30:19 32:17,18 57:22
**stipulations** [1] 2:17
**stood** [2] 14:8 16:25
**straight** [1] 33:23
**street** [2] 2:4,9
**strike** [1] 63:25
**submit** [1] 25:23
**submitted** [1] 25:22
**subordinates** [1] 6:2
**successful** [1] 55:6
**suggest** [4] 14:8 20:8 42:17 52:20
**suggested** [2] 14:10 51:8
**suggests** [1] 12:23
**suited** [3] 45:15,16 46:20
**sullivan** [5] 20:18 21:7 27:2 29:12,22
**supervisor** [5] 3:12 20:2,11,13 48:18

**supply** [3] 44:9,11,13
**support** [1] 49:23
**suppose** [2] 32:1 48:6
**supposed** [3] 19:25 55:4 60:9
**suspended** [1] 67:21
**suspicion** [1] 54:13
**swear** [5] 1:20 6:20 11:12 36:16 64:4
**system** [1] 14:14

**T**

**talked** [1] 65:25
**team** [1] 33:18
**techniques** [1] 4:15
**telecommunications** [1] 43:25
**tells** [3] 24:1,4 47:19
**ten** [6] 13:5,6 43:16 49:6,10 58:7
**tenth** [1] 2:9
**terry** [1] 8:25
**test** [1] 67:2
**testified** [3] 36:25 40:13 42:8
**testing** [1] 63:6
**themselves** [1] 1:25
**therefore** [2] 51:18 53:7
**third** [7] 15:9 18:3 26:13 58:21 61:5,5 62:17
**though** [2] 24:7 63:6
**three** [23] 10:7,9,10,13,22 11:15,20 14:11,20 16:12 17:23 19:8 22:8,18 23:15,16 24:14,17 25:9 51:14 53:5 60:20 63:19
**title** [7] 15:18 57:9,9 59:16,20 60:1,2,3,13 65:8,9
**today** [4] 3:2 8:24 40:6 64:17
**today's** [1] 1:3
**todd** [2] 62:4 67:4
**together** [1] 36:10
**toll** [1] 6:13
**took** [3] 22:22 59:4 67:2
**top** [4] 23:13 26:4 48:4 62:7
**total** [3] 8:12 24:1 62:8
**towing** [1] 28:17
**trailer** [1] 50:4
**training** [2] 62:21 66:11
**transferring** [1] 28:14
**tried** [2] 24:18 53:8
**troop** [1] 6:15
**true** [2] 42:13 53:13
**trust** [1] 53:25
**truthfully** [1] 1:21
**try** [1] 19:24
**trying** [5] 27:19 38:7,21 49:9 55:2
**tuesday** [1] 55:23
**turn** [2] 42:25 62:6

by ETS Inc.

## DEPOSITION OF GREGORY RICHARDS

**turned** [1] 55:17

**turnpike** [20] 1:15 2:8,13,24 3:17 4:5 5:19 7:3,21 8:17 9:3,9 32:3 43: 17,24 49:22 51:13 53:4 56:14 66:16

**twice** [3] 16:14,18 30:6

**two** [41] 10:10,21 11:20,25 12:1,11,13 14:19 15:7,10,11 19:8 21:8,10 22:7,18 28:23 32:20 33:12,12,18 35:5 36:19 37:19 38:8 42:1 43:3,20 44:2 46:15 48:9 50:5 55:11 60:16,21,21 61:8,24 62:9,16 63:22

**tyco** [1] 5:4

**type** [3] 62:23 65:18 66:8

**typed** [1] 57:14

**typewritten** [1] 42:11

**typically** [1] 23:6

**typing** [4] 63:24 66:13,23 67:2

### U

**under** [5] 8:8,11 10:24 14:13 15:25

**understand** [5] 1:19 3:1 12:15 25:12 52:15

**united** [1] 1:10

**unqualified** [1] 10:4

**until** [3] 8:24 26:19 40:5

**up** [9] 5:25 8:6,23 17:13 32:7 33:23 41:9 44:20 55:3

**usual** [1] 2:16

### V

**vacancies** [1] 26:23

**vacancy** [3] 28:22 66:20,22

**vacate** [1] 30:21

**vacation** [2] 38:20 61:7

**various** [1] 4:14

**vehicles** [1] 28:18

**versus** [1] 1:14

**viable** [1] 39:3

**video** [6] 1:1,2,8,24 67:18,21

**voice** [1] 66:17

**voluntarily** [1] 5:1

### W

**wanted** [4] 8:20 12:24 61:3,4

**way** [5] 9:20 30:13 42:19 46:8 56:12

**ways** [1] 12:1

**week** [2] 6:25 56:9

**weeks** [1] 18:12

**weinberg** [14] 2:7,8,16 8:18 34:12 49:3,10 51:21,24 52:3,12 64:10 67:8,14

**whatever** [2] 10:13 63:5

**whether** [5] 9:10 10:3 50:17 58:14,15

**white** [1] 49:1

**whoa** [1] 52:7

**whoever** [4] 50:8 51:4,8 52:23

**whom** [2] 44:3 59:1

**wickert** [4] 28:3 29:24 30:18 31:4

**will** [13] 13:10 14:7,20:2,5,7,8 26:11 30:10 39:13 41:24 48:3 59:8 67: 21

**williams** [11] 1:14 2:22 8:16 25:17,22 62:3 63:8 64:3,14,20 65:2

**willing** [1] 11:7

**within** [5] 17:5 18:12 19:22 21:10,12

**without** [1] 31:19

**witness** [2] 49:5 64:12

**word** [6] 4:2 14:23,23 39:25 40:3,7

**words** [2] 13:2 34:16

**work** [2] 4:9 42:10

**worked** [2] 4:10 39:6

**working** [1] 49:25

**works** [1] 17:8

**write** [2] 57:4 64:24

**writing** [1] 42:21

**written** [4] 44:12 46:16 48:25 60:19

**wrote** [3] 59:13 60:1,12

### X

**x's** [1] 42:11

### Y

**year** [4] 4:10 21:13 28:25 43:19

**years** [3] 4:23 43:16,18

**yourself** [1] 18:1

by ETS Inc.

108

IN THE COURT OF COMMON PLEAS
OF DAUPHIN COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| HARRY E. WILLIAMS, JR. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | NO. 1:CV-01-0877 |
| | ) | |
| PENNSYLVANIA TURNPIKE | ) | |
| COMMISSION, | ) | |
| | ) | |
| Defendant | ) | |

DEPOSITIONS OF:      **WILLIAM CAPONE**

DATE:                **JULY 18, 2002**

APPEARANCES:

Andrew Ostrowksi Esquire
Bailey Stretton & Ostrowski
4311 N. 6th Street
Harrisburg, Pa  17110

Marvin Weinberg
2000 Market Street
Tenth Floor
Philadelphia, PA 19102

Heather Sharp
Counsel for Turnpike Commission

## VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 1   PAGE 1

1    VIDEO OPERATOR:  Ladies and gentlemen,
2 let me advise you that video and audio
3 operations are on.  Today's date is July
4 18th, 2002.  The time now is 2:56, my name is
5 Albert Rodriguez, my address is 4146 Spruce
6 Park, Lebanon, PA 17046.  I have been hired
7 by PR Video to take this video deposition for
8 the plaintiff.  This case is in the United
9 States Middle District of Pennsylvania.  It
10 is docketed at 1CV-01-0877 caption is Harry
11 E. Williams vs. Pennsylvania Turnpike
12 Commission the deponee is William Capone.
13    CAPONE:   William Capone.
14    VIDEO OPERATOR:  Excuse me?
15    CAPONE:  William Capone.
16    VIDEO OPERATOR:  William Capone.  Mr.
17 Capone, please raise your right hand.  Do you
18 understand that this is a legal proceeding
19 and do you swear to truthfully answer the
20 questions asked of you?
21    CAPONE:    I do.
22    VIDEO OPERATOR:  Will counsel please
23 identify themselves and provide the address
24 and phone number for the record.
25    OSTROWSKI:  Andrew Ostrowski, 4211 North

PAGE 2

1 6th Street, Harrisburg PA 17110, (717) 221-
2 9500, counsel for the plaintiff.
3    WEINBERG:  Counsel for Turnpike, Marvin
4 Weinberg, 2000 Market Street, 10th Floor,
5 Philadelphia, 19103.
6    SHARP:    Katherine Sharp, assistant
7 counsel for the Pennsylvania Turnpike
8 Commission, Post Office Box 67676.
9    OSTROWSKI:  Mr. Capone, my name is Andy
10 Ostrowski, introduced just about two or three
11 minutes ago.  You understand you're here
12 today to give a deposition in connection with
13 the lawsuit that Harry Williams has brought
14 against Pennsylvania Turnpike Commission?
15    CAPONE:  Yes.
16    Q:   What's your current with the
17 Pennsylvania Turnpike?
18    A:   I'm the Director of Public Affairs.
19    Q:   And how long you hold, how
20 long have you had that title?
21    A:   I guess I've had that title for
2 about a year.
23    Q:   And prior to that?
24    A:   I was Director of Marketing.
25    Q:   And how long were you Director of

PAGE 3

1 Marketing?
2    A:   Ah, probably since about 1990.
3    Q:   And is the Director of Public
4 Affairs, is that a promotion or a change in
5 position or was there -.
6    A:   It's no, I mean, it's basically the
7 same duties and responsibilities, it's just
8 a re-org and change in title.
9    Q:   Okay.  What are your duties and
10 responsibilities?
11    A:   Well, I'm responsible for all
12 public relations, media relations, customer
13 relations, activities on behalf of the
14 commission.
15    Q:   Okay.  And what, what who do you
16 report to?
17    A:   I report to Greg Richards.
18    Q:   Okay.
19    A:   Under customer service.
20    Q:   And, is that, has that been your
21 direct report, either him or the position
22 occupied by him since 1990?
23    A:   Since, yes that's correct.
24    Q:   And prior to 1990 how were you
25 employed?

PAGE 4

1    A:   I was Director of Traveler Services
2 for the commission.
3    Q:   Director of Traveler?
4    A:   Traveler Services, correct.
5    Q:   And how long total have you been
6 with the Pennsylvania ---
7    A:   Twenty-four and a half years.
8    Q:   Any, any experience in the
9 communication center?
10    A:   Yes, I do.
11    Q:   What's your experience in the
12 communication center?
13    A:   Well in my various, in my various
14 positions and also in my role as a Turnpike
15 Senior Duty Officer since about 1980, I have
16 had occasion to interact via phone and in
17 person in the ops center.  I'm also, because
18 of my role in public affairs, and marketing,
19 because the need to communicate with the
20 outside world about incidents or things that
21 were going on, on the turnpike.  There were
22 many occasions where I would; my presence was
23 required in the - center during certain
24 events.
25    Q:   Did you say, you were a Senior

VIDEO DEPOSITION OF WILLIAM CAPONE

1  Rating Operator?
2      A:    Senior Duty Officer.
3      Q:    Senior Duty Officer.
4      A:    That's correct.
5      Q:    When did you serve in that
6  position?
7      A:    I still do since 1980.
8      Q:    What is, that, what do you do as
9  Senior Duty Officer?
10     A:    Senior Duty Officer essentially
11 serves in the absence of the executive
12 director when there's an event that occurs.
13 When we're on call on a rotating basis, on a
14 weekly basis.  There's a Senior Duty Officer
15 that would be called by the ops center in the
16 event of a major incident.  To run, run you
17 know, the things by them, make them aware of
18 the incident, seek advice, counsel,
19 directions, etc.
20     Q:    You said in the absence of the
21 executive director?
22     A:    That's correct.  And that applied
23 mostly off hours, weekends, you know when
24 something occurred, we, we, we act in their
25 stead, as a senior person, to deal with those

1  events.
2      Q:    So in the on hours.
3      A:    It still applies, I mean, ah---
4      Q:    Who is, who is the senior?
5      A:    Well, it all depends, I mean,
6  what's going on.  I mean right now, the
7  primary report for an event would be you
8  know, the director of operations center and
9  incident management, which is you know, the
10 primary report.
11     Q:    Okay, I'm just trying to
12 understand, in whose absence do you occupy
13 that position.  Mr. Durbin, is that it?
14     A:    That's correct.
15     Stenographer:  Will you spell that for
16 me?
17     Q:    Durbin.  D-U-R-B-I-N.  And that is,
18 so you're the number one point man for the
19 Pennsylvania Turnpike Commission.
20     A:    For the week that I'm on call,
21 that's correct.
22     Q:    Okay.  Is that just for operations
23 as used in emergency type issues?
24     A:    That's correct.
25     Q:    You've never worked in the

1  operations center or communications office.
2      A:    I was never employed by the
3  operations center.  I've worked in the
4  operations center.  I've spent many hours in
5  the operations center.
6      Q:    We're here to talk about some
7  commotions that you were involved in.  Okay,
8  I'm going to show you a document that is
9  marked Exhibit 6.  I'm going to show you a
10 document that says Exhibit 5, excuse me.  And
11 I'm going to turn you; I'll let you look at
12 it as much as you want.  Go ahead and then
13 I'll ask you through it. On the third page of
14 that document, it references you William
15 Capone, as member of the interview panel?
16     A:    Um-hmm.
17     Q:    You recall being a member in an
18 interview panel for the position for the duty
19 officer position in the communications
20 center?
21     A:    I do.
22     Q:    And I just want to ask you, if you
23 flip the next page, and list of four
24 candidates, Daniel Bretzman, Joel Davis Cindy
25 Dietz and Martin Havrilla.  Miss Dietz she

1  was offered that position and declined it, is
2  that correct?  And then Daniel Bretzman was
3  hired?
4      A:    I recall that Cindy Dietz declined
5  the position.  I don't recall what happened
6  after that, to be honest with you.
7      Q:    But this is, this is the position
8  that Cindy Dietz declined.  From this
9  selection, did she decline this position, is
10 that correct?
11     A:    I am not absolutely sure.
12     Q:    But you recall her declining a
13 position.
14     A:    Yeah, I do, yes, that's correct.
15     Q:    Okay.  Umm, if you look at the
16 first page of that document, do you
17 understand that Mr. Bretzman filled that
18 position at that time?
19     A:    No I don't.  I don't know that this
20 was the exact position that he filled.
21     Q:    But you do know that he was
22 ultimately---
23     A:    Yes I do, hired.
24     Q:    Okay, and neither his name nor Miss
25 Dietz appear on the court case correct?

VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 3   PAGE 9

1    A:   Correct.
2    Q:   Miss Dietz name appears on the
3 second page, correct?
4    A:   Yes.
5    Q:   Do you have any understanding as to
6 the difference between the first page and
7 second page other than the physical
8 differences?
9    A:   I do not.
10   Q:   Okay. Let me back up a little.
11 Explain how, how this process works from,
12 from your stand point. I mean, I've been
13 talking to other players in the process, and
14 have a general understanding but I want to
15 know when you become involved and what you
16 did.
17   A:   Can you be more specific when you
18 say this process.
19   Q:   Well, the, this specific,
20 processes-
21   A:   For this position?
22   Q:   For this, the process for this
23 position differ from any other time you
24 participated in the interview and selection
25 process?

PAGE 10

1    A:   No.
2    Q:   Okay, so, when we use this process-
3 --
4    A:   Okay.
5    Q:   How did your involvement start and
6 what was your specific involvement?
7    A:   Well, initially the decision is
8 made that you would be a member of the
9 interview team.
10   Q:   Right.
11   A:   And then you know, from that point,
12 the process where a job is posted and people
13 bid or outside candidates apply for
14 positions.
15   Q:   So do you understand that the
16 interview team is assembled before the, the
17 job is posted?
18   A:   I really don't know. I couldn't
19 say for sure in terms of the time when you
20 actually assemble the interview team.
21   Q:   Who contacted you?
22   A:   Ah, well, it would all depend who
23 was on the team. I mean, generally someone
24 who, who was primarily responsible for this
25 department position, you know and which

PAGE 11

1 department was would basically determine who
2 he wanted to help to assist in participating
3 in the interview process.
4    Q:   Okay, do you recall being, because
5 the third page, subpoena for William Jacob
6 Capone, and Dennis G-E-N-E-V-I-E. Do you
7 recall the person you were documenting?
8    A:   Yes, I believe he asked if I would
9 be willing to split in on this---
10   Q:   How many duty officer positions
11 have you participated on in interview teams?
12   A:   I believe, I can't say in terms of
13 positions. I believe there were at least
14 three occasions when I participated in the
15 interview team for an operation center duty
16 officer position.
17   Q:   Umm, and were they, the three
18 occasions, all during that 1990-1999 time
19 frame?
20   A:   I would say yes.
21   Q:   In each instance were you
22 approached by Mr.McCool?
23   A:   Umm, no.
24   Q:   And other than Mr. McCool, who
25 approached you?

PAGE 12

1    A:   The initial one which was prior to
2 Mr. McCool, arriving at the Turnpike, I
3 honestly don't recall.
4    Q:   You say the initial one, is that the
5 initial one meaning, when the duty officer
6 position was first created?
7    A:   That's correct.
8    Q:   Other than that, have you been
9 approached by Mr. McCool to, to serve on duty
10 officer selection committees?
11   A:   The one, the one I just mentioned.
12 And probably at least two on the three
13 occasions, I believe.
14   Q:   Okay. I disrupted your flow on
15 your involvement on the process. You got to
16 the point of, it came up as to whether when
17 the panel was assembled. After the panel is
18 assembled, what, what, how did your
19 involvement; your specific involvement?
20   A: Well, the, the interviews were
21 scheduled with the individual candidates and
22 as a group, we meet and interview each
23 candidate.
24   Q:   Okay.
25   A:   And typically upon conclusion, the

VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 4  PAGE 13

1 conclusion of the individual interviews, as a
2 group we share, discuss, share our comments
3 and ultimately once the process was
4 completed, we collect and prepare our
5 recommendation.
6    Q:   Okay.  And was there a, what
7 records were generated by the interviews?  I
8 had some questions I'll show.
9    A:   Well, there was a standard set of
10 questions that we all work from.  And I don't
11 know what other interview team members did,
12 but typically, we make some notes during the
13 interview.
14    Q:   On the---
15    A:   On the candidate you're
16 interviewing.  Correct.
17    Q:   And on the questionnaire.
18    A:   And on the questionnaire, correct.
19    Q:   Was there anybody, anybody who
20 prepared a summary of the interview or
21 anything of that nature?
22    A:   Ah no, not that I recall.
23    Q:   Okay, and then, what is after each
24 interview that the three persons who
25 discussed the interview.

PAGE 14

1    A:   That was the initial discussion,
2 right, you know, while it was fresh in your
3 mind, we talked about it after each one.
4    Q:   Anything done to memorialize those
5 discussions?
6    A:   No.
7    Q:   And from one interview to the
8 other, any deliberation or discussion about
9 the process?
10    A:   No, pretty standard.
11    Q:   So whatever time you set aside for
12 the interview, during the process, you dealt
13 with interviews, until you got to the point
14 of recommendation.
15    A:   That's correct.
16    Q:   And umm, then at the point of
17 making recommendation, let's use this as an
18 example.  First of all was Mr. Bretzman
19 interviewed?
20    A:   Yes.
21    Q:   Okay.  Do you recognize this first
22 page of promotion application?  Not
23 specifically this but as a form, what it is?
24    A:   I'm not, no I'm not really familiar
25 with this form.

PAGE 15

1    Q:   Umm, and you do recall interviewing
2 Mr. Bretzman.
3    A:   Yes.
4    Q:   And do you ever, have you ever
5 interviewed him more than once?
6    A:   No.
7    Q:   You only ever interviewed him once.
8    A:   To the best of my recollection, I
9 don't remember interviewing him more than one
10 time.
11    Q:   There's a document here marked
12 Exhibit 4.
13    A:   Okay.
14    Q:   In this one, he's listed as, and he
15 also appears on the--- can you tell when you
16 interviewed him?  You don't recall whether
17 you interviewed him more than once.
18    A:   I do not.
19    Q:   With respect to Exhibit 5, do you
20 recall anything specific about this process?
21 I mean, can you actually recall the
22 interviews?
23    A:   I mean, you know, I recall
24 interviewing two of the names on the first
25 sheet is familiar.  I can't say that I recall

PAGE 16

1 the other two names.  No specific
2 recollection of them, no.
3    Q:   I mean, was, was the process for
4 that position different in terms of its
5 length or any other?  And those, the four
6 recommendations there, are they ah, do you
7 recall discussing or deliberating those
8 recommendations?
9    A:   I don't recall specifically any
10 deliberations, no.
11    Q:   When the committee does that, their
12 discussions or deliberations, how is the, how
13 are the recommendations recorded?
14    A:   The recommendations for?
15    Q:   Yeah, I mean, does someone, does
16 someone take notes, or do you have this form
17 in here and you type it on there?
18    A:   What form are you referring to?
19    Q:   The page, that page.
20    A:   This page.  Recommended personnel
21 actions?
22    Q:   Yes.
23    A:   Are you asking me how this?
24    Q:   Yes, I am asking you, do you, do
25 you, does someone sit on a typewriter and

110

VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 5  PAGE 17

1 type this up at a time.  Or did someone make
2 notes and then record it, or any other way?
3      A:    Well, basically, one of the members
4 of the interview team ultimately prepares
5 this, these recommendations and they are
6 reviewed by the other member of the interview
7 team before they are finalized and forwarded.
8      Q:    So, one of the, who, who takes
9 responsibility for?
10      A:    Ah, it depends, I mean it varies,
11 in terms of who was, who was the leader
12 responsible first before generating the
13 recommendation.
14      Q:    Okay.  So the recommendations don't
15 come on that meeting?
16      A:    This is the only recommendation
17 form that I'm aware of, yes.
18      Q:    But, but, that form is not
19 generated until after the, the panel meets
20 and reviews and comes through a consensus
21 right?
22      A:    That's correct.
23      Q:    And before the panel meets and
24 reviews it and comes through a consensus.
25 Someone has already taken the responsibility

PAGE 18

1 for assembling and drafting, is that correct?
2      A:    Well.
3      Q:    Draft the recommendation.
4      A:    That's correct.
5      Q:    So then that, it's not on that form
6 as a draft recommendation.
7      A:    Well no, I mean, I think it's put
8 on this form. Obviously before any signatures
9 are, are placed on it for review by the other
10 members of the interview team to ensure that
11 everybody is in agreement with the
12 recommendation.
13      Q:    Okay.  Here's a, the PTT 0274, I
14 made copies of it. Do you, do you, have you
15 ever seen it?
16      A:    No.
17      Q:    What's the, who would have a
18 letterhead or a stationery that says Central
19 Office?
20      A:    I'm not sure I understand your
21 question.
22      Q:    Well, I, I'm trying, it's that a
23 document.  What I'm trying to understand is,
24 is this something that may have came to the
25 committee as, as the proposal from one of the

PAGE 19

1 panelist that we discussed.  You know, the
2 process we've been talking about here.
3      A:    Are you asking me who would
4 generate?
5      Q:    Yes, if you, if you know.
6      A:    I do not know.
7      Q:    Umm, is it possible that neither Mr.
8 Bretzman or Miss Deets were interviewed in or
9 around January 2000, but their names were
10 placed on that document?
11      A:    I don't know.
12      Q:    Is it possible?  Do you know
13 whether it's possible?
14      A:    I don't know.
15      Q:    How many times did you interview
16 Cindy Deets?
17      A:    I honestly don't recall.
18      Q:    What are the responsibilities of
19 the lead interviewer?
20      A:    Well, I mean, basically.  Most of
21 the responsibilities more has to do with
22 preparation before and after the interview,
23 than it does specifically with inducting one.
24      Q:    Okay.
25      A:    Helping to organize, you know,

PAGE 20

1 prepare.
2      Q:    Did, did the lead interview had any
3 involvement in assembling the team or
4 determining the candidates?
5      A:    The lead interview, interviewer in
6 some, some cases obviously would be the
7 person that would, you know, ask, identify
8 people and ask them to speak on the interview
9 team.
10      Q:    Okay, briefly, here on Exhibit 3,
11 which is a vacancy notice dated 4/23/99.
12      A:    Okay.
13      Q:    And if you look at the bottom of
14 that document, asterisk, indicating that
15 there are three positions vacant at that
16 time.  Do you recall that, in or around
17 April, May 1999 you participated on a panel
18 for filling vacant, three vacant duty
19 officers in the communications center?
20      A:    I don't recall specifically how
21 many vacant positions there were.
22      Q:    Do you ah, have you ever seen that
23 document before, the vacancy notice?
24      A:    No.
25      Q:    As a general rule, do you know in

VIDEO DEPOSITION OF WILLIAM CAPONE

**SHEET 6    PAGE 21**

1 advance of your participating in the process,
2 how many positions are being filled?
3    **A:    I know how many positions,**
4 **vacancies are being posted, yes, generally**
5 **speaking.**
6    Q:    Do you have any reason to umm,
7 dispute, at least at some point, you knew
8 that you were interviewing, there were three
9 vacancies that you were interviewing?
10    **A:    In which, I mean, instance.**
11    Q:    In this, in this instance, April,
12 May 1999.
13    **A:    I mean, I don't recall**
14 **specifically, but you know, it's hard to**
15 **answer that question.**
16    Q:    But you had nothing, you have no
17 reason to say, "No, I know that was not the
18 case", correct?
19    **A:    That's correct.**
20    Q:    Okay.  The third page of Exhibit 8,
21 it's a, Joel Sullivan, Joseph L. Quairoli,
22 and William J. Capone as the person who
23 conducted the interview, is that, is that, do
24 you have a recollection of that being the
25 panel?

**PAGE 22**

1    **A:    Yes.**
2    Q:    Okay.  Do you umm do you recall
3 how this panel was assembled?
4    **A:    I do not.**
5    Q:    From when I asked you before of
6 anybody that has ever contacted you about
7 participating in the panel, you didn't
8 identify Joel Sullivan.
9    **A:    Didn't identify him for---**
10    Q:    For someone who had contacted you,
11 saying, "Hey, we have some vacancies, we'd
12 like you to participate on the panel", you
13 give---
14    **A:    Is that a question?**
15    Q:    Yes, I mean, did he, did he ever
16 approach you about participating on that?
17    **A:    I don't recall whether he did or**
18 **not.**
19    Q:    And on the bottom of that page, the
20 estimation of the interview and the selection
21 process, it does say on the third line,
22 William Capone was the lead interviewer.
23    **A:    Um-hum, yes.**
24    Q:    Now, as lead interviewer, what did
25 you do in this, in connection with this

**PAGE 23**

1 process?
2    **A:    Again, as I previously stated, as a**
3 **lead interview, interviewer, I was**
4 **responsible for making the initial**
5 **preparations for scheduling the interviews**
6 **and conducting interviews, ultimately**
7 **preparing the recommendation for personnel**
8 **action.**
9    Q:    Okay.  Do you have any, any
10 understanding as to why Joe McCool did not
11 participate in this, on this panel?
12    **A:    I don't recall that.**
13    Q:    Did you have any discussions with
14 anybody concerning that, that matter, Mr.
15 McCool's absence from this panel?
16    **A:    Not that I recall, no.**
17    Q:    Did they call you for any
18 questions?
19    **A:    Did they what?**
20    Q:    Did you have any, any questions that
21 you asked or didn't ask?
22    **A:    About?**
23    Q:    About why Joe McCool did not?
24    **A:    No.**
25    Q:    If you look at the first few pages

**PAGE 24**

1 of these documents, you had eight qualified
2 candidates.  Did you, it indicate that you
3 only interviewed five of them, on the third
4 page.
5    **A:    Correct.**
6    Q:    You have no reason to disagree that
7 you were interviewing for three positions,
8 correct?
9    WEINBERG: I am objecting this form, it's
10 misleading.
11    Q:    Why did you recommend only two
12 people if you took to the fourth page, you
13 have Fred Jumper and Dale Wickerd?  Why only
14 two?
15    **A:    Because they are the two candidates**
16 **that we felt were qualified for the position.**
17    Q:    First few pages you showed me that
18 eight people were qualified.  Why is that?
19    **A:    That is not a determination of the**
20 **interview panel.  That is the determination**
21 **of the human resource department.  Those are**
22 **the people who meet the minimum**
23 **qualifications.**
24    Q:    Qualifications, did Fred Jumper had
25 that Harry Williams didn't?

VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 7   PAGE 25

1    A:    Umm I felt, my personal, I'm just
2  giving you my personal view of, at the time,
3  I felt based on my understanding of the, of
4  the job description, this was a new position,
5  relatively new position that was created.
6  Again based on my understanding of the duties
7  and responsibilities of this new position, it
8  was clear to me that it required individuals
9  that had strong management and decision-
10 making and leadership skills.  I felt that
11 based on my interaction with Fred over the
12 years, you know as a Senior Duty Officer in
13 my time spent in the ops center based on
14 personal observation, I felt that he
15 possessed these skills.
16    Q:    And Dale Wickerd?
17    A:    Same thing would apply.  Again I
18 interacted with Dale on many occasions,
19 observed him, you know in the ops center.  I
20 felt that he possessed the skills that I, I
21 previously mentioned.
22    Q:    How many words a minute does Fred
23 Jumper, or did Fred Jumper type at the time?
24    A:    I do not know.
25    Q:    Did there, was there any inquiry

PAGE 26

1  made at that point?
2    A:    No, I don't recall, no.
3    Q:    Same questions with respect to Dale
4  Wickerd?
5    A:    Correct.
6    Q:    Umm, in the number of times that
7  you had participated as selection panelist
8  for the duty officer position.  Did you ever
9  discuss anybody's typing abilities?
10   A:    Not that I recall, no.
11   Q:    Was it ever a factor in any
12 decision?
13   A:    Typing skills?
14   Q:    Yes.
15   A:    No.
16   Q:    Do you have an understanding of
17 this position senior radio operator was?
18   A:    Yes.
19   Q:    What is it?
20   A:    They essentially serve as the shift
21 leader in most shifts.  They are these radio
22 operators with the most experience in
23 seniority.
24   Q:    Okay.  Do you know whether Mr.
25 Jumper and Mr. Wickerd served as senior radio

PAGE 27

1  operators in between their service?
2    A:    I, I really don't recall.  I
3  believe Mr. Wickerd is obviously a radio
4  operator too, and, and served as a shift
5  leader for some period of time.  I don't
6  recall whether Mr. Jumper did or not.
7    Q:    And do you understand the position
8  of senior radio operator as being the
9  predecessor position to the duty officer.
10   A:    No, I don't think they're
11 comparable, no.
12   Q:    How are they different?
13   A:    Well, the, the senior, the shift
14 leader or whatever refer to the senior---
15   Q:    Senior radio operator.
16   A:    Right, umm, the, essentially we're
17 a bargaining unit employee.  And basically,
18 you know, one of the, one of the problems
19 there in terms of supervising other
20 bargaining employees, it was really one of
21 the key requirements or reasons for creating
22 the operations center, duty officer position.
23 We need to introduce more day to day
24 management within the operations center.
25 That's one of the primary responsibilities,

PAGE 28

1  included in that new job description.
2    Q:    Is there anything that a duty
3  officer does that a senior radio operator
4  didn't do?
5    A:    Yes.
6    Q:    What?
7    A:    There's a lot of things; I guess
8  most notably, and again another, another
9  reason for the need to create this new
10 position is the advent of the advance
11 traveler information systems that were coming
12 on line.  And the other radio communications
13 requirements and duties in terms of, that
14 were required of the person in addition to
15 the management duties.  Supervisory duties
16 that we felt needed to be introduced in the
17 ops center, so.
18   Q:    When did that ah, advance traveler
19 information system, when did that come on
20 line?
21   A:    I can't specifically remember, you
22 know it's been faced, in over many years,
23 since you know, in the early to mid `90's
24 when we started introducing some of the
25 various devices on the turnpike.

113

VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 8   PAGE 29

1   Q:   That was the factor in the change
2 to, from senior radio operator to duty
3 officer.
4      **A:   Well that was a factor in deciding**
5 **to create a new position for the operation**
6 **center, yes.**
7      Q:   With something like the advance
8 traveler's information system, is there
9 anything apart from working on it and working
10 with it to know how to work on.
11     **A:   I'm not sure I understand the**
12 **question.**
13     Q:   Advance traveler information system
14 is something set up strictly for the
15 turnpike, is that correct?
16     **A:   That's correct.**
17     Q:   So there's no one outside the
18 turnpike that you go to as an advance
19 traveler information service expert, correct?
20     **A:   That's correct.**
21     Q:   And you didn't, you didn't need to
22 hire new staff because you've got this new
23 advance traveler information system in place,
24 correct.
25     **A:   Again only the creation of the**

PAGE 30

1 **operations on the duty officer positions.**
2     Q:   Right.  The form that, do you know,
3 where you responsible for typing this up?
4      **A:   I don't specifically recall that I**
5 **did, but.**
6     Q:   Who was there any discussion as to
7 the entry note other candidates recommended
8 as to placing that, making that notation on
9 the form?
10     **A:   I really don't recall.**
11     Q:   Do you in this instance, as the
12 lead interviewer, who made the preliminary
13 recommendation?
14     **A:   Again, as I said, I don't recall**
15 **whether or not I prepared this**
16 **recommendation.  As I said earlier though the**
17 **lead interviewer typically assume that**
18 **responsibility.  Again, this was no pertinent**
19 **than any, any of the other process.**
20     Q:   Martin _?
21     A:   Yes.
22     Q:   He was, he was made a duty officer
23 at some point, right.
24     **A:   I'm not sure about that.**
25     Q:   Now, he's just a radio operator,

PAGE 31

1 right?
2      **A:   Right, as my understanding.**
3     Q:   As specifically as you can, tell me
4 why Harry Williams was not worthy as a
5 candidate to recommend?
6      **A:   Because I didn't believe that Harry**
7 **possessed the skills that I mentioned**
8 **previously.  I felt that was essential to**
9 **successfully perform in the duties of the**
10 **operations center, for the duty officer.**
11     Q:   Tell me what, factually supported
12 your opinion.
13     **A:   Again, my interaction with all the**
14 **individuals mentioned.  The time I spent in**
15 **the ops center, interacting with them,**
16 **observing them.  The time I spent as a senior**
17 **duty officer on a number of instances on the**
18 **phone when I was called overnight.**
19     Q:   When you learned the facts, tell
20 what the facts are.
21     **A:   Excuse me?**
22     Q:   Why, you said, based on your
23 experience, your familiarity, your being
24 around, based on knowing.  But you're not
25 telling me why, what about Harry Williams, on

PAGE 32

1 such and such a date I saw him picking his
2 nose when he should've been answering the
3 phone, you know, give me, tell me why.  What
4 about Harry Williams?
5      **A:   Can you ask me a direct question?**
6 **I'm not sure I'm following you.**
7     Q:   Yes, I tried asking you a direct,
8 but you didn't answer me.  Why, what facts
9 support your opinion that Harry Williams was
10 not worthy of not being recommended as a
11 candidate for duty officer position?
12     **A:   Again for me, I can only base it on**
13 **what I know Harry, my experience with Harry,**
14 **my involvement with Harry.**
15     Q:   What do you know of Harry, what's
16 your experience of Harry, what's your
17 involvement with Harry, tell me?
18     **A:   I think I've explained my**
19 **involvement in my, you know, the fact that,**
20 **you know, in my interaction as a senior duty**
21 **officer, when he would call me or when we**
22 **would discuss incidents**
23     Q:   Give me some example.
24     **A:   It's hard to give -.**
25     WEINBERG: Do you understand the

## VIDEO DEPOSITION OF WILLIAM CAPONE

SHEET 9    PAGE 33

1 question?
2     A:  Not necessarily.
3     Q:  You don't know what, okay.  I'm
4 trying to understand, but if you don't
5 understand the question, I kind of feel bad
6 for the turnpike, but, what about your
7 experience, what about your involvement?
8 Harry Williams did this, Harry Williams said
9 this, Harry Williams didn't do this, I saw
10 Harry Williams interact with this person in
11 this way.  Can you tell me anything?  Any
12 fact of your observations of Harry Williams
13 that lead you to form your opinion that he's
14 not qualified for that position.
15     A: No it's difficult to point the one
16 specific thing.  It's the accumulation of
17 experiences, and, and in observing Harry and
18 forming opinions, in how he conducted himself
19 in the ops center.  And again it basically
20 got down, in my case, my view of whether
21 Harry could assume these additional duties
22 and, and, and manage other people and make,
23 make decisions.  The kind of decisions that
24 were necessary and perform the duties and
25 responsibilities of this new position which

PAGE 34

1 we felt were, were, were critical to,
2 especially the operations center.
3     Q:  So is it fair for me to conclude
4 then, that you cannot tell me a single fact,
5 a single instance where you observed Harry
6 that you, that formed one of the many facets
7 of your opinion, that ah, based on your
8 experience that he was not qualified for that
9 position?
10     A:  It's difficult to think of one
11 specific, no.  It's hard to answer that
12 question.
13     Q:  I'll ask you again at the trial.  So
14 maybe now and then you can, you know, put
15 your heads together and see if you can come
16 up with something.
17     WEINBERG:  This is not for the record
18 that it is not appropriate and superfluous.
19     Q:  He's saying he can't recall and I'm
20 telling him that-.
21     WEINBERG: You're asking him to recall a
22 specific incident in what Mr. Capone is
23 telling you in what I've heard him say is
24 that it's an accumulation of experiences over
25 many years which led him to believe that Mr.

PAGE 35

1 Williams was not suitable to be a duty
2 officer.
3     Q:  Right.
4     WEINBERG: That was his testimony, if you
5 don't like it, tough.
6     Q:  Well let me tell you why it is a
7 completely fair comment for me to make.
8 Because I think he agreed that he could not
9 recall a specific incident.  But it was based
10 on his experience.  And I want that on the
11 record.  So when I question him at trial, I
12 can say, "Do you remember on July 18,2002 I
13 said to you, I'm going to ask you this
14 question at the time of trial.  And between
15 now and then, you have to come up with a
16 single fact".  That's why that's a fair
17 comment.
18     WEINBERG: I have one question you
19 testified with respect to the Addis of the
20 Travelor Advisory System  information system.
21 Did you consider whether Mr. Williams
22 possessed the necessary computer skills to
23 function as a duty officer, is that part of
24 your function?
25     OSTROWSKI: Objection you can answer.

PAGE 36

1     A:  That was a consideration yes.
2     Q: I believe we concluded that Harry
3 didn't - the computer skills the PC skills we
4 felt that were necessary to assume the
5 necessary duties that were associated with
6 the advance travelor information system.
7     WEINBERG: Thank you.
8     OSTROWSKI:    Why after everything we
9 just went through didn't you answer that when
10 I asked that question?
11     Q:    It didn't come to mind.
12     OSTROWSKI: I have nothing else.
13     VIDEO OPERATOR:    It is now 3:45 p.m.
14 and the deposition of William Capone is
15 completed. Suspending audio and video
16 operations. Thank you.

115

 

## DEPOSITION OF WILLIAM CAPONE

**0**

**0274** [1] 18:13

**1**

**10th** [1] 2:4
**17046** [1] 1:6
**17110** [1] 2:1
**18,2002** [1] 35:12
**18th** [1] 1:4
**19103** [1] 2:5
**1980** [2] 4:15 5:7
**1990** [3] 3:2,22,24
**1990-1999** [1] 11:18
**1999** [2] 20:17 21:12
**1cv-01-0877** [1] 1:10

**2**

**2:56** [1] 1:4
**2000** [2] 2:4 19:9
**2002** [1] 1:4
**221** [1] 2:1

**3**

**3** [1] 20:10
**3:45** [1] 36:13

**4**

**4** [1] 15:12
**4/23/99** [1] 20:11
**4146** [1] 1:5
**4211** [1] 1:25

**5**

**5** [2] 7:10 15:19

**6**

**6** [1] 7:9
**67676** [1] 2:8
**6th** [1] 2:1

**7**

**717** [1] 2:1

**8**

**8** [1] 21:20

**9**

**90's** [1] 28:23
**9500** [1] 2:2

**A**

**abilities** [1] 26:9
**absence** [4] 5:11,20 6:12 23:15
**absolutely** [1] 8:11
**accumulation** [2] 33:16 34:24

**act** [1] 5:24
**action** [1] 23:8
**actions** [1] 16:21
**activities** [1] 3:13
**actually** [2] 10:19 15:21
**addis** [1] 35:19
**addition** [1] 28:14
**additional** [1] 33:21
**address** [2] 1:5,23
**advance** [8] 21:1 28:10,18 29:7,13,18,23 36:6
**advent** [1] 28:10
**advice** [1] 5:18
**advise** [1] 1:2
**advisory** [1] 35:20
**affairs** [3] 2:18 3:4 4:18
**ago** [1] 2:11
**agreed** [1] 35:8
**agreement** [1] 18:11
**ah** [10] 3:2 6:3 10:21 13:22 16:5,6 17:10 20:22 28:18 34:7
**ahead** [1] 7:12
**albert** [1] 1:5
**already** [1] 17:25
**andrew** [1] 1:25
**andy** [1] 2:9
**another** [2] 28:8,8
**answer** [6] 1:19 21:15 32:8 34:11 35:25 36:9
**answering** [1] 32:2
**anybody** [4] 13:19,19 22:6 23:14
**anybody's** [1] 26:9
**apart** [1] 29:9
**appear** [1] 8:25
**appears** [2] 9:2 15:15
**application** [1] 14:22
**applied** [1] 15:22
**applies** [1] 6:3
**apply** [2] 10:12 25:17
**approach** [1] 22:16
**approached** [3] 11:22,25 12:9
**appropriate** [1] 34:18
**april** [2] 20:17 21:11
**around** [3] 19:9 20:16 31:24
**arriving** [1] 12:2
**aside** [1] 14:11
**assemble** [1] 10:19
**assembled** [4] 10:15 12:17,18 22:3
**assembling** [2] 18:1 20:3
**assist** [1] 11:2
**assistant** [1] 2:6
**associated** [1] 36:5

 

### DEPOSITION OF WILLIAM CAPONE

**assume** [3] 30:17 33:21 36:4
**asterisk** [1] 20:14
**audio** [2] 1:2 36:15
**aware** [2] 5:17 17:17

**B**

**back** [1] 9:10
**bad** [1] 33:5
**bargaining** [2] 27:17,20
**base** [1] 32:12
**based** [8] 25:3,6,11,13 31:22,24 34:7 35:9
**basically** [6] 3:6 11:1 17:3 19:20 27:17 33:19
**basis** [2] 5:13,14
**become** [1] 9:15
**behalf** [1] 3:13
**believe** [8] 11:8,12,13 12:13 27:3 31:6 34:25 36:2
**best** [1] 15:8
**between** [3] 9:6 27:1 35:14
**bid** [1] 10:12
**bottom** [2] 20:13 22:19
**box** [1] 2:8
**bretzman** [6] 7:24 8:2,17 14:18 15:2 19:8
**briefly** [1] 20:10
**brought** [1] 2:13

**C**

**call** [4] 5:13 6:20 23:17 32:21
**called** [2] 5:15 31:18
**came** [2] 12:16 18:24
**candidate** [4] 12:23 13:15 31:5 32:11
**candidates** [7] 7:24 10:12 12:21 20:4 24:2,15 30:7
**cannot** [1] 34:4
**capone** [16] 1:12,13,13,15,15,16,17,21 2:9,15 7:15 11:6 21:22 22:22 34:22 36:14
**caption** [1] 1:10
**case** [4] 1:8 8:25 21:18 33:20
**cases** [1] 20:6
**center** [23] 4:9,12,17,23 5:15 6:8 7:1,3,4,5,20 11:15 20:19 25:13,19 27:22,24 28:17 29:6 31:10,15 33:19 34:2
**central** [1] 18:18
**certain** [1] 4:23
**change** [3] 3:4,8 29:1
**cindy** [4] 7:24 8:4,8 19:16
**clear** [1] 25:8
**collect** [1] 13:4
**come** [5] 17:15 28:19 34:15 35:15 36:11
**comes** [2] 17:20,24
**coming** [1] 28:11
**comment** [2] 35:7,17
**comments** [1] 13:2

**commission** [6] 1:12 2:8,14 3:14 4:2 6:19
**committee** [2] 16:11 18:25
**committees** [1] 12:10
**commotions** [1] 7:7
**communicate** [1] 4:19
**communication** [2] 4:9,12
**communications** [4] 7:1,19 20:19 28:12
**comparable** [1] 27:11
**completed** [2] 13:4 36:15
**completely** [1] 35:7
**computer** [2] 35:22 36:3
**concerning** [1] 23:14
**conclude** [1] 34:3
**concluded** [1] 36:2
**conclusion** [2] 12:25 13:1
**conducted** [2] 21:23 33:18
**conducting** [1] 23:6
**connection** [2] 2:12 22:25
**consensus** [2] 17:20,24
**consider** [1] 35:21
**consideration** [1] 36:1
**contacted** [3] 10:20 22:6,10
**copies** [1] 18:14
**correct** [30] 3:23 4:4 5:4,22 6:14,21,24 8:2,10,14,25 9:1,3 12:7 13:16, 18 14:15 17:22 18:1,4 21:18,19 24:5,8 26:5 29:15,16,19,20,24
**couldn't** [1] 10:17
**counsel** [5] 1:22 2:2,3,7 5:18
**court** [1] 8:25
**create** [2] 28:9 29:5
**created** [2] 12:6 25:5
**creating** [1] 27:21
**creation** [1] 29:25
**critical** [1] 34:1
**current** [1] 2:16
**customer** [2] 3:12,19

**D**

**d-u-r-b-i-n** [1] 6:17
**dale** [4] 24:13 25:16,18 26:3
**daniel** [2] 7:24 8:2
**date** [2] 1:3 32:1
**dated** [1] 20:11
**davis** [1] 7:24
**day** [2] 27:23,23
**deal** [1] 5:25
**dealt** [1] 14:12
**deciding** [1] 29:4
**decision** [3] 10:6 25:9 26:12
**decisions** [2] 33:23,23



DEPOSITION OF WILLIAM CAPONE

decline [1] 8:9
declined [3] 8:1,4,8
declining [1] 8:12
deets [2] 19:8,16
deliberating [1] 16:7
deliberation [1] 14:8
deliberations [2] 16:10,12
dennis [1] 11:6
department [3] 10:24 11:1 24:21
depend [1] 10:21
depends [2] 6:5 17:10
deponee [1] 1:12
deposition [3] 1:7 2:12 36:14
description [2] 25:4 28:1
determination [2] 24:19,20
determine [1] 11:1
determining [1] 20:4
devices [1] 28:25
dietz [6] 7:25,25 8:4,8,25 9:2
differ [1] 9:23
difference [1] 9:6
differences [1] 9:8
different [2] 16:4 27:12
difficult [2] 33:15 34:10
direct [3] 3:21 32:5,7
directions [1] 5:19
director [9] 2:18,24,25 3:3 4:1,3 5:12,21 6:8
disagree [1] 24:6
discuss [3] 13:2 26:9 32:22
discussed [2] 13:25 19:1
discussing [1] 16:7
discussion [3] 14:1,8 30:6
discussions [3] 14:5 16:12 23:13
dispute [1] 21:7
disrupted [1] 12:14
district [1] 1:9
docketed [1] 1:10
document [9] 7:8,10,14 8:16 15:11 18:23 19:10 20:14,23
documenting [1] 11:7
documents [1] 24:1
done [1] 14:4
down [1] 33:20
draft [2] 18:3,6
drafting [1] 18:1
durbin [2] 6:13,17
during [4] 4:23 11:18 13:12 14:12
duties [10] 3:7,9 25:6 28:13,15,15 31:9 33:21,24 36:5
duty [26] 4:15 5:2,3,9,10,14 7:18 11:10,15 12:5,9 20:18 25:12 26:8 27:9,22 28:2 29:2 30:1,22 31:10,17 32:11,20 35:1,23

## E

each [4] 11:21 12:22 13:23 14:3
earlier [1] 30:16
early [1] 28:23
eight [2] 24:1,18
either [1] 3:21
emergency [1] 6:23
employed [2] 3:25 7:2
employee [1] 27:17
employees [1] 27:20
ensure [1] 18:10
entry [1] 30:7
especially [1] 34:2
essential [1] 31:8
essentially [3] 5:10 26:20 27:16
estimation [1] 22:20
etc [1] 5:19
event [3] 5:12,16 6:7
events [2] 4:24 6:1
everybody [1] 18:11
everything [1] 36:8
exact [1] 8:20
example [2] 14:18 32:23
excuse [3] 1:14 7:10 31:21
executive [2] 5:11,21
exhibit [6] 7:9,10 15:12,19 20:10 21:20
experience [9] 4:8,11 26:22 31:23 32:13,16 33:7 34:8 35:10
experiences [2] 33:17 34:24
expert [1] 29:19
explain [1] 9:11
explained [1] 32:18

## F

faced [1] 28:22
facets [1] 34:6
fact [4] 32:19 33:12 34:4 35:16
factor [3] 26:11 29:1,4
facts [3] 31:19,20 32:8
factually [1] 31:11
fair [3] 34:3 35:7,16
familiar [2] 14:24 15:25
familiarity [1] 31:23
feel [1] 33:5
felt [10] 24:16 25:1,3,10,14,20 28:16 31:8 34:1 36:4
few [2] 23:25 24:17
filled [3] 8:17,20 21:2
filling [1] 20:18
finalized [1] 17:7
first [9] 8:16 9:6 12:6 14:18,21 15:24 17:12 23:25 24:17



## DEPOSITION OF WILLIAM CAPONE

five [1] 24:3
flip [1] 7:23
floor [1] 2:4
flow [1] 12:14
following [1] 32:6
form [12] 14:23,25 16:16,18 17:17,18 18:5,8 24:9 30:2,9 33:13
formed [1] 34:6
forming [1] 33:18
forwarded [1] 17:7
four [2] 7:23 16:5
fourth [1] 24:12
frame [1] 11:19
fred [5] 24:13,24 25:11,22,23
fresh [1] 14:2
function [2] 35:23,24

### G

g-e-n-e-v-i-e [1] 11:6
general [2] 9:14 20:25
generally [2] 10:22 21:4
generate [1] 19:4
generated [2] 13:7 17:19
generating [1] 17:12
gentlemen [1] 1:1
give [5] 2:12 22:13 32:3,23,24
giving [1] 25:2
got [4] 12:15 14:13 29:22 33:20
greg [1] 3:17
group [2] 12:22 13:2
guess [2] 2:21 28:7

### H

half [1] 4:7
hand [1] 1:17
happened [1] 8:5
hard [3] 21:14 32:24 34:11
harrisburg [1] 2:1
harry [23] 1:10 2:13 24:25 31:4,6,25 32:4,9,13,14,15,16,17 33:8,8,9,10,12,17,21 34:5 36:2
havrilla [1] 7:25
heads [1] 34:15
heard [1] 34:23
help [1] 11:2
helping [1] 19:25
himself [1] 33:18
hire [1] 29:22
hired [3] 1:6 8:3,23
hold [1] 2:19
honest [1] 8:6
honestly [2] 12:3 19:17

hours [3] 5:23 6:2 7:4
human [1] 24:21

### I

identify [4] 1:23 20:7 22:8,9
incident [5] 5:16,18 6:9 34:22 35:9
incidents [2] 4:20 32:22
included [1] 28:1
indicate [1] 24:2
indicating [1] 20:14
individual [2] 12:21 13:1
individuals [2] 25:8 31:14
inducting [1] 19:23
information [8] 28:11,19 29:8,13,19,23 35:20 36:6
initial [5] 12:1,4,5 14:1 23:4
initially [1] 10:6
inquiry [1] 25:25
instance [5] 11:21 21:10,11 30:11 34:5
instances [1] 31:17
interact [2] 4:16 33:10
interacted [1] 25:18
interacting [1] 31:15
interaction [3] 25:11 31:13 32:20
interview [29] 7:15,18 9:24 10:8,15,19 11:3,11,15 12:22 13:11,13,20,24,25 14:7,12 17:4,6 18:10 19:15,22 20:2,5,8 21:23 22:20 23:3 24:20
interviewed [7] 14:19 15:5,7,16,17 19:8 24:3
interviewer [7] 19:19 20:5 22:22,24 23:3 30:12,17
interviewing [7] 13:16 15:1,9,24 21:8,9 24:7
interviews [7] 12:20 13:1,7 14:13 15:22 23:5,6
introduce [1] 27:23
introduced [2] 2:10 28:16
introducing [1] 28:24
involved [2] 7:7 9:15
involvement [10] 10:4,5 12:15,19,19 20:3 32:14,17,19 33:7
issues [1] 6:23

### J

jacob [1] 11:5
january [1] 19:9
job [4] 10:11,16 25:4 28:1
joe [2] 23:10,23
joel [3] 7:24 21:21 22:8
joseph [1] 21:21
july [2] 1:3 35:12
jumper [6] 24:13,24 25:23,23 26:25 27:6

### K

katherine [1] 2:6
key [1] 27:21
kind [2] 33:5,23

DEPOSITION OF WILLIAM CAPONE 

knowing [1] 31:24

**L**

ladies [1] 1:1
lawsuit [1] 2:13
lead [9] 19:19 20:2,5 22:22,24 23:3 30:12,17 33:13
leader [4] 17:11 26:21 27:5,14
leadership [1] 25:10
learned [1] 31:19
least [3] 11:13 12:12 21:7
lebanon [1] 1:6
led [1] 34:25
legal [1] 1:18
length [1] 16:5
letterhead [1] 18:18
line [3] 22:21 28:12,20
list [1] 7:23
listed [1] 15:14
little [1] 9:10
long [4] 2:19,20,25 4:5
look [4] 7:11 8:15 20:13 23:25
lot [1] 28:7

**M**

made [5] 10:7 18:14 26:1 30:12,22
major [1] 5:16
man [1] 16:18
manage [1] 33:22
management [4] 6:9 25:9 27:24 28:15
many [12] 4:22 7:4 11:10 19:15 20:21 21:2,3 25:18,22 28:22 34:6,25
marked [2] 7:9 15:11
market [1] 2:4
marketing [3] 2:24 3:1 4:18
martin [2] 7:25 30:20
marvin [1] 2:3
matter [1] 23:14
mccool [5] 11:24 12:2,9 23:10,23
mccool's [1] 23:15
mean [16] 3:6 6:3,5,6 9:12 10:22 15:21,23 16:3,15 17:10 18:7 19:20 21:10,13 22:15
meaning [1] 12:5
media [1] 3:12
meet [2] 12:22 24:22
meeting [1] 17:15
meets [2] 17:19,23
member [4] 7:15,17 10:7 17:6
members [3] 13:11 17:3 18:10
memorialize [1] 14:4
mentioned [4] 12:11 25:21 31:7,14
mid [1] 28:23

middle [1] 1:9
mind [2] 14:3 36:11
minimum [1] 24:22
minute [1] 25:22
minutes [1] 2:11
misleading [1] 24:10
miss [4] 7:25 8:24 9:2 19:8
most [4] 19:20 26:21,22 28:8
mostly [1] 15:23
mr.mccool [1] 11:22
much [1] 7:12

**N**

name [4] 1:4 2:9 8:24 9:2
names [3] 15:24 16:1 19:9
nature [1] 13:21
necessarily [1] 33:2
necessary [4] 33:24 35:22 36:4,5
need [4] 4:19 27:23 28:9 29:21
needed [1] 28:16
neither [2] 8:24 19:7
never [2] 6:25 7:2
new [9] 25:4,5,7 28:1,9 29:5,22,22 33:25
next [1] 17:23
nor [1] 8:24
north [1] 1:25
nose [1] 32:2
notably [1] 28:8
notation [1] 30:8
note [1] 30:7
notes [3] 13:12 16:16 17:2
nothing [2] 21:16 36:12
notice [2] 20:11,23
number [4] 1:24 6:18 26:6 31:17

**O**

objecting [1] 24:9
objection [1] 35:25
observation [1] 25:14
observations [1] 33:12
observed [2] 25:19 34:5
observing [2] 31:16 33:17
obviously [3] 18:8 20:6 27:3
occasion [1] 14:16
occasions [5] 4:22 11:14,18 12:13 25:18
occupied [1] 3:22
occupy [1] 6:12
occurred [1] 5:24
occurs [1] 5:12
offered [1] 8:1



DEPOSITION OF WILLIAM CAPONE

**office** [3] 2:8 7:1 18:19

**officer** [25] 4:15 5:2,3,9,10,14 7:19 11:10,16 12:5,10 25:12 26:8 27:9, 22 28:3 29:3 30:1,22 31:10,17 32:11,21 35:2,23

**officers** [1] 20:19

**okay** [28] 3:9,15,18 6:11,22 7:7 8:15,24 9:10 10:2,3 11:4 12:14,24 13:6,23 14:21 15:13 17:14 18:13 19:24 20:10,12 21:20 22:2 23:9 26:24 33:3

**once** [4] 13:3 15:5,7,17

**one** [23] 6:18 12:1,4,5,11,11 14:3,7 15:9,14 17:3,8 18:25 19:23 27:18, 18,20,25 29:17 33:15 34:6,10 35:18

**only** [7] 15:7 17:16 24:3,11,13 29:25 32:12

**operation** [2] 11:15 29:5

**operations** [13] 1:3 6:8,22 7:1,3,4,5 27:22,24 30:1 31:10 34:2 36:16

**operator** [13] 1:1,14,16,22 5:1 26:17 27:4,8,15 28:3 29:2 30:25 36:13

**operators** [2] 26:22 27:1

**opinion** [4] 31:12 32:9 33:13 34:7

**opinions** [1] 33:18

**ops** [7] 4:17 5:15 25:13,19 28:17 31:15 33:19

**organize** [1] 19:25

**ostrowski** [7] 1:25,25 2:9,10 35:25 36:8,12

**other** [17] 9:7,13,23 11:24 12:8 13:11 14:8 16:1,5 17:2,6 18:9 27:19 28:12 30:7,19 33:22

**outside** [3] 4:20 10:12 29:17

**over** [3] 25:11 28:22 34:24

**overnight** [1] 31:18

**P**

**p.m** [1] 36:13

**pa** [2] 1:6 2:1

**page** [15] 7:13,23 8:16 9:3,6,7 11:5 14:22 16:19,19,20 21:20 22:19 24:4,12

**pages** [2] 23:25 24:17

**panel** [14] 7:15,18 12:17,17 17:19,23 20:17 21:25 22:3,7,12 23:11,15 24:20

**panelist** [2] 19:1 26:7

**park** [1] 1:6

**part** [1] 35:23

**participate** [2] 22:12 23:11

**participated** [5] 9:24 11:11,14 20:17 26:7

**participating** [4] 11:2 21:1 22:7,16

**pc** [1] 36:3

**pennsylvania** [7] 1:9,11 2:7,14,17 4:6 6:19

**people** [6] 10:11 20:8 24:12,18,22 33:22

**perform** [2] 31:9 33:24

**period** [1] 27:5

**person** [7] 4:17 5:25 11:7 20:7 21:22 28:14 33:10

**personal** [3] 25:1,2,14

**personnel** [2] 16:20 23:7

**persons** [1] 13:24

**pertinent** [1] 30:18

**philadelphia** [1] 2:5

**phone** [4] 1:24 4:16 31:18 32:3

**physical** [1] 9:7

**picking** [1] 32:1

**place** [1] 29:23

**placed** [2] 18:9 19:10

**placing** [1] 30:8

**plaintiff** [2] 1:8 2:2

**players** [1] 9:13

**please** [2] 1:17,22

**point** [10] 6:18 9:12 10:10 12:16 14:13,16 21:7 26:1 30:23 33:15

**position** [34] 3:5,21 5:6 6:13 7:18,19 8:1,5,7,9,13,18,20 9:21,23 10:24 11:16 12:6 16:4 24:16 25:4,5,7 26:8,17 27:7,9,22 28:10 29:5 32:11 33:14,25 34:9

**positions** [10] 4:14 10:13 11:10,13 20:15,21 21:2,3 24:7 30:1

**possessed** [4] 25:15,20 31:7 35:22

**possible** [3] 19:7,12,13

**post** [1] 2:8

**posted** [3] 10:11,16 21:4

**pr** [1] 1:7

**predecessor** [1] 27:9

**preliminary** [1] 30:12

**preparation** [1] 19:22

**preparations** [1] 23:5

**prepare** [2] 13:4 20:1

**prepared** [2] 13:20 30:15

**prepares** [1] 17:4

**preparing** [1] 23:7

**presence** [1] 4:22

**pretty** [1] 14:10

**previously** [3] 23:2 25:21 31:8

**primarily** [1] 10:23

**primary** [3] 6:7,10 27:25

**prior** [3] 2:23 3:24 12:1

**probably** [2] 3:2 12:12

**problems** [1] 27:18

**proceeding** [1] 1:18

**process** [19] 9:11,13,18,22,25 10:2,11 11:3 12:15 13:3 14:9,12 15:20 16:3 19:2 21:1 22:21 23:1 30:19

**processes** [1] 9:20

**promotion** [2] 3:4 14:22

**proposal** [1] 18:25

**provide** [1] 11:23

**ptt** [1] 18:13

**public** [4] 2:18 3:3,12 4:18

**put** [2] 18:7 34:14



DEPOSITION OF WILLIAM CAPONE

| Q |
| --- |

**quairoli** [1] 21:21
**qualifications** [2] 24:23,24
**qualified** [5] 24:1,16,18 33:14 34:8
**question** [12] 18:21 21:15 22:14 29:12 32:5 33:1,5 34:12 35:11,14, 18 36:10
**questionnaire** [2] 13:17,18
**questions** [6] 1:20 13:8,10 23:18,20 26:3

| R |
| --- |

**radio** [10] 26:17,21,25 27:3,8,15 28:3,12 29:2 30:25
**raise** [1] 1:17
**rating** [1] 5:1
**re-org** [1] 3:8
**really** [5] 10:17 14:24 27:2,20 30:10
**reason** [4] 21:6,17 24:6 28:9
**reasons** [1] 27:21
**recall** [34] 7:17 8:4,5,12 11:4,7 12:3 13:22 15:1,16,20,21,23,25 16:7,9 19:17 20:16,20 21:13 22:2,17 23:12,16 26:2,10 27:2,6 30:4,10,14 34:19, 21 35:9
**recognize** [1] 14:21
**recollection** [3] 15:8 16:2 21:24
**recommend** [2] 24:11 31:5
**recommendation** [11] 13:5 14:14,17 17:13,16 18:3,6,12 23:7 30:13,16
**recommendations** [6] 16:6,8,13,14 17:5,14
**recommended** [3] 16:20 30:7 32:10
**record** [4] 1:24 17:2 34:17 35:11
**recorded** [1] 16:13
**records** [1] 13:7
**refer** [1] 27:14
**references** [1] 7:14
**referring** [1] 16:18
**relations** [3] 3:12,12,13
**relatively** [1] 25:5
**remember** [3] 15:9 28:21 35:12
**report** [5] 3:16,17,21 6:7,10
**required** [3] 4:23 25:8 28:14
**requirements** [2] 27:21 28:13
**resource** [1] 24:21
**respect** [3] 15:19 26:3 35:19
**responsibilities** [7] 3:7,10 19:18,21 25:7 27:25 33:25
**responsibility** [2] 17:9,25 30:18
**responsible** [5] 3:11 10:23 17:12 23:4 30:3
**review** [1] 18:9
**reviewed** [1] 17:6
**reviews** [2] 17:20,24
**richards** [1] 3:17
**rodriguez** [1] 1:5

**role** [2] 4:14,18
**rotating** [1] 5:13
**rule** [1] 20:25
**run** [2] 5:16,16

| S |
| --- |

**same** [3] 3:7 25:17 26:3
**saw** [2] 32:1 33:9
**saying** [2] 22:11 34:19
**says** [2] 7:10 18:18
**scheduled** [1] 12:21
**scheduling** [1] 23:5
**second** [2] 9:3,7
**see** [1] 34:15
**seek** [1] 5:18
**seen** [2] 18:15 20:22
**selection** [5] 8:9 9:24 12:10 22:20 26:7
**senior** [20] 4:15,25 5:2,3,9,10,14,25 6:4 25:12 26:17,25 27:8,13,14,15 28:3 29:2 31:16 32:20
**seniority** [1] 26:23
**serve** [3] 5:5 12:9 26:20
**served** [2] 26:25 27:4
**serves** [1] 5:11
**service** [3] 3:19 27:1 29:19
**services** [2] 4:1,4
**set** [3] 13:9 14:11 29:14
**share** [2] 13:2,2
**sharp** [2] 2:6,6
**sheet** [1] 15:25
**shift** [3] 26:20 27:4,13
**shifts** [1] 26:21
**should've** [1] 32:2
**show** [3] 7:8,9 13:8
**showed** [1] 24:17
**signatures** [1] 18:8
**since** [6] 3:2,22,23 4:15 5:7 28:23
**single** [3] 34:4,5 35:16
**sit** [1] 16:25
**skills** [8] 25:10,15,20 26:13 31:7 35:22 36:3,3
**someone** [7] 10:22 16:15,16,25 17:1,25 22:10
**speaking** [1] 21:5
**specific** [10] 9:17,19 10:5 12:19 15:20 16:1 33:16 34:11,22 35:9
**specifically** [8] 14:23 16:9 19:23 20:20 21:14 28:21 30:4 31:3
**spell** [1] 6:15
**spent** [4] 7:4 25:13 31:14,16
**split** [1] 11:9
**spruce** [1] 1:5
**staff** [1] 29:22
**stand** [1] 9:12

by ETS Inc.



DEPOSITION OF WILLIAM CAPONE

standard [2] 13:9 14:10
start [1] 10:4
started [1] 28:24
stated [1] 23:2
states [1] 1:9
stationery [1] 18:18
stead [1] 5:25
stenographer [1] 6:15
still [2] 5:7 6:3
street [2] 2:1,4
strictly [1] 29:14
strong [1] 25:9
subpoena [1] 11:5
successfully [1] 31:9
suitable [1] 35:1
sullivan [2] 21:21 22:8
summary [1] 13:20
superfluous [1] 34:18
supervising [1] 27:19
supervisory [1] 28:15
support [1] 32:9
supported [1] 31:11
suspending [1] 36:15
swear [1] 1:19
system [7] 28:19 29:8,13,23 35:20,20 36:6
systems [1] 28:11

### T

talked [1] 14:3
team [11] 10:8,15,19,22 11:15 13:11 17:4,7 18:10 20:3,9
teams [1] 11:11
terms [6] 10:18 11:12 16:4 17:11 27:19 28:13
testified [1] 35:19
testimony [1] 35:4
themselves [1] 11:23
there's [5] 5:12,14 15:11 28:7 29:17
third [5] 7:13 11:5 21:20 22:21 24:3
though [1] 30:16
three [9] 2:10 11:14,17 12:12 13:24 20:15,18 21:8 24:7
title [3] 2:20,21 3:8
today [1] 2:12
today's [1] 1:3
together [1] 34:15
took [1] 24:12
total [1] 4:5
tough [1] 35:5
traveler [8] 4:1,3,4 28:11,18 29:13,19,23
traveler's [1] 29:8
travelor [2] 35:20 36:6

trial [3] 34:13 35:11,14
tried [1] 32:7
truthfully [1] 1:19
trying [4] 6:11 18:22,23 33:4
turn [1] 7:11
turnpike [13] 1:11 2:3,7,14,17 4:14,21 6:19 12:2 28:25 29:15,18 33:6
twenty-four [1] 4:7
two [7] 2:10 12:12 15:24 16:1 24:11,14,15
type [4] 6:23 16:17 17:1 25:23
typewriter [1] 16:25
typically [3] 12:25 13:12 30:17
typing [3] 26:9,13 30:3

### U

ultimately [4] 8:22 13:3 17:4 23:6
um-hmm [1] 7:16
um-hum [1] 22:23
umm [11] 8:15 11:17,23 14:16 15:1 19:7 21:6 22:2 25:1 26:6 27:16
under [1] 3:19
understand [12] 1:18 2:11 6:12 8:17 10:14 18:20,23 27:7 29:11 32:25 33:4,5
understanding [7] 9:5,14 23:10 25:3,6 26:16 31:2
unit [1] 27:17
united [1] 1:8
until [2] 14:13 17:19
up [7] 9:10 12:16 17:1 29:14 30:3 34:16 35:15

### V

vacancies [3] 21:4,9 22:11
vacancy [2] 20:11,23
vacant [4] 20:15,18,18,21
varies [1] 17:10
various [3] 4:13,13 28:25
via [1] 4:16
video [9] 1:1,2,7,7,14,16,22 36:13,15
view [2] 25:2 33:20
vs [1] 1:11

### W

wanted [1] 11:2
way [2] 17:2 33:11
week [1] 6:20
weekends [1] 5:23
weekly [1] 5:14
weinberg [9] 2:3,4 24:9 32:25 34:17,21 35:4,18 36:7
whatever [2] 14:11 27:14
whether [9] 12:16 15:16 19:13 22:17 26:24 27:6 30:15 33:20 35:21
wickerd [5] 24:13 25:16 26:4,25 27:3
will [2] 1:22 6:15
william [9] 1:12,13,15,16 7:14 11:5 21:22 22:22 36:14

by ETS Inc.



DEPOSITION OF WILLIAM CAPONE

**williams** [14] 1:11 2:13 24:25 31:4,25 32:4,9 33:8,8,9,10,12 35:1,21
**willing** [1] 11:9
**within** [1] 27:24
**words** [1] 25:22
**work** [2] 13:10 29:10
**worked** [2] 6:25 7:3
**working** [2] 29:9,9
**works** [1] 9:11
**world** [1] 4:20
**worthy** [2] 31:4 32:10

---

### Y

**year** [1] 2:22
**years** [4] 4:7 25:12 28:22 34:25

by ETS Inc.

williams - years

## CERTIFICATE OF SERVICE

I, Andrew J. Ostrowski, Esquire, hereby certify that I have served a true and correct copy of the foregoing document by depositing the same in the U.S. Mail, first class, postage prepaid, addressed as follows:

        John C. Romeo, Esquire
        Fox, Rothschild, O'Brien & Frankel
        2000 Market Street, Tenth Floor
        Philadelphia, PA 19103-2706

By_____
    Andrew J. Ostrowski, Esquire

Dated: September 24, 2002